1                        - VOLUME A -

2              IN THE UNITED STATES DISTRICT COURT

3              IN AND FOR THE DISTRICT OF DELAWARE

4                          - - -

5
    SENJU PHARMACEUTICAL CO.,      :    CIVIL ACTION
6   LTD., KYORIN PHARMACEUTICAL    :
    CO., LTD. and ALLERGAN,        :
7   INC.,                          :
                                   :
8                   Plaintiffs,    :
                                   :
9        vs.                       :
                                   :
10  APOTEX INC. and APOTEX         :
    CORP.,                         :
11                                 :
                    Defendants.    :    NO. 07-779 (SLR)
12

13                             - - -

14                        Wilmington, Delaware
                          Tuesday, January 12, 2010
15                        9:35 o'clock, a.m.

16                             - - -

17  BEFORE:  HONORABLE SUE L. ROBINSON, U.S.D.C.J.

18                             - - -

19  APPEARANCES:

20           MORRIS, NICHOLS, ARSHT & TUNNELL
             BY:  MARYELLEN NOREIKA, ESQ.
21

22                      -and-

23

24                             Valerie J. Gunning
                               Brian P. Gaffigan
25                             Official Court Reporters

1    APPEARANCES (Continued):

2

3              OBLON, SPIVAK, McCLELLAND, MAIER & NEUSTADT,
               L.L.P.
4              BY:  RICHARD D. KELLY, ESQ. and
                    STEPHEN G. BAXTER, ESQ.,
5                   FRANK J. WEST, ESQ. and
                    ALEX GASSER, ESQ.
6                   (Alexandria, Virginia)

7

8                    Counsel for Plaintiffs

9

10

11             MURPHY & LANDON
               BY:  FRANCIS J. MURPHY, ESQ.
12

13                       -and-

14

15

16             LOCKE LORD BISSELL & LIDDELL LLP
               BY:  ALAN B. CLEMENT, ESQ.
                    (New York, New York)
17

18                       -and-

19

20             LOCKE LORD BISSELL & LIDDELL LLP
                    BY:  SCOTT B. FEDER, ESQ.,
                    DAVID B. ABRAMOWITZ, ESQ. and
21                  PATRICK C. GALLAGHER, ESQ.
                    (Chicago, Illinois)
22

23                   Counsel for Defendants

24

25                       - - -

1    ALSO PRESENT:

2

           JAPAN AMERICA, INC.
3          MASAKO SHO WINKLER,
           INTERPRETER/TRANSLATOR

4

5          SATOKO (SOPHIE) UTSUNOMIYA
           CONFERENCE INTERPRETER

6

7                    - - -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      P R O C E E D I N G S

 2

 3                 (Proceedings commenced in the courtroom,

 4      beginning at 9:35 a.m.)

 5

 6                 THE COURT:  Good morning, counsel, and everyone.

 7                 I will let you make reintroductions, if you care

 8      to, and then I assume you might have some opening statements

 9      to offer.  Most counsel don't take -- well, they do take

10      advantage of that opportunity.

11                 MR. KELLY:  Plaintiff does, your Honor.

12                 MR. CLEMENT:  As does defendant.

13                 THE COURT:  Should we just begin then, or Ms.

14      Noreika, reintroduce everyone?

15                 MS. NOREIKA:  Your Honor, Mary Noreika from

16      Morris Nichols.  With me is Richard Kelly from Oblon Spivak

17      firm, Stephen Baxter and Frank West.  And we do have some

18      clients here as well, your Honor, and Mr. Kelly can

19      introduce those.

20                 MR. KELLY:  Yes, your Honor.  From Allergan, we

21      have the Vice President and Chief Patent Counsel, Deborah

22      Condino; Mr. William Scarf, who's our litigation counsel.

23      We also have representatives from the plaintiffs in this

24      case.  From Senju, we have a Mr. Morita, a Ms. Tashida, and

25      from Kyorin, we have Dr. Shiitake and Dr. Soya.
```

1            THE COURT:  Welcome all.  Thank you very much.

2            MR. MURPHY:  Good morning, Francis Murphy of

3   Murphy & Landon are for the defendants.  I have with me

4   Allen Clement, Scott Feder, Dave Abramowitz, Patrick

5   Gallagher.  I didn't know if they wanted to do any

6   additional introductions.

7            MR. CLEMENT:  That's fine.

8            THE COURT:  All right.  Well let's start with

9   plaintiffs' counsel, then.

10           MR. KELLY:  Good morning, your Honor.

11           THE COURT:  Good morning.

12           MR. KELLY:  This case involves United States

13   patent 6,333,045, which is JTX-1, which is co-owned by

14   Kyorin Pharmaceutical and Senju Pharmaceutical, and

15   exclusively licensed to Allergan.

16           The '045 patent is directed to a, what we call

17   gatifloxacin pharmaceutical composition, aqueous

18   composition.  Gatifloxacin is an antibiotic, a broad

19   spectrum antibiotic, which is quite widely used in the

20   ophthalmic field.

21           The key point of the patent is discovery by the

22   inventors, Dr. Yasueda and Mr. Inada, that EDTA coupled with

23   gatifloxacin provided for some unique properties.  There was

24   enhanced stability of the solution.  There was enhanced

25   corneal permeability of the solution, which could not have

1    been predicted.  Plaintiffs have asserted claims -- six

2    claims.  Claims 1 to 3, 6, 7 and 9, as shown in our PTX-182.

3    That's the patent.

4                   Go to PTX-182, Chris.

5                   And you can see the claims.  The claims have

6    admitted -- the plaintiffs have admitted infringement if the

7    claims are found valid, if 1 to 3 and 9.

8                   This admission is very easy to understand when

9    you realize Apotex has internally acknowledged that the use

10   of the application of EDTA would be infringing on the

11   patent.  Apotex has asserted in its ANDA and seeking

12   regulatory approval that its product is both quantitatively

13   and qualitatively the same as Allergan's Zymar, which is an

14   aqueous eyedrop formulation of gatifloxacin with EDTA.

15                  Apotex has further told the FDA that it's

16   formulation was obtained by copying Zymar.

17                  Can we go to 746, please.

18                  And you can see that they deliberately designed

19   it to have the same formulation of ingredients in terms of

20   both quantities and qualities, which is what's going to be

21   at issue here.  Thus, the only infringement issue is that of

22   Claim 6 and 7.  But even here, Apotex's admission will

23   simplify the analysis.

24                  If you could bring up PTX-182, second page.

25                  In admitting infringement of claims 3 and 1,

1    they have admitted half of the requirements of claims 6 and

2    7.   Namely, that they do incorporate disodium edetate -- and

3    I'm often going to refer to that as EDTA, your Honor, to

4    make it easier for me -- in its eyedrop solution.   And they

5    also have admitted that they incorporate EDTA into more

6    generally their liquid preparations.

7              So the issue is going to be whether or not the

8    plaintiffs here have provided sufficient evidence that in

9    the Apotex product, the EDTA, serves to raise the corneal

10   permeability of the gatifloxacin.   Corneal permeability

11   is important because you want to get the drug into any

12   infected tissue.   And this becomes -- so this is an

13   important aspect.

14             The second thing that we have to prove is that

15   in the Apotex formulation, we prevent the precipitation of

16   crystals.   Now, your Honor may remember that the preventing

17   is a claim term at issue here, but we submit that preventing

18   does not mean a hundred-percent prevention, because if

19   that's the case, then one of our examples, which underlines

20   claim 8, is no longer within the scope of the claim.

21             Now, plaintiffs are going to show infringement

22   of claim 6 with testing done long prior to this dispute.

23             If you could bring up 186, Chris.   PTX-186.

24   There we go.

25             The testing that we're going to be relying upon

1    that's reflected in JTX-24, we also have a JTX-25, 30, 31,

2    88, was all done prior to any dispute.  And much of it was

3    done as part of the development work at Senju of the

4    formulation in question.

5         Now, the difference between these tests and what

6    the plaintiff has is that in our testing, the control

7    solution did not contain BAK.  However, Senju had already

8    determined that back had no impact on gatifloxacin corneal

9    permeability formulation.  And this was a determination

10    that was made again during the development phase of the

11    product.

12         So we submit that the inescapable conclusion

13    from the totality of the evidence, not a single test, a

14    series of tests performed at different times, lead to the

15    conclusion that EDTA is improving the corneal permeability

16    of the gatifloxacin in the Apotex formulation.

17         With respect to claim 7, we're going to

18    demonstrate infringement with testing done in the late

19    nineties, which was a development work, as well as testing

20    done for this litigation on a formulation which is identical

21    to Apotex's.  And Apotex would have the Court believe that

22    this testing was not on their product, but that cannot be

23    true.

24         As Apotex has represented its product as both

25    quantitatively and qualitatively the same as Zymar, as we've

1    seen, and, indeed -- bring up PTX-139.  Apotex sought and

2    received a waiver of bioequivalents-required testing because

3    it contains the same active and inactive ingredients in the

4    same concentration as Zymar.

5             And you can see comparison.  And if you go down

6    below.  Do we have the bioequivalency one?  I think that may

7    be 740.  There it is.

8             And you can see in getting the bioequivalent

9    waiver, again, they're representing to the FDA who's going

10   to look at their product for safety, putting it in their

11   eyes, it's the same.

12            Fundamentally, when you look at everything,

13   you're going to see that the formulation that was tested

14   falls foursquare within the product Apotex is authorized to

15   sell under its ANDA.  But perhaps the most telling thing is

16   that Apotex could have avoided infringement in this case if

17   it was correct that EDTA had no effect by simply omitting

18   EDTA from its formulation, but it couldn't because it does

19   have an effect.

20            Thus, for Apotex to succeed, they have to prove

21   that the '045 patent is invalid.  And while the claim

22   composition may appear to be simple, it was neither easy nor

23   obvious to arrive at such a composition.

24            Our expert, Dr. Stella, renowned expert in

25   formulation, will describe for the Court the challenges that

1    one faces in trying to formulate a drug so that it can be

2    effectively administered.

3             Apotex would have you believe that formulating

4    gatifloxacin was simple because it's a fluoroquinolone

5    having structural similarities to other fluoroquinolones.

6    We'll acknowledge that it has structural similarities, and

7    that these have been previously formulated.  However, in

8    doing so, Apotex belittles the fact that the examiner had

9    that type of information in front of him.  He had the best

10   prior art.  Apotex ignores the fact that the prior art

11   demonstrates that different fluoroquinolones behave quite

12   differently in the presence of additives.

13            One fluoroquinolone may be very, very happy to

14   be in the solution with sodium chloride, such as

15   gatifloxacin is, while a related fluoroquinolone, very

16   close, lomefloxacin, you're not putting very much in there.

17   There's a tremendous difference in the solubility of

18   lomefloxacin in the most common tonicity agent, sodium

19   chloride, which is markedly different from that of

20   gatifloxacin, so you simply cannot make assumptions in the

21   formulation area.

22            Structurally similar fluoroquinolones have very

23   different solubility.  And you can see this in the graph.

24   Each one of those curves represents a solubility that is

25   approximately ten times that of the one underneath it.

1           So here are three structurally similar

2    fluoroquinolones, each demonstrating a very different

3    solubility.  Ofloxacin is about ten times more soluble than

4    norfloxacin, which again ten times more soluble than

5    ciprofloxacin.  And we have a large scale on the Y axis.

6           Furthermore, Apotex's own data that was

7    submitted to the FDA, and if you bring up 187, again, shows

8    that gatifloxacin behaves differently.  This is the

9    solubility curve imposed on the figure in the Firestone

10   article, which shows that gatifloxacin solubility is

11   measured by Apotex.  It's doing some very strange things.

12   It does not look like the others.  You just can't make a

13   prediction.

14          Now, the centerpiece of Apotex's defense is the

15   Grass reference.  Now, this is an article which is cited

16   right in the patent, described in the patent.  And this

17   does, and we've admitted it, demonstrate that EDTA, a half

18   a percent, increase the corneal permeability of glycerol.

19          Now, we acknowledge that in the patent.  And the

20   invention here, as described in JTX-1 at Column 2, lies in

21   discovery that they're able to achieve that effect of

22   increasing permeability of gatifloxacin, a very different

23   compound than glycerol, at lower concentrations.

24          So this is what the difference is between the

25   general teaching of Grass and us.  Grass would have you at

1    half a percent, we're much lower and we're very effective,

2    which is surprising because in vivo, you don't have a lot of

3    time for the drug to sit on the eye before it is washed out

4    as you blink.

5            Now, Apotex's position on precipitation is so

6    weak, we've had our little discussions on what the term

7    "preventing" means in claim 6 and claim 7.

8            To the extent that we would wind up excluding

9    from the scope of claim 8 the example underlying it, there

10   is not a single reference, your Honor, that they're going

11   to bring in which suggests the use of EDTA to prevent or

12   suppress the precipitation of any drug, let alone a

13   fluoroquinolone.

14           The reference that they rely upon, Riley, is

15   not directed to adding small qualities of anything.  Riley

16   proposes that you modify the drug substance itself by making

17   it a salt form, and it is the salt form that you dissolve

18   into the solution.  That's different than what is required

19   by the claimed method.

20           Furthermore, Riley's data itself shows that not

21   all additives are equal.  Some additives have no effect,

22   some additives have a little bit of an effect and some

23   additives take you the wrong way to virtual insolubility.

24   So Riley is simply irrelevant to the compositions here.

25   Riley relies upon being able to convert all the material

1    into a salt and dissolving it into water, whereas we have,

2    in the compositions at issue, there simply isn't enough EDTA

3    there to function the way Riley says its functioning.  Yet,

4    we're able to see an effect.  We know that something is

5    happening between EDTA and gatifloxacin.

6              You are going to hear about the invalidity,

7    purported invalidity of non-asserted claim 8.  Since it's

8    not non-asserted, I'm going to skip it.

9              In considering the issue of validity, you have

10   to consider the issues of secondary considerations.  The

11   fact that EDTA has a favorable impact on corneal

12   permeability was something that was not predictable.  It's

13   certainly something you are not going to find discussed in

14   the prior art as a rule.  Most of the art they're going to

15   talk about, which suggests the possibility of using EDTA, I

16   want to put it suggested as part of a laundry list of

17   chelating agents.

18             As I said before, corneal permeability is

19   important because it is a measure used in the pharmaceutical

20   industry to determine how effective a particular ophthalmic

21   solution will be.

22             It was demonstrated to significantly improve the

23   corneal permeability, something not taught for other

24   fluoroquinolone solutions.

25             Can we have PTX-186, Table 10.  Indeed, the use

1    of EDTA allowed Senju to produce a formulation which had

2    the same corneal permeability penetration as a competing

3    fluoroquinolone, levofloxacin.  You can see that with the

4    absence of EDTA, gatifloxacin was, significantly less amount

5    was introduced into the aqueous humor of the eye -- that is

6    the measure we're using -- and when you added the EDTA, they

7    became, that gatifloxacin became better.  That is something

8    that is not going to see predicted anywhere.

9         The next thing which is related to claim 7,

10   improves the resistance of gatifloxacin solutions to

11   precipitation.  Now, precipitation is important here because

12   the material precipitates in a bottle.  When the patient

13   administers it, they're not going to be getting the desired

14   dose, they'll be getting less.  That can complicate your

15   treatment.  You may not kill all the microorganisms, and

16   worse yet, some microorganisms that are present may mutate

17   to resistant microorganisms.

18        Now, Apotex, like many defendants, all too

19   often is asserting Senju committed inequitable conduct in

20   prosecuting the '045 patent.  We have one allegation, the

21   Inada declaration is not a fair declaration to the Patent

22   Office.  However, all the data we had in that example was

23   presented to the Patent Office.  And it was an accurate

24   reproduction of the prior art.  Their complaint is really

25   that the Patent Office should have rejected it because it

1    wasn't good enough.  The examiner had it.  He could have

2    made that determination.

3         Apotex, for reasons which we don't fully

4    comprehend, are inserting the inventors withheld the best

5    mode because we did not disclose alternative methods for

6    mitigating the coloration of the gatifloxacin solution.

7         Now, these methods were not as good as the

8    method actually disclosed and used in the patent.  Somehow,

9    they are getting into the minds of the inventors and saying

10   that the inventors and something else to be the best mode.

11        We have an allegation of a lack of enabling

12   disclosure.  However, in making that argument, the experts

13   are ignoring the teachings in the patent.  They want to take

14   the claims and rip them out of the patent and consider them

15   in a vacuum.  The '045 patent is not directed to any aqueous

16   gatifloxacin, but to an aqueous pharmaceutical composition.

17        In discussing solubility -- if you could bring

18   up -- the '045 patent describes conditions for which it is

19   attempting to improve solubility.  And that is at, that's

20   PTX-1, at Column 2, Lines 5 to 15.  And highlight that first

21   full paragraph.

22        And here, we're acknowledging the pH, which

23   is one of the issues they have, has an effect on the

24   solubility.  And what we're looking for to improve is to

25   have an impact on the solubility of gatifloxacin at the

1    desired concentration.

2              And people are going to recognize that if you

3    run too much gatifloxacin in there so it can't go into

4    solution, the EDTA is not going to do you any good.  And

5    similarly if you use a very low concentration of EDTA -- of

6    gatifloxacin, EDTA may not exhibit in the usual test

7    conditions an effect but that doesn't mean we don't enable

8    what we've done.

9              Apotex also asserts inequitable conduct because

10   Senju admitted some coloration data from the table in the

11   patent which showed the EDTA at low concentrations, below

12   that taught in the specification, did not prevent

13   discoloration.

14             The data in the patent demonstrated that EDTA

15   contents equal to or above the concentrations taught,

16   discoloration was prevented.  So over the range that we

17   teach, we demonstrated coloration was prevented.  The two

18   experiments in question were below the claim or below range.

19             Further, Apotex argues that Senju did not

20   provide the USPTO with all its corneal permeability data.

21   This is a red herring.  All of the tests show that Senju had

22   that EDTA improved the corneal permeability of gatifloxacin.

23             That is PTX-186, please.

24             All of these tests are consistent.  The tests

25   that were in existence at the time the prosecution of this

1    case was ongoing, which are described in JTX-24, and JTX-8,

2    were all consistent.  We didn't hide anything.

3              Now, they also argue that somehow, because we

4    did not provide the examiner with the number of eyes

5    underlying the data in Table 2 that we've somehow kept the

6    examiner from doing his job correctly.

7              Could you bring up JTX-1 with Table 2.

8              And Table 2 is the table where we demonstrated

9    corneal permeability, and the issue is we didn't tell them

10   how many eyes were used in each test.

11             Now, first off, these tests weren't run for the

12   Patent Office.  They were run and relied upon by Senju in

13   developing the formulation.  But what is more telling is

14   that the lack of intent here.  If Senju had wanted to

15   deceive, we would have shown a higher value for Formulation

16   C.  We calculated two penetrations:  the low one which was

17   reported and the higher one which was not reported.  We were

18   not out to deceive anyone.  And we did give the examiner the

19   standard deviation.

20             In the end, Apotex's inequitable conduct

21   allegations are bankrupt.  Plaintiffs submit that the

22   evidence will show the patent is infringed, the patent is

23   not invalid and an injunction should issue.  Thank you.

24             THE COURT:  All right.  Thank you very much.

25             MR. CLEMENT:  Good morning, your Honor.

1          THE COURT:  Good morning.

2          MR. CLEMENT:  My name is Alan Clement from the

3    FIRM of Locke Lord Bissell & Liddell.  I represent Apotex,

4    and I'm going to give the opening statement.

5          May we have the next slide?  I'm going to go

6    through this pretty quickly.  I think we all know why we're

7    here.

8          Apotex filed an Paragraph 4 certification

9    against the '045 patent.  Senju and Kyorin has sued as

10   co-assignees and Allergan has sued as the allegedly

11   exclusive licensee and ANDA holder.

12         Okay.  The reason that Apotex should win, your

13   Honor.  Apotex should win this case because all of the

14   claims in dispute are obvious.  The patent is simply

15   invalid.  I think that, you know, the fact that they're

16   trying to import limitations into the claim amount the

17   amount of disodium edetate speaks volumes about that.  They

18   know these claims are invalid.  They need to import new

19   limitations that shouldn't be there.  They're not in the

20   claim.

21         Regarding claims 6 and 7, the method claims,

22   Apotex is also going to present a defense that the asserted

23   method claims are not infringed.  That is only if the

24   preambles are in the limitation, the corneal permeability

25   and the preventing precipitation.

1            Apotex is also going to present a defense that

2     the patent is unenforceable for failure to disclose material

3     information.

4            And finally, your Honor -- and that material

5     information is not as Mr. Kelly has said.  It's information

6     they didn't disclose that directly contradicts statements in

7     the patent.  He can say that the inventors just did it for

8     their own research but when they put it into the patent,

9     they did it for patentability purposes.

10            Method claims 6 and 7 additionally are invalid

11     under 35 U.S.C. 112 for nonenablement to the full scope.

12            Okay.  What are the claims here?  And there are

13     a couple different types of claims.

14            The first one, I'm going to talk about

15     obviousness, and we have to separate the claims into two

16     different types, composition claims and method claims.  And

17     because, your Honor, as you will recall, a couple weeks ago

18     we did have a Markman hearing here and we discussed a few

19     terms.  We're going to try to cover the obviousness in any

20     way that you might choose to construe the claims.  We think

21     it's obvious no matter how it's construed.

22            So we're going to look at the composition claims

23     1, 2, 3 and 9, with and without plaintiffs' proposed EDTA

24     disodium edetate concentration limitation.

25            And likewise regarding the method claims, we're

1    going to look at them with and without the limitation in the

2    preamble, with and without the disodium edetate

3    concentration limitation, with and without the statistical

4    significance limitation on claim 6, and we're going to look

5    at it with the claim term "prevention" read as prevention.

6    Prevent means prevent, as Apotex asserts, or as plaintiffs

7    would like to change the claim to resistance, as they assert

8    in claim 7 for precipitation.

9            Okay.  Let's look at -- first I want to talk

10   about the claim compositions in dispute.  What are the

11   composition claims?  Claims 1, 2, 3 and 9.

12           Claim 1 has basically three limitations, your

13   Honor, with possibly a fourth.  It's got to be an aqueous

14   liquid formulation.  Gatifloxacin, disodium edetate and then

15   possibly this disodium edetate concentration limitation.

16           And the dependent claims, 2, 3 and 9, those just

17   merely add limitations regarding the pH, eyedrops.  And 9

18   says eye drops at certain pHs.

19           Okay.  Your Honor, defendants have the burden of

20   proof on obviousness.  It's their burden to prove.  And how

21   they prove obviousness is you go through the **Graham v John**

22   **Deere** factors, which I'm sure your Honor is familiar with,

23   level of skill in the art, scope and content of the prior

24   art, the differences between the art and the claimed

25   invention, and then we have to take into account secondary

1    considerations.

2                Okay.  Who is the person of ordinary skill in

3    the art?  Your Honor, the person of ordinary skill in the

4    art here is a formulator who is a Ph.D. with a few years of

5    experience or a lesser degree with a much more experience,

6    who knows that, one, fluoroquinolones are structurally

7    related, and as such, structurally related fluoroquinolones

8    can be simulated -- can be formulated in similar manners,

9    including aqueous formulations, such as eyedrops.  There may

10   be small differences in the solubility and different

11   buffers, as Mr. Kelly tried to show in the Firestone

12   reference, but they're all basically similar when it comes

13   to formulation.  Apotex's expert, Dr. Myrdal, is going to

14   speak to that.

15               Also, the person of ordinary skill in the art

16   will know that the eyedrops with structurally related

17   fluoroquinolones are known to use certain excipients.  Same

18   group of certain excipients:  pH buffers, isotonizing

19   agents, such as salts, and multipurpose excipients, such as

20   disodium, which is a known corneal permeability.  It has

21   been used over and over in formulations, your Honor,

22   throughout time, at the time the '045 patent.

23               As a matter of fact, I think the amount

24   limitation speaks to that.  They want to say it's an amount

25   of the disodium edetate because they know disodium edetate

1    is just a typical excipient that's used in eyedrop

2    formulations.

3            What is the prior art that's before us?

4    Basically regarding the composition claims, Apotex is going

5    to rely on and assert three references:  The 456 patent, the

6    '470 patent, and the '465 patent.

7            The '456 patent, your Honor, was not before the

8    Patent Office.  The Patent Examiner never had a chance to

9    consider that one.  That's the primary reference we're

10   relying on here.  And, your Honor, what does that patent

11   teach?  That teaches that five other structurally related

12   fluoroquinolones -- gatifloxacin is a fluoroquinolone --

13   can be made into eyedrop formulations with disodium edetate.

14           THE COURT:  Is that the Grass reference, just so

15   I --

16           MR. CLEMENT:  No.  The Grass reference we'll get

17   to later.

18           THE COURT:  Okay.

19           MR. CLEMENT:  We're not relying on the Grass

20   reference to invalidate claim 1.  That is when we get to --

21   corneal permeability really isn't a part of claim 1.

22   Claim 1 is really a simple composition claim.  The '470

23   patent teaches gatifloxacin is a fluoroquinolone and can be

24   formulated into eyedrops with conventional excipients.  The

25   '465 patent, which was a patent that was before the

1    examiner, taught that one fluoroquinolone, lomefloxacin, can

2    be made into eyedrop formulations with disodium edetate as

3    an excipient.

4         Okay.  So what are the differences between the

5    prior art and the composition claims?  Apotex will show that

6    disodium edetate, as I've said, is used in eyedrop

7    formulations with structurally related fluoroquinolones, but

8    it just had never been used with gatifloxacin.  Otherwise,

9    we'd be here on anticipation case.

10        Gatifloxacin, however, was a very well-known

11   fluoroquinolone at the time of the '045 patent and it was

12   known to be used in eyedrops and with conventional

13   excipients, just not explicitly with disodium edetate.

14        And disodium edetate was, again, well-known for

15   multipurpose use in eyedrops.  We're doing a number of

16   things.  Chelating, corneal permeability enhancement of

17   polar compounds and complexing agents.

18        So, your Honor, Apotex thinks its just a simple,

19   it's really a simple step.  Fluoroquinolones have been used

20   with EDTA.  Gatifloxacin is just another fluoroquinolone,

21   known to be used in eyedrops, simple comparison.  We'll show

22   that in one example, the '456 patent, you just simply

23   substitute one quinolone for a gatifloxacin and you have the

24   claim composition.

25        EDTA was a well-known eyedrop excipient and

1    other prior art eyedrop formulations that were actually sold

2    commercially were fluoroquinolone antibiotics contain the

3    disodium edetate.  This is not rocket science.

4            Okay.  Plaintiffs attempt to overcome, as I've

5    said, you know, what they know is obvious by putting this

6    amount limitation into disodium edetate and reading that

7    into the claim.  However, Apotex's expert, Dr. Myrdal, is

8    going to explain to you, your Honor, these amounts were well

9    within the scope of the teachings of the art.  The '456

10   patent used an amount of disodium edetate that was in this

11   .01 to .2 range, and it was also known in other

12   formulations.

13           We're also going to have to look at the

14   dependent claims.  For invalidity, we have to prove

15   invalidity of each and every claim.  Claim 2 has a pH of 5

16   to 8.  Claim 3 talks about eyedrops.  Claim 9 says eyedrops

17   at pH 5 to 8.  Again, your Honor, these are minor claim

18   limitations.  They add nothing to the patentability, and

19   Apotex will show that all of these limitations were well

20   within the teachings of the prior art.

21           Okay.  The method claims and the obviousness of

22   the method claims.

23           First, we want to look at them without the

24   preamble limitation.  That's Apotex's position in the claim

25   construction.

1            If you take out the method, the preamble

2     limitation, claim 6 simply collapses into a claim saying

3     incorporating disodium edetate into gatifloxacin eyedrops.

4     So it's really just a method of making claim 3.  If claim 3

5     is obvious, claim 6 is obvious.

6            Likewise, with 7 and 8, that collapses to a

7     simple method of making claim 1 formulation, and if claim 1

8     is obvious, that one is also obvious.  And Apotex will also

9     address again the concentration limitation and that would

10    still be obvious for the same reasons that we've put forward

11    for 1 and 3.

12           Okay.  Now, what if the preambles are a

13    limitation?  We have improved corneal permeability, claim 6.

14    Preventing precipitation, claim 7.  And preventing

15    coloration, Claim 8.

16           Let's look at claim 6 first.  Here's where we

17    rely on the Grass reference, your Honor.  Improved corneal

18    permeability preamble.  And why do we -- why does Apotex

19    rely on the Grass reference for obviousness?  Because it

20    teaches that disodium edetate was a well-known corneal

21    permeability enhancer for polar compounds.  And guess what?

22    Gatifloxacin is such a polar compound.  It's a

23    fluoroquinolone.  It's also polar.  Dr. Myrdal will show

24    that.

25           Now, why would a person of ordinary skill in the

1   art have reasonable belief that this would work for

2   gatifloxacin?  Well, your Honor, Apotex will show that

3   calcium ion chelators, such as disodium edetate, are known

4   to open channels in the otherwise hydrophobic layers that

5   coat the cornea, to keep out polar compounds.  And what the

6   calcium ion chelator does is, it removes the calcium from

7   the cell walls, opening the cell walls so that channels

8   form and the molecule, gatifloxacin, the polar molecule, can

9   get through the hydrophobic layer and into the aqueous

10  humor.

11          How do we know that, your Honor?  The Grass

12  reference tells you this.  It says it's exactly what the

13  disodium edetate does, and also we know this from basic eye

14  anatomy.

15          And what about statistical significance

16  limitation?  Apotex thinks that, you know, statistical

17  significance should be put into this claim as well.  We

18  think that that would be obvious because if you are going to

19  have an improvement in corneal permeability, it's not worth

20  talking about unless it's reproducible, statistically

21  significant.  If it's not statistically significant, as

22  plaintiffs would assert, well, then it's simply obvious.

23  You just have to show a small improvement.

24          And the lower EDTA amounts that plaintiffs

25  assert, that's also just as obvious.  It's simply less

```
 1    disodium edetate.  You'll have less corneal permeability,

 2    and the amounts of disodium edetate in the prior art are

 3    still within that range.

 4              Also, your Honor, amounts of -- those lower

 5    amounts of disodium edetate are in the Grass reference.

 6    Grass says you can use these lower amounts.  The '456 patent

 7    uses a lower amount of disodium edetate.  Other commercial

 8    eyedrop products with structurally related quinolones also

 9    use lower amounts of disodium edetate.  It's a red herring,

10    this limitation.

11              Let's talk about precipitation prevention.

12    Here, your Honor, in addition to the '456 and '470 patent,

13    Apotex relies on the Riley reference.  You'll hear more

14    about that in the next couple of days.  The Riley reference

15    teaches increased solubility of fluoroquinolones with

16    carboxylic acids by using carboxylic acids in a relevant pH

17    range.

18              Well, guess what?  Gatifloxacin is a

19    fluoroquinolone, and disodium, not only is it a carboxylic

20    acid, it has four carboxylic acid groups.  It's going to

21    work very well.  And, again, here, the lower amounts are

22    just as obvious, simply just use the lower amounts of less

23    EDTA, as taught in the '456 patent, and the other commercial

24    products that are out there on the market.

25              Okay.  Coloration prevention.  You heard
```

1    plaintiffs are not asserting infringement of this claim.

2    Apotex is still contesting it because the reasons for

3    rebutting some of their unexpected results, secondary

4    consideration, lead to this claim being obvious, so Apotex

5    is continuing to assert that.

6             It's Claim 8, and what Apotex relies on is the

7    Griffith reference.  The Griffith reference teaches that

8    disodium edetate prevents coloration on a wide range of

9    molecules, and Apotex asserts it would be reasonable to try

10   to add disodium edetate to gatifloxacin to prevent

11   discoloration with a reasonable expectation of success, and

12   the lower amounts are just as obvious.

13            Moreover, your Honor, we think that Dr. Stella,

14   plaintiffs' own expert, admitted in deposition that this

15   claim was obvious.  That's why they're not asserting it.

16   They asked him for an opinion of infringement on it and he

17   said he could not support it.

18            Okay.  Let's talk about secondary

19   considerations.  There are two types of secondary

20   considerations, your Honor.  There are secondary

21   considerations that help support an obvious case and there

22   are secondary considerations that say something should be

23   nonobvious.

24            We heard Mr. Kelly talk only about those that go

25   to nonobviousness.  There is one that does go to supporting

1    the obviousness, and that's contemporaneous, simultaneous,

2    independent development of the same invention.  If someone

3    else made it around the same time, it must have been

4    obvious.  It's not someone -- only one person who could have

5    come up with it.  There are others.

6              And here we have evidence in the form of Kyorin

7    in-house documents which show that they made gatifloxacin,

8    disodium edetate, in aqueous liquid solutions before the

9    '045 patent inventors, Mr. Inada and Dr. Yasueda.

10             Now, plaintiffs' evidence of unexpected results.

11   They're kind of putting on a half-hearted case here, if you

12   ask me.  Unexpected results, they're going to rely on

13   licensing, copying and commercial success, from our

14   estimation.

15             Unexpected results fails for three reasons.

16   There's nothing unexpected here.  As we've shown in the

17   obviousness case, corneal permeability was expected,

18   precipitation prevention was expected, and improved

19   coloration was expected.

20             Their results.  Anything that they're relying on

21   also was not in commensurate in scope of the claims.  When

22   you rely on unexpected results, you have to show it for the

23   whole claim range.

24             Here, the claims have no limitations on the

25   amount of gatifloxacin, no limitations on the amount of

1    disodium edetate.  They're very broad, broad claims.

2    They have -- they have experiments in, like, one or two

3    narrow ranges.  They certainly don't have it for the broad

4    range.

5            And here we believe we have a very strong

6    obviousness case.  If you have a very strong prima facie

7    obviousness case, then unexpected results is insufficient to

8    overcome that.

9            What about licensing?  Again, we have a strong

10   obviousness case, and the license says -- there is a

11   purported license of the '045 patent, but what it says about

12   the '045 patent is that it's not worth an additional

13   royalty.  You'll see evidence regarding that.

14           Copying.  They say is that Apotex copied.  Well,

15   Apotex did not copy.  Apotex may have the same components,

16   but they're in different amounts.  They have a different

17   amount of salt and they have a different type of active.

18   We have gatifloxacin hemihydrate as opposed to

19   sesquihydrate.

20           Now, Mr. Kelly was nice and he put up that

21   chart, he showed that statement, boilerplate in the Apotex

22   ANDAs that said they were the same.  What he didn't direct

23   your attention to was really the formulation chart above,

24   which specifically said it was different amounts of sodium

25   chloride.  .86 versus .82 and different type of active.

1    Gatifloxacin hemihydrate, gatifloxacin sesquihydrate.  Two

2    different things that can have an effect on the formulation.

3    It is not a copy.

4              As far as commercial success, your Honor, again,

5    we have a strong obviousness case.  We don't believe that

6    any success that they're showing, which we don't think is

7    that great anyhow, has a nexus to the '045 patent claims,

8    has nothing to do with adding the disodium edetate, your

9    Honor.  It's really just gatifloxacin, happens to be a

10   molecule that's pretty good at killing the bugs.  You get an

11   infection in your eye.  If you can get gatifloxacin there,

12   it's pretty good at killing the bugs, better than some of

13   the earlier quinolones.  And any success of the product is

14   based on that.

15             In fact, your Honor, in Japan, their product

16   does not have disodium edetate.  They have a gatifloxacin

17   product out there in Japan.  They chose not to use disodium

18   edetate and it works perfectly well.  So it's gatifloxacin,

19   not the formulation, and therefore their commercial success.

20   Secondary consideration also fails.

21             Let's talk about noninfringement.  Here,

22   plaintiffs have the burden of proof.  It's plaintiffs'

23   burden to show that Apotex is likely -- the product that

24   Apotex is likely to sell meets all of the claim limitations

25   literally.  I don't believe, I have not heard that there's a

1    doctrine of equivalents assertion, so I believe we're just

2    talking literal infringement here, your Honor.

3            Now, why, in general, should there -- have they

4    not met their burden of proof?  First of all, they've never

5    tested the Apotex product here, which is typically what a

6    patentee will do.  When they want to prove infringement,

7    they test the competitor's product and they compare it to

8    the claims and say, here, we have infringement.

9            Here, Apotex gave plaintiffs samples of Apotex's

10   product.  We gave them our product.  We gave them our raw

11   material.  We said, go ahead and test it.  Did they test it?

12   We don't know.  They certainly are not coming into court

13   with testing of the Apotex product.  Instead, what

14   plaintiffs are presenting is merely testing of their own

15   product to show that their own product meets the claim

16   limitations, and then they want to do something called -- I

17   guess I would call it infringement by analogy.  Because the

18   brand infringes, well, then, the generic must also infringe.

19   And while that may have some appeal, your Honor, it just

20   does not hold up here, because there are differences in the

21   products.  There's a different amount of salt and there's a

22   different type of -- of the raw material.

23           If plaintiffs really had believed that the

24   products were identical, your Honor, they would have tested

25   our product.  They had it and they would have come in with

1    evidence of that.  I think they failed to meet their burden

2    of proof.

3            Okay.  Let's talk about the corneal

4    permeability.  I think we did that one.  Okay.  What is

5    their evidence that they are going to show, that they're

6    going to use to attempt to show that Apotex infringes claim

7    6?  Their evidence is in the form of an Allergan study.  The

8    '045 patent, Table 2.  The Senju Japanese/foreign comparison

9    study; foreign here meaning non-Japanese.  And then they had

10   two Senju time course studies.

11           Again, none of these studies compared is the

12   Apotex product by testing the Apotex product against a

13   control identical to the Apotex but without the disodium

14   edetate.

15           Also one thing that is lacking is testing in

16   humans.  Apotex ANDA is for giving this product to humans.

17   What do they show in their testing?  Well, they have it in

18   corneal cell cultures, and they also have it in rabbit eyes.

19   However, they provided no correlation as to how those relate

20   to the human eye.  It was their burden of proof to show

21   infringement as Apotex is going to use and sell the product

22   for humans.  They should have come in with human -- some

23   sort of evidence that it will infringe in humans.

24           Also, your Honor, all of their evidence that

25   they show, if it shows an improvement in corneal

1    permeability, it's certainly not a statistically significant

2    improvement.  It's probably not even reproducible.

3           We'll take them one by one.  The Allergan study,

4    your Honor, not Apotex's product.  This study was conducted

5    well before the Apotex's product was even developed.  It's a

6    corneal cell culture with no correlation to the humans in

7    vivo performance.

8           And it uses an improper control.  Dr. Stella, in

9    using this -- plaintiffs' expert, Dr. Stella, in using this,

10   to show infringement, compares the Zymar, the plaintiffs'

11   formulation with another gatifloxacin formulation that

12   included another bunch of components, this EBSS, Earle

13   Balance Salt Solution, which I think has 10 or 11 other

14   salts in it.  You will see.  We have a big chart.  And then

15   he says that because Zymar did better than the Earle balance

16   salt, well it must have been because the EDTA.  But what

17   about all these other components?  It wasn't a with or

18   without.  There wasn't a proper control.  And you can't not

19   drawn any conclusions from it.

20          The '045 Table 2 study.  Here again they're

21   trying to use a study of the patent to prove infringement of

22   Apotex product.  It's not the Apotex product.  Obviously, it

23   was done much earlier.  That was a rabbit study, your Honor.

24   Again, they have no correlation.

25          Moreover, when you look at the data, it's not,

1    the differences are not statistically significant.

2    Mr. Kelly showed you the table, Table 2 in the '045 patent,

3    with means plus standard deviations.  He doesn't show the

4    number of rabbits tested.  When you know the number of

5    rabbits tested, you can tell whether or not those are really

6    different, whether a scientist would think those are

7    different by running a simple statistical test.

8            If you run that test, they're not significant.

9    You don't really know if they're different.  You can't make

10   that conclusion.

11           And when Dr. Elder, Apotex's expert, ran a

12   proper global multiple study, pooling outlier analysis of

13   that data, it showed, if anything, there was a formulation

14   effect based on the absence or presence of sodium chloride,

15   not the absence or presence of the disodium edetate.

16           Okay.  The Senju foreign formulation.  Again,

17   not the Apotex product.  In fact, those had .5 gatifloxacin,

18   not .3.  Again, it was an improper comparison, more than one

19   variable.  Here, the comparator had no -- had EDTA and BAK,

20   with benzalkonium chloride where the other one had neither.

21   Again, it's two studies, three different variables.  You

22   can't draw any conclusions.  And when you run the statistics

23   on that test, they weren't statistically significantly

24   different.  No infringement.

25           The two Senju time course studies.  Similarly,

1  no Apotex product.  And there again there was no statistical

2  significant difference.

3        Okay.  What about the one study you didn't hear,

4  plaintiffs talk about in their case?  Apotex actually ran

5  its own study, your Honor, called the Nucro-Technics Study.

6  This is the only study on corneal permeability in this case

7  that actually tested Apotex product.  And, your Honor, it

8  was a proper control.  This had, this had Apotex's product

9  and the identical to Apotex's product but without disodium

10  edetate.  One variable.  You can even make a comparison, one

11  variable difference.

12        And what did it show?  It showed there was no

13  statistically significant difference.  The two were

14  statistically -- I guess you can't say the same but they

15  were not different.  In fact, your Honor, if we don't have

16  the statistical significant limitation into this claim, what

17  this Apotex study actually showed was the product without

18  EDTA had higher corneal permeability than the product with.

19  So it would disprove their infringement case if there is no

20  statistical significant requirement.

21        Let's talk about precipitation, claim 7.

22        What is plaintiffs' evidence regarding

23  precipitation?  They have the Cyanta study, and the Senju

24  freeze-thaw, which I would call the Senju freeze-thaw

25  testing study which also includes the data from the '045

1    patent, Table 3.

2           The Cyanta study.  Well, this was not the Apotex

3    formulation.  Mr. Kelly went right away to that chart.  At

4    the bottom, it says, oh, they admitted they were the same.

5    They're not the same.  There is difference in amount of

6    salt, and there is a difference in the ADI.

7           Also, your Honor, when we get into this study

8    and we cross their witnesses, you're going to hear the study

9    design was flawed.  They did not follow good laboratory

10   practices.  Things as simple as pH control, what did the

11   precipitants they were looking at, what the temperature was

12   on the table after -- when they were looking for the

13   precipitant, whether or not the study was blinded, whether

14   it was properly randomized.  All those were missing from

15   this study.  It was not even in accordance with good

16   laboratory practices.

17          And, your Honor, if prevention means prevention,

18   which Apotex asserts, that's what the claim says, well,

19   precipitation wasn't prevented for either of the formulations

20   in that study.  They all showed precipitation.

21          So what does plaintiffs try to do?  They hire

22   Dr. Mahnken, and he conduct this very intricate statistical

23   odds analysis study, which does not address prevention of

24   precipitation at all.  First of all, some of his assumptions

25   are violated because of his failure to follow GLP, but he is

1    wondering whether the rates are different, which is not what

2    the claim in question talks about.  It talks about

3    precipitation prevention.

4          The Senju freeze-thaw testing, your Honor.

5    Again, sometimes there was precipitation, sometimes there

6    wasn't.  But, most importantly, they didn't test the Apotex

7    product.

8          There is another study that Mr. Kelly did not

9    talk about, Apotex's study.  Apotex actually filed two ANDAs

10   here.  They filed one that is the subject of this case, and

11   they filed one on an identical product which did not have

12   disodium edetate.  And in accordance with the need to

13   perform all the FDA required testing, they had to run FDA

14   required freeze-thaw testing.

15         What did the FDA freeze-thaw testing that Apotex

16   performed on both of those ANDA products show?  It showed

17   that neither precipitated.  Well, if the Apotex product

18   without EDTA doesn't precipitate, well, the EDTA does not

19   preventing precipitation in the Apotex product either.

20         Okay.  Inequitable conduct.  Your Honor, I think

21   you know the law.  Failure to disclose, intent to disclose,

22   you balance the materiality and intent.

23         Here, Apotex is relying on three instances of

24   inequitable conduct.  One based on the corneal permeability

25   data, one based on the precipitation data, and one based on

1    Mr. Inada's declaration that he filed during the prosecution

2    of the '045.

3                Corneal permeability.

4                Your Honor, basically Mr. Kelly showed you Table

5    2.  What he didn't tell you was that there was a lot of

6    other corneal permeability data that Senju or Kyorin had in

7    their possession.  And when you look at the disclosed data,

8    what you find is that it did not show that there was this

9    1.5 times difference between a formulation with disodium

10   edetate and the formulation without disodium edetate.  It

11   showed it was almost one to one.  They didn't tell the

12   examiner that.  They wanted the examiner to think there was

13   this dramatic difference when in fact a second test didn't

14   confirm the first test.

15               And what is really troubling about it is that is

16   the reason they didn't disclose the number of rabbit eyes.

17   They didn't want the examiner to know that really they

18   didn't think the results were reproducible.  Had they put

19   those ends in that column, the examiner could have seen

20   those ends and understood the statistics of it, it's a

21   simple statistical test, the examiner could have determined

22   for him or herself that the results were not statistically

23   significantly different and wouldn't have relied on this 1.5

24   times data.  So we think that there is high materiality

25   here.

1                Precipitation.

2                Again, undisclosed precipitation data.  Table 3

3     only shows three of many, many, many data points they have

4     on precipitation.  And there is a wide range.  When you look

5     at the wide range of the undisclosed data, you will find

6     that in general, the disodium edetate really had no effect

7     on precipitation.  It's really the effect of the

8     gatifloxacin concentration, its intrinsic solubility

9     characteristics and the pH of the solution.

10                And we think this failure to disclose all this

11    other data that didn't show precipitation or that did show

12    precipitation -- I'm sorry -- contradicts the patent

13    statement that EDTA prevents precipitation of gatifloxacin.

14                The Inada declaration.

15                Your Honor, Mr. Inada submitted a declaration in

16    order to get over a rejection from the patent examiner.  It

17    had results regarding coloration and precipitation.  And the

18    problem with this declaration was that it was designed so

19    that it could not fail.  And had he disclosed the reasons

20    why it could not fail to the examiner, the examiner would

21    not have been misled into accepting his conclusions.  And

22    the law, your Honor, is that misleading statements in

23    declarations are always material to patentability.

24                Intent.

25                Intent is different for defendants to show.  It

1    is rarely smoking gun evidence.  It needs to be inferred

2    from the surrounding circumstances and the high materiality.

3    We believe here it should be inferred because contradictory

4    statements are highly material.  And these statements were

5    made in the patent and the declaration in order to convince

6    the examiner that the disodium edetate gave gatifloxacin

7    these improved results.  However, they were only able to do

8    that based on the results of falsely hiding contrary

9    information.

10                 Nonenablement to the full scope.

11                 I'll be a little bit brief here.  The law is

12   that even if some embodiments are enabled, they have to be

13   enabled to their full scope.  Very broad claims here.  No

14   limitations on the amounts of disodium edetate or

15   gatifloxacin.

16                 And if there is a substantial number of

17   embodiments within a claim that are not enabled, then that

18   claim is invalid.

19                 Here we're going to look at corneal permeability

20   and precipitation.

21                 Regarding corneal permeability, when you look at

22   all their underlying data, you will see there were a lot of

23   embodiments where corneal permeability were not improved by

24   the addition of disodium edetate.  They simply did not do

25   it.  They have not enabled it to the full scope.

Schultz - direct

1          Second.  Precipitation, pretty much the same

2     thing.  A number of times, they had run a lot of examples

3     that did not show the addition of disodium edetate prevented

4     precipitation.  They cherry-picked the ones to put into the

5     patent.  There were a lot of them that did not.  And, your

6     Honor, that makes sense simply on the physical chemical

7     property of gatifloxacin and the broad range of conditions

8     within the claim scope.

9          Thank you, your Honor.

10          THE COURT:  All right.  Thank you.  Do you wish

11     to start with the presentation of evidence?

12          MR. KELLY:  Yes, your Honor.  Plaintiffs call

13     Joseph Schultz to the stand.

14          Your Honor can I hand Mr. Schultz his binder.

15          THE COURT:  Yes.

16          (Witness receives binder, then takes witness

17     stand.)

18          PLAINTIFFS' TESTIMONY

19          JOSEPH SCHULTZ, having been duly sworn as a

20     witness, was examined and testified as follows:

21                    DIRECT EXAMINATION

22     BY MR. KELLY:

23     Q.     Mr. Schultz, could you state your educational

24     background since high school?

25     A.     Yes.  Following high school, I attended Elizabethtown

Schultz - direct

1   College in Pennsylvania and have an undergraduate degree in

2   Biology; and then later pursued my MBA in part time evening

3   and got that from Fordham University in Manhattan.

4   Q.    And can you briefly set forth your work experience?

5   A.    Yes.  Following graduation from high school, I

6   started as a college admissions counselor for a year.  And

7   then a year later entered the pharmaceutical industry and

8   have been in pharmaceutical for about 25 years now.

9          I started as a sales representative with Pfizer

10  Pharmaceuticals, worked my way up through various positions

11  to corporate headquarters, where I spent several years in

12  international marketing there.

13         And then after about eight years at Pfizer, I

14  moved to Johnson & Johnson in New Jersey, and spent 13 years

15  at Johnson & Johnson in various capacities in both sales and

16  marketing and in senior leadership positions in the sales

17  and marketing organization.

18         And about six years ago, I moved to Allergan.

19  And I am the senior vice president of U.S. eye care for

20  Allergan, which means I'm responsible for sales and

21  marketing of our eye care products.

22  Q.    Just briefly could you describe what Allergan's

23  business is?

24  A.    Allergan is a midsized multiple special

25  pharmaceutical and device company.  We have a broad range of

Schultz - direct

1    specialty portfolios.  The part that I'm responsible for in

2    particular is our eye care portfolio, where we call on

3    ophthalmologists and optometrists.  Eye care is a heritage

4    business for Allergan.  We've been in the eye care for about

5    60 years.

6    Q.    Do you have any responsibilities with respect to the

7    product Zymar?

8    A.    I do.

9    Q.    What is Zymar?

10   A.    Zymar is a fourth generation fluoroquinolone.  It's a

11   topical ophthalmic solution of an anti-infective which is

12   indicated for conjunctivitis.

13   Q.    What has the market acceptance been for Zymar?

14   A.    Zymar has been a very, very successful ophthalmic

15   pharmaceutical.

16   Q.    Can I ask you to look at JTX-005?

17   A.    Yes.

18   Q.    And I'd ask you to look at Page 559 of that.

19              Does that exhibit illustrate the acceptance rate

20   of Zymar.

21   A.    Yes.  This exhibit is demonstrating the market

22   acceptance in terms of total prescriptions for actually the

23   fourth generation fluoroquinolones of Zymar and Vigamox from

24   their launch to one year post-launch prior to the launch of

25   the fourth generation fluoroquinolones.

Schultz - direct

1          The third generation fluoroquinolones, both

2     ocuflox and Ciloxan (phonetic) were dominant products in the

3     marketplace as prescribed by ophthalmologists and very

4     quickly you can see the curve within a year, the third

5     generation fluoroquinolones had declined dramatically in

6     terms of their utilization for preference for the fourth

7     generation fluoroquinolones, including Zymar.

8          MR. KELLY:  I'd like to offer JTX-005, your

9     Honor.

10          THE COURT:  Any objection.

11          MR. GALLAGHER:  No objection.

12          THE COURT:  Thank you.

13          (Joint Trial Exhibit No. 005 was received into

14     evidence.)

15     BY MR. KELLY:

16     Q.    Mr. Schultz, do you have any more recent information

17     on the market shares of Zymar?

18     A.    Yes.  Zymar continues to perform very well in the

19     market.

20     Q.    Can I ask you to look at JTX-27?

21     A.    Yes.

22     Q.    And Page 786.  And could you explain what is shown

23     there?

24     A.    What this specifically shows is approximately a year

25     post-launch, the fluoroquinolones are the predominant used

Schultz - direct

1    topical anti-infectives by ophthalmologists.  They accounted

2    for nearly 80 percent for all prescriptions for

3    antiinfectives by ophthalmologists.  And within a year, the

4    new fourth generation fluoroquinolones, both Zymar and

5    Vigamox accounted for 73 percent for those prescriptions

6    written by ophthalmologists, and that success continues

7    today where 90 percent of the fluoroquinolone market in

8    ophthalmology is both Zymar and Vigamox.

9    Q.    And do you have any information --

10            MR. KELLY:  I'd like to offer JTX-27 into

11   evidence, your Honor.

12            THE COURT:  Any objection?

13            MR. GALLAGHER:  No objection.

14            THE COURT:  All right.  Thank you.

15            (Joint Trial Exhibit No. 27 was received into

16   evidence.)

17   BY MR. KELLY:

18   Q.    What is the market share today?

19   A.    It depends on how you want to measure market share.

20   We tend to look at the market share within ophthalmology or

21   within eye care professional.  Allergan is an eye care

22   focused company.

23            Our competitors with Vigamox also call on

24   primary care and pediatrics.  So you can look at overall

25   market share in the overall market.  What we tend to look at

Schultz - direct

1  is ophthalmology only.  And it is, with Zymar, if you look

2  that overall market, we have about a 35 percent market share

3  of the total fluoroquinolone market.

4  Q.     Did any -- during the time period, did any other

5  fourth generation fluoroquinolones attempt to enter the

6  market?

7  A.     Yes.  There have been several other attempts, most

8  recently this past year.  There was an attempt by Bausch &

9  Lomb and in partnership with Pfizer to launch Besseres,

10  which is a new fourth generation quinolone.

11  Q.     How successful has that been?

12  A.     It has been very unsuccessful.

13  Q.     Thank you.  What are the uses for Zymar?

14  A.     Zymar is used for a broad range of conditions.  It is

15  indicated for conjunctivitis, which is what it was studied

16  for, but with anti-infectives in any category as well,

17  physicians have the ability to prescribe that for any

18  condition where they think that anti-infective or that agent

19  would be useful.

20        So beyond conjunctivitis, it could be used for

21  corneal ulcers, other infections of the eye.  It's also used

22  extensively as a prophylactic agent around certain

23  procedures to prevent infection.

24  Q.     Do you consider the sales of Zymar to be significant?

25  A.     Yes, I do.

Schultz - direct

1  Q.     Why?

2  A.     Zymar had about a hundred million dollars in sales

3  this past year, and that accounts for about ten percent of

4  our overall eye care business in the United States.  And if

5  you look within ophthalmics, it's probably in the top ten

6  ophthalmic pharmaceuticals in the United States.

7  Q.     Thank you.

8         Are you familiar with the way Zymar is marketed

9  by Allergan?

10  A.     Yes, I am.

11  Q.     And what is -- how does Zymar -- how does Allergan

12  market Zymar?

13  A.     The promotion and marketing of Zymar has changed over

14  time, as you can imagine.  So at the initial launch of the

15  product, the market was predominantly the third generation

16  fluoroquinolones.  Those were the products that were being

17  used.

18         So with the launch of Zymar, the marketing

19  platform really looked at what were the advantages of Zymar

20  as a fourth generation agent versus the dominant products in

21  the market, the third generation agents.

22         And so the main promotion points and

23  discussion points were that the third generations agents had

24  been used for an extended period of time, and with any

25  anti-infective, as it's used over time, resistance begins to

Schultz - direct

1    develop and the confidence that physicians have in those

2    agents begins to decline.  They can't depend on them to be

3    as effective.

4                   So with the launch of Zymar, the discussion

5    was around the fact that this was a more potent agent.  A

6    new generation of fluoroquinolones.  It had multi-mechanisms

7    of action.  It was effective against some organisms which

8    had become resistant or started to become resistant to the

9    third generation agents, and that was really the core

10   messaging in that these newer agents, this new agent, Zymar,

11   would be -- provide greater confidence for the physician in

12   terms of delivering the efficacy and the outcome they were

13   looking for.

14   Q.    Now, you indicated that was the initial marketing

15   message.  Did it change?

16   A.    Yes, it did.  As you saw from the graph, within about

17   a year, the fourth generation quinolones had taken over the

18   market, so the competition was no longer the older agents,

19   but actually it became, frankly, a two-horse race.  It's

20   like Coke and Pepsi.  It became really a comparison between

21   Vigamox and Zymar.

22                   So we were in a heated competitive battle

23   with Vigamox, and therefore the messaging evolved to focus

24   more on the comparison or the differences that we would try

25   to draw to differentiate Vigamox from Zymar.

Schultz - direct

1  Q.     What were some of those differences you tried to

2  utilize?

3  A.     It was a very close two-horse race.  Many physicians

4  saw these products very similar and they have some

5  significant similarities.  The spectrum of activities are

6  very similar.  So a lot of the evolution turned around to be

7  attributes of the products.

8              So our competitors were making the fact

9  that our product was preserved with BAK, or benzalkonium

10 chloride, as a disadvantage for our product, and they were

11 self-preserved.  They were connotating that BAK had negative

12 effects on the surface of the eye.

13             So as we started getting into the

14 comparison of between the two products, the formulations

15 became part of that discussion.  And as part of that, we,

16 you know, evaluated and looked at, you know, the differences

17 that our formulation had versus Vigamox.

18             So the fact that, for example, BAK added to the

19 formulation enhanced the killing power against some of the

20 more resistant organisms was a differentiating feature.  The

21 fact that it included BAK also meant that it was less likely

22 to contaminate the bottle, because if a product was not

23 preserved and a patient touches their eyes, they can

24 contaminate the solution, which, of course, would not be a

25 good thing.

Schultz - direct

```
 1              And then also that with BAK, the competition was
 2    kind of connotating that BAK was toxic to the surface of the
 3    eye and had a negative impact on corneal cells.  And with
 4    some of the clinical data that was generated in animal
 5    models, we were able to demonstrate that Zymar, with the
 6    addition of BAK, was actually -- had less corneal toxicity
 7    than our competitor's product, Vigamox, which appeared to be
 8    more linked to the molecule moxifloxacin, and less to the
 9    addition of BAK as a preservative.
10    Q.    Is corneal penetration something that's considered
11    important in ophthalmic drugs?
12    A.    I would say corneal penetration and ocular tissue
13    concentrations is an important selling point.  That was
14    something our competitors were making a lot of hay with in
15    terms of penetration into the ocular tissues.  These
16    anti-infectives do work on the surface of the eye, but you
17    need to get adequate concentrations to overcome the level
18    required to kill the organisms.
19              So our position was that Zymar had
20    excellent penetration and penetration of Zymar into ocular
21    tissues was higher than was required to kill all the common
22    organisms, and that beyond that, it was a very safe, well
23    tolerated, anti-infective that had some of the advantages
24    that I mentioned in terms of not being able to be
25    contaminated, et cetera.
```

Schultz - direct

1  Q.    Are you aware of any data that shows that the

2  formulation affects the penetration of the gatifloxacin with

3  the corneal tissue?

4  A.    Yes.

5         MR. CLEMENT:  Objection.  Leading.

6         THE COURT:  Overruled.

7         THE WITNESS:  Yes.  There's a variety of pieces

8  of data that we used in our promotional materials, really

9  highlighting the formulation.  And it was, as I mentioned,

10  what you wanted to do was demonstrate, first of all, that

11  you had the adequate penetration to overcome the organisms,

12  and then some of that data carried forward and also showed

13  that the inclusion of BAK did not have a toxic effect on

14  corneal cells.

15  BY MR. KELLY:

16  Q.    Can I ask -- could you look at PTX-88 please?  In

17  particular, you can look at the entire document, but I'm

18  just going to ask you a quick question about Page 1260.

19         Let's bring up 1260.

20         Is this some of the data that was used to show

21  the corneal -- the penetration of the gatifloxacin in the

22  Zymar formulation?

23  A.    Yes.  As part of the competitive battle with our

24  competitors looking at penetration as their poor message,

25  they were offering -- often compares gatifloxacin alone

Schultz - direct

1    versus moxifloxacin alone in terms of penetration, trying to

2    demonstrate that Zymar had poor penetration.

3            We said it's really not gatifloxacin.  It's

4    Zymar, the formulation, which is important to look at.  And

5    data like this was used to show that Zymar, the formulation,

6    actually had very good penetration to achieve the level that

7    you needed to kill the organisms.  And then within studies

8    like this, often the tolerability of BAK as part of the

9    formulation was looked at and demonstrated that BAK did not

10   have a negative tolerability effect versus moxifloxacin or

11   Vigamox.

12   Q.    Thank you.

13           Do you have any experience with what

14   happens to the market for a drug when it goes off patent?

15   A.    Generally, yes.  As the generic products enter the

16   market, they very rapidly impact the brand.  Our most recent

17   example, we had late last year in November a brand that went

18   generic and within about five weeks, 60 percent of the

19   prescriptions had converted over to the generic, so our

20   sales dropped off almost immediately.  And I would expect

21   that within two to three months, that somewhere between 80

22   to 90 percent of the branded product will be cannibalized by

23   the generic.

24   Q.    Has Allergan made the estimates to the effect an

25   Apotex launch would have on the sales of Zymar?

54

Schultz - cross

1    A.      Yes.   In 2010, based on various scenario planning

2    that we've done, we can see up to $50 million negative

3    impact in revenue for Allergan.

4    Q.      Could money damages make Allergan whole?

5    A.      I highly doubt it in that the generic products

6    generally launch at a much lower price, and the revenue that

7    they generate is generally significantly below the brand

8    revenue that's generated before the generic enters.

9              MR. KELLY:   Thank you.   I have no further

10   questions, your Honor.

11             THE COURT:   Or maybe you do.

12             MR. KELLY:   Oh, excuse me.   I'd like to move in

13   Exhibit 88.

14             THE COURT:   All right.   Any objection?

15             MR. GALLAGHER:   No objection.

16             THE COURT:   All right.   Cross-examination.

17             (Exhibit No. 88 was received into evidence.)

18                   CROSS-EXAMINATION.

19   BY MR. GALLAGHER:

20   Q.     Good morning, Mr. Schultz.

21   A.     Good morning.

22             MR. GALLAGHER:   Your Honor, I have a binder with

23   additional documents.

24             THE COURT:   All right.

25             (Mr. Gallagher handed a binder to the witness.)

Schultz - cross

1           THE WITNESS:  Thank you.

2    BY MR. GALLAGHER:

3    Q.     Mr. Schultz, would you look at JTX-5 on the front

4    page?

5    A.     Mm-hmm.

6    Q.     The bottom right.

7           All right.  Am I correct that this is a

8    graph presenting market share data for ophthalmic-branded

9    fluoroquinolones?

10   A.     Yes, it is.

11   Q.     And this is presenting market share for all

12   specialties?

13   A.     It does.

14   Q.     And the data presented on the graph are from a period

15   of 2002 to mid-2004?

16   A.     That's correct.

17   Q.     Am I correct that fluoroquinolones are a type of

18   antibiotic medication?

19   A.     Yes, they are.

20   Q.     And am I correct that there are additional ophthalmic

21   antibiotic solutions other than fluoroquinolones on the

22   market at this time that are not included on the graph?

23   A.     Yes.  This is specifically looking at

24   fluoroquinolones.

25   Q.     And so this graph does not present data for all

Schultz - cross

1    ophthalmic antibiotic solutions on the market during this

2    time period?

3    A.    No, it does not.

4    Q.    Am I correct that before Zymar came on the market,

5    Ocuflox was the market leader among branded

6    fluoroquinolones?

7    A.    Within ophthalmology, it was, and from this chart --

8    let me see if I can see if it was in all specialties as

9    well.  I can't quite tell.

10            Maybe you can tell me whether the circles

11    and squares are -- which one -- it looks like, to me,

12    Ocuflox would be the second product in; is that right?  So

13    it would say branded ciprofloxacin was the leading product

14    on the market.

15    Q.    Okay.

16    A.    Which, again, would not surprise me, because as I

17    mentioned earlier, our competitor, Alcon, does participate

18    in all specialties.  They promote their products in primary

19    care and in pediatrics, which would be included in this

20    chart, whereas we're an all ophthalmology company versus the

21    other slide that was already presented, looked at

22    ophthalmology.  In an ophthalmology only, it is correct that

23    Ocuflox was the lead brand.

24    Q.    Very good.

25            Am I correct that Allergan stopped

Schultz - cross

1    promoting Ocuflox as soon as Zymar was launched on the

2    market?

3    A.     That's correct.  We launched a new product which we

4    felt was superior.

5    Q.     And as we look to the right side of the graph, in the

6    period around 2004, am I correct that Zymar is not the

7    market leader?

8    A.     Correct.  In all specialties, as I've already

9    mentioned, we do not participate in primary care in

10   pediatrics where about half of the topical anti-infective

11   market exists, so as we measure our success in the area of

12   ophthalmology, which is the kind of company that we are,

13   versus our competitors, which participate in these all

14   specialty arenas.

15   Q.     Vigamox is the market leader in all specialties; is

16   that correct?

17   A.     That's correct.  It is today as well.

18   Q.     All right.  Isn't it also true that Zymar launched

19   before Vigamox?

20   A.     With a few weeks, yes.  A few weeks to a few months,

21   that's correct.

22   Q.     Isn't it also true that being the first to launch,

23   the first product to launch, can be an advantage for a

24   product?

25   A.     Yes.  Most companies would like to be the first to

Schultz - cross

1    enter with a new innovative product.  That is correct.

2    Q.     Despite the fact that Zymar launched first, Vigamox

3    is the market leader over Zymar?

4    A.     In all specialties because they promote in audiences

5    which we currently don't promote in.

6    Q.     Thank you.

7            Will you turn to Page 560, the third page of

8    JTX-5, and the bottom slide.

9    A.     Yes.

10   Q.     And does this slide present a pie chart showing the

11   total anti-ineffective market by prescriber specialty?

12   A.     That's correct.

13   Q.     And am I correct that ophthalmology is only

14   32 percent of the total anti-ineffective market?

15   A.     That's correct.  That's, as I stated, why Vigamox

16   would have the lead share in all specialties, because they

17   compete and promote in those -- of that other 60 percent of

18   the pie that Allergan does not participate in.

19   Q.     And will you turn back one page to Page 559, and the

20   top slide.

21           This is showing data for market share for

22   ophthalmology only?

23   A.     That's correct.

24   Q.     And so this is only looking at about a third of the

25   total market for ophthalmic anti-infectives?

Schultz - cross

1    A.      Correct.

2    Q.      Will you look to JTX-27, please, and turn to Page

3    786.  You were looking at this before?

4    A.      Yes.

5    Q.      And this, again, is for ophthalmology only; is that

6    correct?

7    A.      That is correct.  That's for ophthalmology only.

8    Q.      All right.  Will you turn to Page 803?  Sorry.

9    ALL803.

10   A.      Okay.

11   Q.      And you had discussed this earlier, I believe, that

12   Allergan wanted to drive differentiation with BAK; is that

13   correct?

14   A.      We were trying to drive differentiation as it related

15   to our product versus Vigamox, because BAK was part of that

16   discussion as a competitive message from our -- from Alcon

17   in that they were trying to make that a negative.  We were

18   looking at what BAK offered in terms of advantages versus

19   the negative that they were trying to paint in the

20   marketplace.

21   Q.      All right.  There's nowhere in this document where it

22   specifically mentions disodium edetate or EDTA as a factor

23   that could drive differentiation of Zymar?

24   A.      No.  We never really got that involved.  Even with

25   BAK, the message wasn't hundred-percent on BAK.  The

Schultz - cross

1    messages are primarily the spectrum of activity, and

2    actually really evolved speed to kill, that we could kill

3    organisms quickly based on formulation, and the components

4    of the formulation, including BAK.

5            So physicians aren't as interested, frankly, in

6    all the formulation stuff.  They're clinicians.  They want

7    to know what outcomes are there.  So time, the speed to kill

8    to the efficacy, and the expectation that they would get a

9    positive outcome quickly was a promotional message from

10   sales and marketing.

11   Q.    Thank you.

12           Would you look at JTX-029 in the binder that I

13   handed you?  And this is a marketing document, marketing

14   plan for Zymar from 2006?

15   A.    That is correct.

16   Q.    So it's similar to the document we were just

17   looking at, JTX-27, except this is the 2006 marketing plan.

18   JTX-027 was the 2005 marketing plan?

19   A.    Correct.  On an annual basis, we would do complete

20   business and marketing plans, assessing, you know, what was

21   going on in the market, what the attitudes and perceptions

22   were of the products, and then look at how we were going to

23   evolve our platform to compete in that next calendar year.

24   Q.    Will you turn to Page ALL759, please?

25           Am I correct that from a marketing

Schultz - cross

1    perspective, Allergan wanted to own a product attribute

2    other than penetration?

3    A.    That's correct.

4    Q.    And am I correct that Allergan wanted to own a

5    product attribute other than penetration because Vigamox

6    already owned that product attribute?

7    A.    Yes.  Vigamox at launch had taken penetration as

8    their main platform message and had owned that attribute.

9    And as I mentioned, our message back was our penetration was

10   adequate to achieve the MICs to kill the appropriate

11   organisms.

12              And then that evolved a speed to kill based

13   on the overall formulation that we could kill the organisms

14   and the resistant organisms faster than Vigamox could.

15              MR. GALLAGHER:  Thank you.  Thank you, your

16   Honor.

17              THE COURT:  All right.  Any redirect?

18              MR. KELLY:  No, your Honor.

19              THE COURT:  All right.  You may step down.

20   We'll take our 15-minute morning break.

21              MR. KELLY:  Thank you, your Honor.

22              (Short recess taken.)

23              THE COURT:  Next witness.

24              MR. KELLY:  Your Honor, before I call the next

25   witness, I was wondering if Mr. Schultz could be released.

Yasueda - direct

1          THE COURT:  I certainly have no objection.

2          MR. CLEMENT:  No objection, your Honor.

3          THE COURT:  Thank you very much.

4          MR. KELLY:  Dr. Yasueda.  And, your Honor, we

5     also placed witness books on the stand and we provided a

6     copy.

7          SHINICHI YASUEDA, having been first duly sworn,

8     was examined and testified as follows:

9                    DIRECT EXAMINATION

10    BY MR. KELLY:

11    Q.     Dr.  Yasueda, could you provide us briefly with

12    educational background?

13    A.     I majored in Pharmaceutical Science in the

14    university; and I then went on to graduate school.  I also

15    majored in Pharmaceutical Science and received a master's

16    degree.

17    Q.     Have you any other degrees beyond the master's?

18    A.     Yes.  I have doctor's degree.

19    Q.     Thank you.  Who do you work for?

20    A.     It is Senju Pharmaceutical Company, Limited.

21    Q.     How long worked for Senju?

22    A.     I've been working for them for about 15 years.

23    Q.     And what is your present position?

24    A.     I am is the Director of Pharmaceutical Development

25    Research Laboratories.

Yasueda - direct

1   Q.      And what type of research is conducted at the

2   laboratory?

3   A.      We mostly work on formulations for eyedrops.

4   Q.      Could you briefly ascribe for me Senju's business?

5   A.      It deals with ophthalmic agents.  Mostly, eyedrops in

6   Japan.

7           Manufacturers and markets of pharmaceutical

8   agents.  Mostly, eyedrops in Japan.

9   Q.      Thank you.  Dr. Yasueda, do you have any patents?

10          I'm sorry.  Dr. Yasueda, do you have any

11  patents.

12  A.      Yes, I do.

13  Q.      Can I ask you to turn to JTX-1 in the book in front

14  of you?

15  A.      Yes.

16  Q.      Is that one of the patents -- one of your patents?

17  A.      Yes, it is.

18  Q.      And is that patent directed to ophthalmic solutions?

19   -- strike that.

20          What is the invention of the '045 patent as you

21  understand it?

22          MR. ABRAMOWITZ:  Objection.  Calls for expert

23  testimony.  Dr. Yasueda hasn't been qualified as an expert

24  by his counsel.

25          THE COURT:  Well, if this were a jury, I might

Yasueda - direct

1    explore that objection, but it seems to me as though this is

2    background information that I might find interesting, if not

3    useful.  So the objection is overruled.

4              MR. KELLY:  Thank you, your Honor.

5              THE WITNESS:  This patent is about gatifloxacin

6    ophthalmic agent, and there are three inventions.

7              One is the improvement of gatifloxacin's corneal

8    permeability at a low concentration of EDTA for gatifloxacin

9    ophthalmic agent.

10             Number two is when gatifloxacin is frozen and

11   thawed, it prevents the precipitation of gatifloxacin

12   crystals.

13             And the third is when the -- during the

14   manufacturing of gatifloxacin eyedrops, the coloration of it

15   is prevented.

16             MR. KELLY:  Thank you.  Your Honor, before I

17   forget, I'd like to offer JTX-1 into evidence.

18             THE COURT:  Any objection?

19             MR. ABRAMOWITZ:  No objection.

20             THE COURT:  Thank you.

21             (Joint Trial Exhibit No. 1 was received into

22   evidence.)

23   BY MR. KELLY:

24   Q.    Dr. Yasueda, how did you become involved in

25   developing gatifloxacin solutions?

Yasueda - direct

1   A.    Gatifloxacin was compound developed by Kyorin because

2   it was effective.  Because it was effective, it was used for

3   oral agents as --

4             THE INTERPRETER:  I'm sorry.  Let me start over.

5             Gatifloxacin was a compound developed by Kyorin

6   Pharmaceutical.  Because it was effective, it was used as

7   oral drops, oral drugs by Kyorin.  And Kyorin then started

8   to develop eyedrops using gatifloxacin but because Senju

9   licensed it later, the development of eyedrops was conducted

10  by Senju and I got involved in the formulation of eyedrops.

11  BY MR. KELLY:

12  Q.    Did you receive any information on the Kyorin

13  formulation?

14  A.    Yes.  Kyorin had one prototype formulation, so when I

15  started the experiments, I was given that formulation.

16  Q.    Can I ask you to look at JTX-36 in your book.

17  A.    Yes.

18  Q.    Is the Kyorin prototype formulation shown in that

19  document?

20             MR. ABRAMOWITZ:  Objection, leading.

21             THE COURT:  I truly -- those aren't the kind of

22  objections that are helpful in a bench trial, although they

23  might be true.  The objection is overruled.

24             THE WITNESS:  Yes, it is.

25  BY MR. KELLY:

Yasueda - direct

1   Q.      And could you tell us where the document may be

2   found?

3   A.      It is on the page SEN390352.

4   Q.      And did this formulation contain EDTA?

5   A.      No, it doesn't.

6   Q.      Did you ever receive any information on the Kyorin

7   formulation containing EDTA?

8   A.      No, I did not.

9   Q.      Do you understand what JTX-36 is?

10  A.      Yes, I do.

11  Q.      And what is it?

12  A.      It is reference document obtained from Kyorin

13  Pharmaceutical regarding gatifloxacin.

14  Q.      Thank you.

15          MR. KELLY:  I'd like to offer JTX-36 into

16  evidence, your Honor.

17          THE COURT:  Any objection?

18          MR. ABRAMOWITZ:  No objection.

19          THE COURT:  Thank you.

20          (Joint Trial Exhibit No. 36 was received into

21  evidence.)

22  BY MR. KELLY:

23  Q.      Did you do anything with the Kyorin prototype

24  formulation?

25          THE INTERPRETER:  I'm sorry.  Can you repeat

Yasueda - direct

1    that?

2              MR. KELLY:  Let me make it simple.  Did you

3    modify the Kyorin prototype formulation?

4              THE WITNESS:  When I studied the formulation of

5    gatifloxacin, I found out that there were many problems with

6    the Kyorin formulation, so we started from scratch.

7    BY MR. KELLY:

8    Q.    And what were some of the problems?

9    A.    One problem was its tendency to have a high

10   precipitation of crystal.  Another one was the high

11   concentration of isotonic agent such as sodium hydrogen

12   phosphate.

13   Q.    Can I ask you to look in JTX --

14             THE INTERPRETER:  Excuse me.

15             (Pause while interpreters communicate.)

16             THE INTERPRETER:  Excuse me.  I'd like to change

17   sodium hydrogen phosphate to disodium hydrogen phosphate.

18             MR. KELLY:  Thank you.

19   BY MR. KELLY:

20   Q.    In JTX-1, is Example 9 an example of one of the

21   formulations that you developed?

22   A.    Yes, it is.

23             MR. KELLY:  Could I ask you to bring up PTX-177,

24   Chris?

25             And could you highlight Example 9?

Yasueda - direct

1   BY MR. KELLY:

2   Q.    Is this an example of the changes that you had to

3   make to develop a successful formulation?

4              THE INTERPRETER:  JTX-1?

5              MR. KELLY:  Yes.

6              Excuse me.  This is PTX-177.

7              THE INTERPRETER:  Could you repeat the question?

8              MR. KELLY:  Sure.

9   BY MR. KELLY:

10  Q.    Does PTX-177 illustrate some of the changes that you

11  had to make to come up with a successful formulation?

12             THE WITNESS:  Yes.

13  BY MR. KELLY:

14  Q.    Was it simple for you to go from the formulation that

15  Kyorin provided which is shown on the left-hand side of

16  PTX-177 to the formulation of Example 9?

17  A.    No, it was not.  We had to do various experiments.

18  Q.    And can I ask you to look at JTX-8?  Dr. Yasueda,

19  it's the big book to your right.  And I promise not to go

20  into that book very much.

21             Have you seen the documents there that comprise

22  JTX-8 before?

23  A.    Yes, I have.

24  Q.    And do you know who prepared those documents?

25  A.    Yes.  I did.

Yasueda - direct

1    Q.      And what do those documents reflect?

2    A.      It reflects the experiments that I conducted for

3    gatifloxacin.

4    Q.      In conducting those experiments, did you conduct

5    experiments on components to see if they impacted the

6    corneal permeability of gatifloxacin?

7    A.      Yes, I did.

8            MR. KELLY:  And before I forget, can I offer

9    JTX-8 into evidence, your Honor?

10           MR. ABRAMOWITZ:  No objection.

11           THE COURT:  Thank you.

12           (Joint Trial Exhibit No. 8 was received into

13   evidence.)

14   BY MR. KELLY:

15   Q.      And, Dr. Yasueda, can you describe for us some of the

16   compounds which you tested to determine their impact on

17   gatifloxacin corneal permeability?

18   A.      I have used many compounds, but -- I have used

19   various compounds, but they were mainly thickeners and

20   enhancers, and I pair agents.

21   Q.      Did you, as part of that work, test the compound

22   we'll call BAK had on the gatifloxacin corneal permeability?

23   A.      Yes, I did.  But we did not obtain the results

24   showing that BAK had the impact on gatifloxacin's corneal

25   permeability.

Yasueda - direct

1    Q.    Is that information recorded in a report that you

2    authored?

3    A.    Yes.

4    Q.    Could I ask you to look at JTX-24?

5         MR. KELLY:  Chris, if I could ask you to put

6    that up.

7         THE WITNESS:  Yes.

8    BY MR. KELLY:

9    Q.    Is that the report?

10   A.    Yes, it is.

11   Q.    And where might I find the information on BAK in this

12   report?

13   A.    The report is contained in the Table 11.

14        MR. KELLY:  Can I ask you to bring up -- it's

15   23742, Chris.  If you can highlight it.

16   BY MR. KELLY:

17   Q.    And what does Table 11 demonstrate, Dr. Yasueda?

18   A.    This table shows the concentration of gatifloxacin in

19   aqueous humor, but it -- in rabbits, and it does not show

20   that BAK made any difference.

21   Q.    And does that -- did you report that opinion, that

22   conclusion in the report?

23   A.    Yes.  It reports that when adding .5005-percent BAK

24   in gatifloxacin eyedrops, the aqueous humor was not

25   affected.  Aqueous humor migration was not affected.

Yasueda - direct

1    Q.      Thank you.

2            Now, does this report -- does this report

3    contain experiments on some of the other compounds that you

4    tried to see their effect on the corneal permeability of

5    gatifloxacin?

6    A.      Yes, it does.

7    Q.      And can I ask you to point to -- for example,

8    does Table 4, does that report some corneal permeability

9    test?

10   A.      Table 4?

11   Q.      Yes.

12   A.      Yes, it is.

13   Q.      And what is sodium laurel sulfate?

14   A.      We thought it was an eye impair agent that would

15   improve corneal permeability.

16   Q.      Did it?

17   A.      No, it did not.

18   Q.      Can I ask you to look at Table 5?  And what does

19   Table 5 show?

20   A.      This is another one of corneal permeability

21   experiments.

22   Q.      And were you trying -- were you experimenting with

23   sorbic acid to improve corneal permeability?

24   A.      Yes, I was.

25   Q.      And why did you try sorbic acid?

Yasueda - direct

1    A.    I thought it -- because I thought it had a

2    possibility as an eye impair.

3    Q.    And what was the result?

4    A.    We did not obtain good results.

5    Q.    Does this report contain all the testing you did on

6    corneal permeability?

7    A.    Yes, it does.

8    Q.    And so it contains all the testing that you did as in

9    PTX-8?

10   A.    No.

11   Q.    So there's additional testing that I would find in

12   PTX-8?

13   A.    What is PTX-8?

14   Q.    To the right.  JTX.  Excuse me.  I'm sorry.

15   A.    Yes, JTX-8 contains all the data.

16   Q.    Thank you.

17            MR. KELLY:  I believe I offered that into

18   evidence, but I hope I did as a JTX number, your Honor.

19            THE COURT:  Well, we'll correct it if you

20   didn't.

21   BY MR. KELLY:

22   Q.    Who prepared JTX-24?  Who drafted it?

23   A.    I did.

24   Q.    Okay.  As a result of the corneal permeability

25   testing, did you ultimately find an agent which improved

Yasueda - direct

1    gatifloxacin's corneal permeability?

2    A.    Yes.  Eventually, we obtained the results that EDTA

3    was the best additive.

4              MR. KELLY:  I'd like to offer JTX-24 into

5    evidence.

6              THE COURT:  Any objection?  I will assume none.

7              MR. ABRAMOWITZ:  No objection.

8              THE COURT:  All right.

9              (JTX-24 was received into evidence.)

10   BY MR. KELLY:

11   Q.    Are there results with -- are some of the results

12   that you obtained with EDTA reported in JTX-24?

13   A.    Yes.  Yes.

14   Q.    And where would I find those?

15   A.    The results are in Tables 7, 9 and 10 of this report.

16   Q.    And what do those tables show?

17   A.    These tables show the presence of gatifloxacin in

18   aqueous humor in rabbits when gatifloxacin eyedrops were

19   given.

20   Q.    And what did you conclude from these -- this data

21   with respect to the effect of EDTA?

22   A.    The results obtained were that when low concentration

23   of EDTA is added -- when a very low concentration of EDTA is

24   added to gatifloxacin eyedrops, the transfer of gatifloxacin

25   to -- into aqueous humor was improved.

Yasueda - direct

1    Q.      Were you surprised by this result?

2    A.      Yes, I was.  It had been reported that when EDTA of

3    high concentration was added, there was an improvement,

4    but this was the first time that gatifloxacin's permeability

5    improved at a low concentration, so I was very surprised.

6    Q.      Has Senju seen this effect with any other ophthalmic

7    solution that is developed?

8    A.      We have tested it with other eyedrops, but this was

9    the first time we had seen the effect.

10   Q.      Was there any need for Senju to improve

11   gatifloxacin's permeability?

12   A.      There was a drug called levofloxacin, and because

13   of that existence, we thought this was an important

14   additive.

15   Q.      Is there any information --

16          THE INTERPRETER:  Wait.  Excuse me.

17          We thought it was important to come up with this

18   as an additive because -- to go against levofloxacin.

19   BY MR. KELLY:

20   Q.      Is there any data in JTX-24 showing the relative

21   permeability of levofloxacin and gatifloxacin?

22   A.      That result is shown in Table 10.

23   Q.      Is there any --

24          MR. KELLY:  Can I ask, Chris, can you bring up

25   23742, please?  And if you could blow out Table 10 at the

Yasueda - direct

1    top.

2    BY MR. KELLY:

3    Q.      And what does Table 10 show, Dr. Yasueda?

4    A.      This is the result of AUC obtained after giving each

5    eyedrop to rabbits.

6    Q.      And what does this show?

7    A.      It shows that by adding EDTA to an eyedrop with

8    gatifloxacin, it becomes as effective as levofloxacin

9    eyedrop, or effective -- or more effective than levofloxacin

10   eyedrop.

11   Q.      And without the EDTA, was it -- what was its

12   effectiveness?

13   A.      Without the EDTA, we were not able to achieve the

14   same level of, same level of effectiveness as levofloxacin.

15   Q.      And, Dr. Yasueda, we've been using the word

16   gatifloxacin.  Is AM-1155 a code name for gatifloxacin?

17   A.      Yes, it is.

18   Q.      Is any of the data that is found in JTX-24, is any of

19   that found in the patent?

20   A.      Yes.  The results in Table 7 is contained in the

21   patent.

22   Q.      And which table -- and where is it found in JTX-1?

23              MR. KELLY:  Chris, could you bring up 178?

24              THE WITNESS:  The results are in Table 2 of the

25   patent.

Yasueda - direct

1   BY MR. KELLY:

2   Q.    And which of the formulations identified in Table 2

3   appear in Table 7?

4   A.    A is No. 1 in Table 7.  B is F1 in Table 7.  And C is

5   about E4 in Table 7.

6   Q.    Thank you.  Is the raw data found in Table 7 found in

7   JTX-8?

8   A.    Yes.

9   Q.    And where might I find that?

10          And if I could help the witness and direct him

11  to -- actually, if you look in the smaller book, we have

12  simplified things.  I'm going to direct the witness to

13  SEN18068 and ask if that is the page that records the raw

14  data.

15          THE INTERPRETER:  Could you say the serial

16  number again?

17          MR. KELLY:  18068.  And for everybody's

18  convenience, we put on the board PTX-179.

19          Your Honor, could I offer PTX-178 for your use

20  in reviewing the record?

21          THE COURT:  Not if it's going to be up there.

22          MR. KELLY:  Excuse me.

23          THE COURT:  I said usually I just -- I don't

24  need any extra paper.

25          MR. KELLY:  Okay.  Thank you, your Honor.

Yasueda - direct

1    BY MR. KELLY:

2    Q.    Can you identify for us where we would find value

3    that is shown in Table 2 of the patent on Senju 18068?

4    A.    If you look at the bottom line of the third table on

5    the page, the value, 1.932 is in Table 2 of the patent.

6              MR. KELLY:  And if you could click once, Chris.

7    BY MR. KELLY:

8    Q.    And which experiment samples were used to calculate

9    that number?  Which samples were used to calculate the

10   number shown at the bottom of the bottom chart?  The 1.932.

11   A.    The average was obtained by using the numbers under

12   10R, 11L, 13R, 14L, 16R, in the second table.

13   Q.    Now, I noticed that there is a line drawn through the

14   information to the right of Sample 11L.  Do you know who

15   drew those lines?

16   A.    Yes.  I did it.

17   Q.    Why did you draw lines there?

18   A.    I drew these lines to omit this result because the

19   result of this sample was so different from other samples.

20   Q.    And did you calculate an average omitting this

21   sample?

22   A.    Yes.

23   Q.    And what average did you get?

24   A.    I'm sorry.  I did not understand the question.

25   Q.    And what was the average you calculated omitting

Yasueda - direct

1  Sample 11L?

2  A.    It was 2.256.

3  Q.    And does that show greater penetration of the

4  gatifloxacin than the 1.932?

5  A.    Yes, it did.

6  Q.    Why did you use the lower number in Table 2 of the

7  patent?

8  A.    It is because we thought that this low value, 1.932,

9  was sufficient to see, show the effect of EDTA; and to have

10 a conservative position, we included the value for 11.

11 Q.    Thank you.  Does Senju sell a gatifloxacin ophthalmic

12 solution in Japan?

13 A.    Yes, it does.

14 Q.    Does that formulation contain EDTA?

15 A.    No, it does not.

16 Q.    Why not?

17 A.    In Japan, ophthalmological doctors do not ophthalmic

18 agents with EDTA or BAK and because we market in Japan, the

19 formulations don't contain them.

20 Q.    Thank you.  Now --

21          THE INTERPRETER:  Wait.  Let me start over.

22          In Japan, ophthalmic, ophthalmological doctors

23 do not like ophthalmic agents containing EDTA or BAK.  And

24 because we market in Japan, the formulations don't contain

25 them.

Yasueda - direct

1    BY MR. KELLY:

2    Q.      Thank you.  Did you conduct any studies to try to

3    improve the stability of the gatifloxacin ophthalmic

4    solution?

5    A.      Yes, I did.

6    Q.      And did you write any report that contains the

7    results of those studies?

8    A.      Yes I did.

9    Q.      Can I ask you to look at JTX-23, please?

10   A.      Yes.

11   Q.      Is that the report that contains the results of the

12   testing to improve stability?

13   A.      Yes, it is.

14            MR. KELLY:  I'd like to offer JTX-23 into

15   evidence.

16            MR. ABRAMOWITZ:  No objection.

17            (Joint Trial Exhibit No. 23 was received into

18   evidence.)

19   BY MR. KELLY:

20   Q.      And did you experiment with different additives to

21   try and improve the formulation stability?

22   A.      Yes, I did.

23   Q.      And what types of additives did you try?

24   A.      I have tried various additives, such as surfactants

25   and polymers.

Yasueda - direct

1   Q.      And what did you conclude was the best at improving

2   the stability?

3   A.      Even though at a very low concentration of EDTA, we

4   obtained the results that -- we obtained the results that

5   there was no precipitation of gatifloxacin after freeze and

6   thaw testing.

7               MR. KELLY:  Let me ask, Chris, can you put up

8   17515?  17515.

9               We seem to be having technical difficulties

10  here.

11  BY MR. KELLY:

12  Q.      And what does that page show, Dr. Yasueda?

13  A.      It shows that when gatifloxacin eyedrops were frozen

14  and thawed, when precipitation of gatifloxacin is observed.

15              Did you say Page 17515?

16  Q.      Yes.

17  A.      It's in the table at the top.

18  Q.      And what did you conclude from those results?

19  A.      The results were -- the results obtained were that

20  when a low concentration of EDTA is added to gatifloxacin

21  eyedrops, after freeze and thaw testing, there was no

22  precipitation.

23  Q.      Were you surprised by the results?

24  A.      Yes, I was very surprised because there was no report

25  of EDTA's effect on prevention of precipitations in the

Yasueda - direct

1   past.

2   Q.      Have you observed that effect since then?

3   A.      Observed?

4   Q.      Have you observed this effect with EDTA for other

5   drugs since you performed this work?

6            MR. ABRAMOWITZ:  Objection, your Honor.

7   Foundation.  I think Dr. Yasueda answered wrong.  Senju has

8   knowledge of all these formulations.

9            THE COURT:  The question was, has Senju as

10  opposed to has he?

11           MR. ABRAMOWITZ:  Yes.

12           MR. KELLY:  He's the director of the

13  formulations lab, your Honor.

14           MR. ABRAMOWITZ:  But Senju has been around

15  longer than Dr. Yasueda's formulations lab.

16           THE COURT:  Maybe you can restate the question.

17  BY MR. KELLY:

18  Q.      Dr. Yasueda, are you aware of any other drugs for

19  which this effect of EDTA has been observed?

20  A.      No, I was not.

21  Q.      Is the freeze-thaw testing that is recorded in JTX-23

22  a standard test at Senju?

23  A.      Yes, it is.

24  Q.      And is this a test that's performed when Senju is

25  developing ophthalmic solutions?

Yasueda - cross

1    A.      Yes, it does.

2               MR. KELLY:  I'd like to offer JTX-23 into

3    evidence in case I haven't previously.

4               THE COURT:  No objection?

5               MR. ABRAMOWITZ:  No objection.

6               MR. KELLY:  Sorry.

7               (JTX-23 was received into evidence.)

8    BY MR. KELLY:

9    Q.      Dr. Yasueda, I'd like to ask you to look at what has

10   been marked as JTX-25, 30 and 31.

11   A.      Yes.

12   Q.      What type of tests are reported in JTX-25, 30 and 31?

13   A.      It is tests on drug corneal permeability.

14   Q.      Okay.  And is that drug gatifloxacin?

15   A.      Yes.

16               MR. KELLY:  I'd like to offer JTX-25, 30 and 31

17   into evidence, your Honor.

18               MR. ABRAMOWITZ:  No objection.

19               THE COURT:  Thank you.

20               (JTX-25, 30 and 31 were received into evidence.)

21               MR. KELLY:  And we'd pass the witness.

22               THE COURT:  All right.  Cross-examination.

23                       CROSS-EXAMINATION

24   BY MR. ABRAMOWITZ:

25   Q.      Good morning, Dr. Yasueda.

Yasueda - cross

1              If you could turn to JTX-001 in your book,

2    the '045 patent.

3    A.      Good morning.

4    Q.      Please look at Experiment 1 of the '045 patent,

5    Table 1.

6    A.      Yes.

7    Q.      Am I correct that all the formulations displayed in

8    Table 1 and tested in Experiment 1 contained .5 percent

9    weight volume gatifloxacin?

10   A.      Yes, I think so.

11   Q.      And am I also correct that all formulations tested in

12   Table 1 contained .9 percent weight volume sodium chloride?

13   A.      Yes, it is.

14   Q.      And is it true that no formulations tested in Table 1

15   contained BAK?

16   A.      Right.

17   Q.      So am I correct that no formulations in Table 1

18   contained .3 percent weight volume gatifloxacin, .82 percent

19   weight volume sodium chloride and BAK?

20   A.      Could you ask the question again?

21   Q.      Looking at Table 1, do any of the formulations

22   contain .3 percent weight volume gatifloxacin, .82 percent

23   weight volume sodium chloride and BAK?

24   A.      I didn't understand the interpretation of the

25   question.  What was the percentage for BAK?

Yasueda - cross

1    Q.      Any percentage.

2    A.      It is correct that there is no such formulation in

3    this table.

4    Q.      And would you agree with me, that a formulation

5    with less gatifloxacin, less sodium chloride and BAK would

6    be a completely different formulation than any tested in

7    Table 1?

8    A.      I'm not sure what you mean by different, but there is

9    no such formulation in this table.

10   Q.      And is it true that Formulation C is the only

11   formulation that contains disodium edetate in the table?

12   A.      Yes, it is.

13   Q.      And is it correct that sodium edetate in Formulation

14   C is .05 percent?

15   A.      Yes, it is.

16   Q.      And would you agree that Formulation C did not

17   contain .01 percent disodium edetate?

18   A.      Are you saying that there is no formulation with

19   .01 percent EDT concentration formulation?

20   Q.      Yes.

21   A.      Yes.

22   Q.      And would you agree that you would consider a

23   formulation using a different amount of that same edetate to

24   be a different formulation from those in Table 7 -- Table 1

25   as well?

Yasueda - cross

1    A.      If the EDTA concentration is different, I think it is

2    a different formulation.

3    Q.      And am I correct that Formulation A was formulated at

4    pH 7.0?

5    A.      Yes.

6    Q.      And is it your understanding that pH changes can

7    affect the corneal permeability of gatifloxacin?

8    A.      pH level is one of the factors that affect the

9    corneal permeability.

10   Q.      Dr. Yasueda, if you could open JTX-024.

11           MR. ABRAMOWITZ:  If I could get that up on the

12   screen.

13   BY MR. ABRAMOWITZ:

14   Q.      Table 7 on Page SEN23740.

15           Now, you earlier testified, am I correct -- now,

16   am I correct that you earlier testified that Table 7

17   includes formulations A, B and C of the '045 patent?

18   A.      Yes.

19   Q.      And am I correct that the number of rabbit eyes

20   tested for Formulation A, which was number one, differs from

21   the number of rabbit eyes tested for Formulation C, which

22   was E-4?

23   A.      Can you say -- can you repeat the question?

24   Q.      Yes.  And am I correct that the number of rabbit eyes

25   tested for Formulation 1, which was A, differs of that from

Yasueda - cross

1    Formulation E-4, which was C?

2    A.    Yes.

3    Q.    And the number of rabbit eyes tested for formulation

4    B, which was F-1, also differs from the number of rabbit

5    eyes tested for E-4, which was C; is that correct?

6    A.    Yes.

7    Q.    And so am I correct that Table 7 of JTX-024 and

8    Table 2 of the patent do not describe tests where the

9    results for all three formulations were tested on the same

10   set of rabbits?

11   A.    I'm not sure what you mean by the eyes of the same

12   rabbit, same set of rabbits, but rabbits have two eyes, so

13   we use both eyes.

14   Q.    But in testing Formulations 1, F-1 and E-4, did you

15   test all three formulations on the same set of rabbits in

16   the same experiment?

17   A.    Are you trying to say -- I guess what you are trying

18   to say is that after obtaining aqueous humor, we need to

19   kill the rabbits.  So are you asking, are you saying that

20   that each test results were obtained from different rabbits?

21   Q.    That's correct.

22   A.    That is correct.

23          MR. ABRAMOWITZ:  And could you bring up, from

24   JTX-8, Page SEN18068.  And could you blow up the table on

25   the bottom?

Yasueda - cross

1            THE INTERPRETER:  This is JTX number, reminded?

2            MR. ABRAMOWITZ:  JTX-008.

3            THE WITNESS:  Yes.

4   BY MR. ABRAMOWITZ:

5   Q.     Dr. Yasueda, am I correct that this experiment is

6   where the data for formulation E4 comes from?

7   A.     Yes, it is.

8   Q.     But the data for formulation F1 does not come from

9   this experiment; is that correct?

10           But the data for formulation F1 does not come

11  from this experiment; is that correct?

12  A.     Right.  It is from a different experiment.

13  Q.     And this experiment also does not contain all the

14  data for Formulation 1; is that correct?

15  A.     The data for Formulation No. 1 is at the top line

16  where N is 6.

17  Q.     But the data contained on this page for Formulation

18  F1 is not all of the data for Formulation 1 on Table 7; is

19  that correct?

20  A.     Yes, we conducted various experiments obtaining

21  these -- and obtained these results.  So the result of some

22  of these experiments are shown as the top line.

23  Q.     Going back to the number with the strikethrough in

24  it, at the top of this page, for 11L, Dr. Yasueda, did you

25  place your initials and the date next to the strikethrough

Yasueda - cross

1   for Rabbit 11L?

2   A.      I did not.

3   Q.      And did you do any analysis to determine whether any

4   of this data was, for example, an outlier that should not be

5   included in Table 7?

6   A.      Because the calculation was eventually made with the

7   value of 11L included, we did not pursue the reason why it

8   was an outlier.

9   Q.      So could you please turn to the next page SEN18069?

10  A.      You asked about my signature, but there is a seal of

11  mine at the top of that page.

12  Q.      But that signature isn't next to the number; is that

13  correct?

14  A.      Yes.

15  Q.      Going back to JTX-024, could you please look at Table

16  9?

17  A.      Yes.

18  Q.      And am I correct that this table also includes

19  testing of formulations F1 and E4?

20  A.      Yes, it is.

21  Q.      And was Formulation F1 without disodium edetate --

22  strike that.  And did Formulation F1 without disodium

23  edetate have a higher concentration of gatifloxacin in the

24  aqueous humor at the .5 hour time point than Formulation E4

25  with disodium edetate?

Yasueda - cross

1   A.      Yes, the number is as you said.

2   Q.      And am I correct that at the one hour time point, the

3   difference between mean concentrations of E4 and F1 was less

4   than 1.5 times as much?

5   A.      Yes.  If you look at the elapsed time of one hour,

6   then it is less than 1.5 times.  But these are animal

7   experiments, so if you look at the elapsed time of two

8   hours, it is twice as much.

9   Q.      But, Dr. Yasueda, for the values at the one hour time

10  point, does this information differ than the results that

11  were presented in Table 2 of your patent?

12  A.      What do you mean that the number differ from the one

13  in Table 2?

14  Q.      Does the increase between E4 and F1 differ between

15  Table 9 and Table 1?

16  A.      Did you mean Table 9 and Table 2?

17  Q.      Yes.

18  A.      Yes, because they are different experiments.  That is

19  why they are different.

20  Q.      Going back to your patent, JTX-001, and looking at

21  Table 3, did all the formulations in the precipitation

22  experiment, Experiment 2, also contain .5 percent weight

23  volume gatifloxacin?

24  A.      Yes.

25  Q.      And none of these formulations contain .3

Yasueda - cross

1    gatifloxacin; is that right?

2    A.    Yes.

3    Q.    And none of the formulations in Table 3 contain

4    benzalkonium chloride; correct?

5    A.    Yes.  BAK.  No, none of these contain BAK.

6    Q.    And none of the formulations in Table 3 contain .1

7    percent disodium edetate; is that correct?

8    A.    Yes.  None of the formulations contains .01 of EDTA.

9    Q.    And, Dr. Yasueda, are you familiar with the

10   formulation of the Zymar product?

11   A.    The Zymar formulation is in Example 9 of this patent.

12   Q.    And is it true that Experiment 1 does not test the

13   Zymar formulation?

14   A.    Right.

15   Q.    And is it true that Experiment 2 does not test the

16   Zymar formulation?

17   A.    Right.

18   Q.    Dr. Yasueda, are you aware of what the Apotex

19   formulation is?

20   A.    No.

21   Q.    If you could turn to JTX-025.

22   A.    Yes.

23   Q.    Looking at Page SEN11683.  Am I correct that the

24   formulations test in this experiment contain .5 percent

25   gatifloxacin?

Yasueda - cross

1    A.    Yes.

2    Q.    And am I correct that the formulations tested in this

3    formulation were at pH 5.5?

4    A.    Yes.

5    Q.    And am I correct that neither formulation tested in

6    this experiment is the Zymar formulation?

7    A.    Right.  It said so, so I think that is correct.

8          Yes, is written so, so I think that is correct.

9    Q.    Turning to Page SEN11686.  Is it correct that the

10   difference in aqueous humor concentration between the two

11   formulations was less than 1.5 times?

12   A.    You can obtain that it was -- it did not reach 1.5

13   times with this chart.

14   Q.    And looking back at SEN1185, am I correct that the

15   difference between these two formulations was not

16   statistically significant?

17   A.    Because I did not conduct this experiment, I don't

18   have in-depth knowledge, but if the result was not

19   statistically significant, it would have been mentioned

20   here.

21   Q.    All right.  Is that fact mentioned on Page SEN11685?

22   A.    The summary says that the difference was not

23   significant.

24   Q.    Dr. Yasueda, could you please turn to JTX-30, Page

25   SEN14815?

Yasueda - cross

1    A.    Yes.

2    Q.    Looking at the formulations on SEN14815, did either

3    of the formulations tested in this experiment contain BAK?

4    A.    No.

5    Q.    And did either of the formulations tested in this

6    experiment contain .82-percent sodium chloride?

7    A.    .82 percent?

8    Q.    Correct.

9    A.    No.  It was .86 percent.

10   Q.    And am I correct that neither of these formulations

11   is the same as Zymar?

12   A.    Yes.

13   Q.    Looking at Pages SEN14821, does this page present

14   aqueous humor concentrations for corneal permeability

15   testing of these formulations?

16   A.    Yes.

17   Q.    And at the one hour time point, was the difference

18   between the formulation with EDTA and the formulation

19   without EDTA less than 1.5 times?

20   A.    I did not do this experiment, so I am not familiar

21   with it, but as far as the notations of the -- in the table

22   go, one hour time point, it was less than 1.5 times, but

23   there was significant difference at .5 hour time point.

24   Q.    But am I correct there was not a significant

25   difference at the one hour time point?

Yasueda - cross

1   A.      Yes.

2   Q.      And turning to Page SEN1520057 of JTX-031, are the

3   formulations tested in JTX-031 identical to the formulations

4   tested in JTX-030?

5   A.      Excuse me.  Could you repeat the question?

6   Q.      Yes.  Are the formulations test in JTX-031 identical

7   to the formulations tested in JTX-30?

8   A.      Yes, I believe so, as far as I can see them now.

9   Q.      Turning to Page SEN15063, are corneal permeability

10  results for these formulations reported on this page?

11  A.      Yes.

12  Q.      And is the difference between the concentration

13  of gatifloxacin and the aqueous humor at the one hour

14  time point less than 1.5 times between the two

15  formulations?

16  A.      I have to do the math, but it is about 1.5, or a

17  little less.

18  Q.      Are you sure, Dr. Yasueda, that it's not 1.2?

19  A.      If you did the calculation, I'm sure that is correct.

20  Q.      And, Dr. Yasueda, is the one hour time point reported

21  on this page to be statistically significant?

22  A.      I didn't do the calculation, so I don't know, but

23  at least it does not say that it is statistically

24  significant.

25  Q.      Okay, Dr. Yasueda.  If you could turn back to

Yasueda - cross

1    JTX-024.

2               THE COURT:  We've been at it for two hours.  If

3    you are just about to finish up?  All right.  Why don't you

4    go ahead and finish up.

5    BY MR. ABRAMOWITZ:

6    Q.     JTX-24, Table 11.  And am I correct, Dr. Yasueda,

7    that this is the table dealing with BAK?

8    A.     Yes, it is.

9    Q.     And is the mean concentration number for BAK greater

10   than the mean concentration number for the formulation

11   without BAK?

12   A.     No.  Can you -- can you ask the question again?

13   Q.     Is the number, mean number for BAK, 1.14, higher than

14   the mean number for the formulation without?

15   A.     Yes.

16   Q.     But you reported that no effect was observed; is that

17   correct?

18   A.     This is the experiment I did and as a result of

19   various experiment results, I determined that there was no

20   effect.

21   Q.     And how did you determine there was no effect?

22   A.     The value of the formulation with the BAK and the

23   value of the formulation without the BAK is about ten

24   percent, so at the time I thought that -- I felt that there

25   was no effect of BAK.

Yasueda - redirect

 1              MR. ABRAMOWITZ:  Thank you, Dr. Yasueda.  Thank

 2   you, your Honor.

 3              THE COURT:  All right.  Let's take our lunch

 4   break.

 5              (Luncheon recess taken.)

 6                        -   -   -

 7              AFTERNOON SESSION - 1:34 P.M.

 8              THE COURT:  Redirect.

 9              MR. KELLY:  I'd say just a little, your Honor,

10   but ...

11                   REDIRECT EXAMINATION

12   BY MR. KELLY:

13   Q.    Dr. Yasueda, I'd like to direct your attention to

14   JTX-30, at Page SEN14821.

15   A.    Yes.

16              MR. KELLY:  And I would first like, if you

17   could, Chris, just blow up the top three tables.

18   BY MR. KELLY:

19   Q.    Do these tables show, or calculate, the amount of

20   increase that one obtains in gatifloxacin penetration

21   compared to the current product?

22   A.    Yes.

23   Q.    And what is Cmax?

24   A.    Cmax is the --

25              MR. ABRAMOWITZ:  Objection.  That is outside the

Yasueda - redirect

1    scope of cross.

2              THE COURT:  Objection overruled.

3              THE WITNESS:  Cmax is the concentration when the

4    concentration in aqueous humor is the highest.

5    BY MR. KELLY:

6    Q.    And in that experiment, which formulation gave the

7    highest value?

8    A.    The Cmax was the highest with the formulation with

9    EDTA.

10   Q.    And the ratio is 1.27; is that correct?

11   A.    Yes.

12   Q.    And if we go over, it says AUC.  And it looks like a

13   0-2 hours?

14   A.    Yes.

15   Q.    And what is the ratio of the EDTA formula to the

16   current ratio at two hours?

17   A.    The table shows that it's 1.4.

18   Q.    Thank you.  Now, if you would look at the graph below

19   that.

20              Is there any information on the legend of that

21   graph that would explain how the gatifloxacin ophthalmic

22   solution was administered?

23   A.    Would you please repeat the question?

24   Q.    Sure.  Is there any information on the legend

25   underneath the figure which explains how the gatifloxacin

Yasueda - redirect

1   solutions were administered to the rabbit?

2   A.    Yes.  It says that 50 milliliter eyedrop was

3   administered in 15-minute intervals, three times.

4   Q.    Now, is the half-hour time interval, is that

5   determined after the administration of the first or the

6   last drop?

7   A.    It is the last time or 30 minutes after the last

8   drop.

9   Q.    And that would be one hour after the first drop?

10  A.    An hour and 15 minutes.  No, one hour.

11  Q.    Fine.  Now we're finished with that.  Could I direct

12  your attention to JTX-31, please.

13          MR. KELLY:  And if we could bring up SEN15062.

14  BY MR. KELLY:

15  Q.    Is there any conclusion -- excuse me.  I'm ahead of

16  you?

17  A.    15062?

18  Q.    Yes.

19          Is there any conclusion drawn and reported on

20  that page regarding the impact EDTA has on gatifloxacin

21  permeability?

22  A.    Yes.

23  Q.    And what is the conclusion?

24  A.    It says that EDTA eventually enhances the corneal

25  permeability of gatifloxacin.

Yasueda - redirect

1   Q.     And does it report on how the AUC values are

2   increased?

3   A.     Yes.

4   Q.     And what does it report?

5          Let me withdraw the question.

6          Dr. Yasueda, did the report make any conclusion

7   as to whether or not EDTA's migration into the aqueous humor

8   was increased by blending with 0.01 percent EDTA?

9   A.     Yes, it is indicated that with the addition of

10  .01 percent EDTA, gatifloxacin eyedrops showed the

11  improvement in the transfer of gatifloxacin into the

12  aqueous humor.

13         MR. KELLY:  No further questions, your Honor.

14         THE COURT:  All right.  You may step down.

15  Thank you very much.

16         MR. ABRAMOWITZ:  Your Honor, could we have

17  recross?

18         THE COURT:  I don't allow recross unless it was

19  truly something extraordinarily new.

20         (Witness excused.)

21         MR. KELLY:  Your Honor, if I may remove the

22  binders to make room for the next witness?

23         THE COURT:  You certainly may.

24         MR. KELLY:  Thank you.

25         (Binders removed.)

Aijima - direct

1            MR. WEST:  Your Honor the plaintiffs call

2     Hiroshi Aijima.  And, your Honor, may I have permission to

3     hand up a binder?

4            THE COURT:  You may.

5            (Witness handed a binder, then takes witness

6     stand.

7            HIROSHI AIJIMA, having been first duly sworn

8     testified and was examined as follows:

9                    DIRECT EXAMINATION

10    BY MR. WEST:

11    Q.    Good afternoon, Dr. Aijima.  I understand today you

12    will be speaking or testifying in English.  I also

13    understand it's your second language and that you may have

14    some difficulty understanding the questions that are either

15    posed by myself or opposing counsel.  If you do have any

16    problems understanding the question, I would appreciate if

17    you ask either myself or opposing counsel, depending on who

18    is asking the question, for an interpretation.  Do you

19    understand?

20    A.    Yes, I do.

21    Q.    Okay.  Are you currently employed?

22    A.    Yes.  I'm a Senior Advisor of Business Development at

23    Kyorin company.

24    Q.    And what are your responsibilities as Senior Advisor?

25    A.    I advise my colleagues on matters such as evaluation

Aijima - direct

1    of products of company.

2    Q.    And in 2000, were you also employed by Kyorin?

3    A.    Yes, I was.

4    Q.    And did your responsibilities in 2000 also include

5    licensing?

6    A.    Yes.

7    Q.    Do you know whether Kyorin has any license agreements

8    involving the compound gatifloxacin?

9    A.    Yes.  Kyorin has licensed exclusively to Senju to use

10   -- and use all technical information and know-how in Japan,

11   Korea, China and Hermosa.

12   Q.    And I would ask that you turn to -- in your binder to

13   JTX-043.

14              MR. WEST:  Chris, could you put that on the

15   screen.  And could you put Page 2 on the screen, please?

16              THE WITNESS:  Yes.

17   BY MR. WEST:

18   Q.    Is this the exclusive license agreement between

19   Kyorin and Allergan that you were referring to?

20   A.    Yes.

21   Q.    Could you next turn to JTX-001 that is also in your

22   binder?

23   A.    Yes.

24   Q.    Do you recognize this document?

25   A.    Yes.  This is U.S. Patent No. 6,333,045.  It's a

Aijima - direct

1    formulation of gatifloxacin.  This is the matter of this

2    suit.

3    Q.    And, earlier, you stated that the exclusive license

4    agreement covered patent rights.  Does the exclusive license

5    agreement between Allergan and Kyorin include U.S. patent

6    6,333,045?

7    A.    Yes, it does.  But in United States, it not

8    specifically listed, but it is included as a pending patent

9    application.

10              MR. WEST:  Chris, could you put Section 1.9 of

11   JTX-043?

12   BY MR. WEST:

13   Q.    And, Dr. Aijima, how does the fact that the exclusive

14   license covers pending patent applications mean that U.S.

15   patent 6,333,045 is included as part of the license?

16   A.    License application was reviewed 9th of August, 2000.

17   And Kyorin exclusively licensed Allergan patent rights.  And

18   the patent, pending patent, pending patent application is

19   one of patent rights.  And this patent was filed in 1996 in

20   U.S.  Therefore, when we sign up the license agreement, it

21   was pending patent application.

22   Q.    Dr. Aijima, I'd like to take you back to JTX-001.

23   I'd just like you to confirm the filing date of the '045

24   patent.

25   A.    Filing date?

Aijima - direct

1    Q.      Yes.

2    A.      January 4th, 2000.

3    Q.      I'm sorry.  Okay.  And on what date was the PCT

4    application filed in that case?

5    A.      August 20th, 1999.

6    Q.      And are both August 20th, 1999, and April 21st, 2000,

7    prior to the effective date of the license agreement?

8    A.      Yes.

9    Q.      And when you state that this is an exclusive license

10   agreement, are you referring to the license agreement of

11   Section 2.11 of this agreement?

12   A.      Yes.

13                MR. WEST:  Would you go to Section 2.3.

14   BY MR. WEST:

15   Q.      What does Section 2 .1 say is being licensed?

16   A.      Kyorin's exclusive patent rights under the patent

17   right to use -- to use information and know how to make, to

18   have made, used and sell licensing products.

19   Q.      And when you refer to licensed products, what do you

20   mean?

21   A.      Licensed products is defined as 2.1.

22   Q.      Doctor, if I could be of some assistance, could you

23   refer to the screen?

24   A.      1.6.  And indicated that mentioned, but it's a -- a

25   solution containing --

Aijima - direct

1   Q.      And how do you know that it contains gatifloxacin?

2   A.      It contains the licensed -- licensed --

3   Q.      Okay.

4   A.      1.2.

5            MR. WEST:  Your Honor, we would like to move

6   into evidence JTX-043.

7            THE COURT:  Any objection?

8            MR. GALLAGHER:  No objection.

9            THE COURT:  Thank you.

10           (JTX-043 was received into evidence.)

11  BY MR. WEST:

12  Q.      Dr. Aijima, have you been deposed before?

13  A.      Yes.  In this case.

14  Q.      And during that deposition, did you testify regarding

15  the license between Kyorin and Allergan?

16  A.      Yes.

17  Q.      And during your deposition, did you testify "as far

18  as seeing this license agreement, it does not touch upon

19  '045 patent at this point"?

20  A.      Yes.  I said that -- because in the license

21  agreement, it did not specifically restate, but it's pending

22  patent application.  So it's part of license.

23  Q.      Dr. Aijima, I'd also like to take you to Section 5.1

24  of the agreement.

25  A.      Yes.

Aijima - direct

1   Q.      What does 5.1 say that Allergan will be paying the

2   royalties for?

3   A.      Paying royalty to Kyorin and 25 percent of the net

4   sales.

5   Q.      Of what?  The net sales of what?

6   A.      Net sales is the --

7   Q.      I'd refer you back to 5.1, Dr. Aijima.

8                   Dr. Aijima --

9   A.      Yes?

10  Q.      I'm asking about the royalties that are being paid on

11  the net sales of what?

12  A.      25 percent.

13  Q.      Okay.  The royalties are 25 percent of the net sales

14  of what?  What is the 25 percent being paid for -- of?

15  Okay.

16  A.      I can't understand.

17  Q.      All right.  I withdraw the question.

18                  Dr. Aijima, I'd next like to take you to

19  PTX-227.

20                  Are you aware of any other agreements between

21  Kyorin and Allergan?

22  A.      Yes, we have supplemental agreement which Kyorin

23  surprise API with gatifloxacin for use.

24  Q.      And could you turn to the second page of this

25  agreement, please?

Aijima - direct

1               And is this the supply agreement that

2  Allergan and Kyorin entered into to supply gatifloxacin API?

3  A.      Yes.

4               MR. WEST:  Your Honor, we wish to move in

5  PTX-227.

6               MR. GALLAGHER:  No objection.

7               THE COURT:  Thank you.

8               (PTX-227 was received into evidence.)

9  BY MR. WEST:

10 Q.      And has Kyorin provided gatifloxacin to fully supply

11 Allergan's requirements for API for the use in ophthalmic

12 solutions in the past?

13 A.      Yes.

14 Q.      And should there be an increase in the demand for

15 gatifloxacin in API for use in aqueous liquid formulations,

16 would Kyorin be able to meet that additional demand?

17 A.      Yes, because the current -- during production is

18 seven kilograms per month.  82,000 kilograms a year.  And we

19 have also over whole seven kilograms in stock, and

20 currently, that requirement of Allergan, a hundred kilograms

21 a year.  Therefore, we have enough.

22              MR. WEST:  Thank you, Dr. Aijima.  I pass the

23 witness.

24              THE COURT:  Cross-examination.

25                      CROSS-EXAMINATION

Aijima - cross

1   BY MR. GALLAGHER:

2   Q.      Good afternoon, Dr. Aijima.

3   A.      Good afternoon.

4   Q.      Would you turn to JTX-043, Paragraph 1.9?

5   A.      Yes.

6   Q.      And this is the section defining patent rights which

7   are being licensed by this agreement; is that correct?

8   A.      The patent rights.  Division patent rights, all

9   patent, and pending patent applications and other type of

10  patents.

11  Q.      And does this paragraph also say that current patent

12  rights are listed in Appendix 1?

13  A.      No.  Current patent, no.

14  Q.      Could I direct your attention to the final sentence

15  of this paragraph?

16  A.      Yes.

17  Q.      Does this section indicate that current patent rights

18  are listed in Appendix 1?

19  A.      Yes.

20  Q.      Okay.  Would you turn to Appendix 1, please?  I

21  believe it's on Page 24 of the document.

22          And in Appendix 1, am I correct that this does

23  not specifically mention '045 patent?

24  A.      No.

25  Q.      And this does not specifically mention the patent

Aijima - cross

1    application for the '045 patent; is that correct?

2    A.    It doesn't mention that.

3    Q.    All right.  Would you turn to Paragraph 6.3?  It

4    starts on Page 11 and runs over to Page 12.

5              Does this paragraph of the license agreement

6    provide that there will be a license for any improvements

7    given?

8    A.    Yes.

9    Q.    And if you look to Paragraph 6.2, was Kyorin supposed

10   to advise Allergan about any patent applications covering

11   improvements?

12   A.    The question?

13   Q.    Am I correct that Kyorin was supposed to advise

14   Allergan regarding patent application for any improvement?

15   A.    Yes.

16   Q.    Would you turn to Article X of the agreement at Page

17   18?

18   A.    Article what?

19   Q.    Article X, Roman Numeral X.  Article X, notices, on

20   Page 18.

21             And does this section provide that any notice

22   required by the terms of the agreement must be made in

23   writing?

24   A.    Yes.

25   Q.    And am I correct that Kyorin did not provide such

Aijima - redirect

1   written notice to Allergan regarding the patent application

2   for the '045 patent to Allergan?

3   A.    No.  We -- we did.

4   Q.    Do you know when notice of the -- do you know when

5   Kyorin licensed the '045 -- I withdraw that question.

6         Will you turn to -- back to Paragraph 6.3?

7   A.    Yes.

8   Q.    On Page 12.  Does this section provide that license

9   for any improvements will be provided by Kyorin to Allergan

10  without any additional payment to Kyorin?

11  A.    Yes.

12        MR. GALLAGHER:  Thank you, Dr. Aijima.

13        Thank you, your Honor.

14        THE COURT:  Redirect?

15        MR. WEST:  A few more questions.

16                   REDIRECT EXAMINATION

17  BY MR. WEST:

18  Q.    Dr. Aijima, could you turn to Section 6.3 of JTX-043?

19  A.    Yes.

20  Q.    Is 6.3 talking about improvements made after entry

21  into the license?

22  A.    Yes.

23  Q.    And was the '045 patent part of the license?

24  A.    No.  That's the agreement.

25  Q.    I'm sorry?

Gemoules - direct

1    A.    It meant improvement.

2    Q.    But was the '045 patent part of the license?

3    A.    Yes.

4    Q.    And the duty to inform Allergan about patent

5    applications as contained in 6.2, that duty arises after the

6    effective date of the license; isn't that correct?

7    A.    Yes.

8              MR. WEST:  No further questions.

9              THE COURT:  All right.  You may step down.

10   Thank you very much.

11             (Witness excused.)

12             MR. BAXTER:  Your Honor, we need to bring in our

13   next witness.

14             THE COURT:  All right.

15             MR. BAXTER:  Your Honor, plaintiffs would like

16   to call Mr. Gemoules to the stand, and I'd like to hand him

17   a witness notebook.

18             ... JOHN GEMOULES, having been duly sworn

19        as a witness, was examined and testified as

20        follows ...

21                  DIRECT EXAMINATION

22   BY MR. BAXTER:

23   Q.    Good afternoon.  Could you briefly summarize your

24   education since high school?

25   A.    I received my degree in Chemistry from Southern

Gemoules - direct

1    Illinois University in 1977.  After that, I received my

2    Master's degree also in Chemistry from Southern Illinois

3    University in 1980.

4    Q.    Could you briefly summarize your employment history

5    since 2000?

6    A.    Since 2000?

7    Q.    2003.

8    A.    2003.  I joined Wyeth Biopharmaceutical as a project

9    manager implementing GMP, good manufacturing practices, for

10   the production of a pharmaceutical product.

11              In 2004, the facility was transferred from

12   Wyeth to Senticore Biologic, part of Johnson & Johnson.  At

13   that time, I became the QC chemistry laboratory manager,

14   supervised about a dozen analysts.  Our function there was

15   to perform analysis and chemistry analysis on intermediate

16   products, final products, in support of a pharmaceutical

17   product.

18   Q.    Did you change jobs in 2008?

19   A.    In 2008, I joined Cyanta Analytical Laboratories.

20   I am associate laboratory manager and a GMP review

21   specialist.

22              I currently work on method development, method

23   validation and then, of course, analysis using these

24   validated methods.

25   Q.    Could you please tell us a little bit about Cyanta?

Gemoules - direct

1    A.      Cyanta is a contract pharmaceutical laboratory.  We

2    do analytical work based on the method validations that we

3    perform and method development.

4    Q.      Can you tell us what type of companies rely on Cyanta

5    for analytic testing?

6    A.      Companies such as Pfizer.

7    Q.      Did you do any testing for this litigation?

8    A.      Yes.

9    Q.      I would like you to turn to Exhibit PTX-163 in the

10   book in front of you.

11          Do you have it?

12   A.      I do, yes.

13   Q.      Can you tell us what PTX-163 is?

14   A.      It's a report of a pharmaceutical formulation.

15   Q.      Was that analytical work conducted at Cyanta?

16   A.      Yes, it was.

17   Q.      Did you author this report, PTX-163?

18   A.      I did, yes.

19          MR. BAXTER:  Your Honor, plaintiffs would like

20   to move PTX-163 into evidence.

21          MR. ABRAMOWITZ:  No objection.

22          THE COURT:  Thank you.

23          (Plaintiffs' Exhibit No. 163 was received into

24   evidence.)

25   BY MR. BAXTER:

Gemoules - direct

1    Q.      Could you turn to Page 3 of PTX-163?

2    A.      (Witness complies.)

3    Q.      Mr. Gemoules, could you describe the testing which is

4    reported in PTX-163?

5    A.      The protocol starts with the development of the

6    formulations found on the table on Page 3.

7    Q.      Okay.  Were there -- and did you prepare these

8    formulations?

9    A.      Yes, I did.

10   Q.      Were there any similarities between any of the

11   formulations?

12   A.      All ten of the formulations contained gatifloxacin,

13   sodium chloride, benzalkonium chloride, and some .1 normal H

14   scale hydrochloric acid.

15   Q.      Were there any differences between any of the

16   formulations?

17   A.      The first set of five did not contain any disodium

18   EDTA.  The remaining set of five, second set contained

19   disodium EDTA.

20   Q.      Did you measure the pH of each of the 10

21   formulations?

22   A.      Yes.

23   Q.      At what point in the preparation of the formulations

24   did you measure the pH?

25   A.      The final pH was adjusted and measured essentially at

Gemoules - direct

1    the second to last step, just prior to bringing the

2    formulations up to their final volume.

3    Q.     Would the file dilution be expected to have had any

4    significant affect on the pH?

5    A.     No.

6    Q.     Even if the file dilution had a small affect on the

7    pH, would that affect have been the same for both the EDTA

8    formulations and the non-EDTA formulations?

9    A.     That's true.  Both sets were treated identically.

10   Q.     Why did you measure the pH prior to the final

11   solution?

12   A.     Those were the instructions in the protocol.

13   Q.     What did you do next?

14   A.     After the formulations were prepared, they were

15   placed into glass ampules and sealed.

16   Q.     And what did you do after that?

17   A.     All the glass ampules were placed in the freezer

18   overnight.  The next morning, they were removed from the

19   freezer, placed on the laboratory bench to thaw, to come to

20   thermal equilibrium in the laboratory.

21   Q.     Is there a shorthand name for that kind of testing?

22   A.     Freeze-thaw study.

23   Q.     Okay.  Now, when you took the samples or the ampules

24   out of the freezer the next morning, were they inspected?

25   A.     Yes.  Each of the ampules, upon equilibrium in the

Gemoules - direct

1   laboratory, were inspected for a precipitate.  And they were

2   noted if such -- if there was a precipitate present,

3   notation was made as a plus sign.  If there was no

4   precipitate observed, a minus sign or a dash was recorded.

5   Q.     Were those ampules in which a precipitate had been

6   observed, did you do anything else?

7   A.     If the precipitate was observed, the ampules were

8   agitated and observed a second time for the presence of the

9   precipitate.

10  Q.     And after that first time of freezing overnight,

11  equilibrating to room temperature and inspecting, did you do

12  anything else?

13  A.     The ampules were then, of course, placed back in the

14  freezer for essentially nine more cycles, a total of ten

15  thaw cycles freeze-thaw inspection.

16  Q.     And did each of those nine additional freeze-thaw

17  cycles include the steps of coming out of the freezer,

18  equilibrating to temperature and inspection?

19  A.     Yes.

20  Q.     Are these the results of the observations reported in

21  your -- included in your report?

22  A.     They are.  At the back of the report, you will see

23  ten pages of tables with hand-recorded observations.

24          MR. BAXTER:  Can I have the -- thank you.

25  BY MR. BAXTER:

Gemoules - direct

1    Q.      Is this one of those tables?

2    A.      Yes.

3    Q.      Are these the data for Formulation 1 which was one of

4    the ten -- one of the five formulations which did not

5    contain the EDTA?

6    A.      Yes.

7    Q.      Can you give us a brief description of how to read

8    the results presented in the table?

9    A.      Each table is for one formulation.  The rows across

10   are the ampules that were prepared from the formulation.

11   The columns represent the observations of cycles one through

12   ten.  Within each column are two sub-columns, one for the

13   first observation and then one for the second, if necessary.

14   Q.      So, for example, what is that plus sign in the very

15   upper left-hand corner, so the first row of the first

16   column, of Table 1 mean?

17   A.      That means for Formulation 1, during the first cycle,

18   the first ampule is first observation, precipitate was

19   noted.

20   Q.      And what does the negative sign or dash immediately

21   to right of that mean?

22   A.      Upon agitation, the precipitate was not observed.

23            MR. BAXTER:  Okay.  Could we have the table for

24   Formulation 6 put up on the screen?

25   BY MR. BAXTER:

Gemoules - direct

1    Q.      Are these, the data for Formulation 6, one of the

2    five formulations which did contain EDTA?

3    A.      Yes.

4    Q.      In this case, what does the negative sign in the

5    upper left-hand corner mean?

6    A.      That means for the Formulation No. 6, ampule 1, cycle

7    1, of the first cycle, no precipitate was observed, on the

8    first observation.

9    Q.      And what does the NA, directly to the right of that

10   mean?

11   A.      NA means not applicable.  And in that case, of

12   course, if there was no precipitates observed initially, no

13   agitation was performed when the second observation was

14   made.

15   Q.      What do the other tables at the end of your report

16   represent?

17   A.      Tables 2 through 5, which include Table 1, they are

18   formulations which did not contain disodium EDTA.  Tables 7

19   through 10 are similar to 6.  They are the formulations

20   where disodium EDTA was included.

21   Q.      Who made the observations that are recorded in those

22   tables?

23   A.      I made some of the observations.  Ken Wagner and

24   Robert Mueller made the others.

25   Q.      When you were making those observations, did you know

Gemoules - direct

1    which formulations contained EDTA and which formulations did

2    not contain EDTA?

3    A.    Yes.

4    Q.    Despite that fact -- or did that fact have any effect

5    on your objectivity?

6    A.    No.

7    Q.    Do you believe Ken Wagner and Robert Mueller were

8    also objective when reporting the observations?

9    A.    Yes.

10            MR. ABRAMOWITZ:  Objection, hearsay.

11            THE COURT:  I'm not exactly sure what the

12    foundation of that is.

13            MR. BAXTER:  Okay.  I'll lay some foundation.

14    BY MR. BAXTER:

15    Q.    Do you work with Ken Wagner and Robert Mueller?

16    A.    Yes.

17    Q.    In carrying out your duties as associate lab manager

18    at Cyanta, do you rely on the objectivity of Ken Wagner and

19    Robert Mueller?

20    A.    Yes.

21    Q.    Do you believe that Ken Wagner and Robert Mueller

22    were also objective when recording the observations in that

23    table?

24            MR. ABRAMOWITZ:  Objection, speculation.

25            THE COURT:  I think it is.  The objection is

1    sustained.

2    BY MR. BAXTER:

3    Q.    Do you have any reason to believe that they were not

4    objective?

5              MR. ABRAMOWITZ:  Objection.  Same objection.

6              THE COURT:  Is that the same?  I mean I don't

7    know what "objective" is different from, did they follow all

8    the procedures.  I think that is an appropriate question.

9              MR. BAXTER:  Inappropriate or appropriate?

10             THE COURT:  Appropriate.

11   BY MR. BAXTER:

12   Q.    Do you believe Ken Wagner and Robert Mueller followed

13   the protocol when making the entries in these tables?

14   A.    Yes.

15   Q.    At the time that you were conducting this research,

16   did you know whether the Oblon law firm representing the

17   patentee in this litigation?

18   A.    No.

19   Q.    Did anybody from the Oblon law firm -- let me back

20   up.  When you conducted this testing, did you know that the

21   Oblon law firm had requested this testing be conducted by

22   Cyanta?

23   A.    Yes.

24   Q.    Did anybody from the Oblon law firm ever tell you

25   what result they were looking for?

Gemoules - direct

1    A.    No.

2    Q.    Were the sets of ampules for each formulation

3    observed in a random order from cycle to cycle?

4    A.    Yes.

5    Q.    Even if the sets of ampules had not been observed in

6    a random order from cycle to cycle, would it have made any

7    difference in the results?

8    A.    No.

9            MR. ABRAMOWITZ:  Objection, speculation.

10           THE COURT:  The objection is overruled.

11           THE WITNESS:  The sets of ampules were removed

12   from the freezer and placed on a lab bench for a

13   sufficiently long time to come to thermal equilibrium in the

14   room to thaw, and they were all at the same temperature at

15   the time that any of the observations were made.

16           MR. BAXTER:  Can I have the table for

17   Formulation 5 put up on the screen?

18   BY MR. BAXTER:

19   Q.    Do you see, in the table for this formulation, in the

20   last row it says no ampule 18 was prepared?

21   A.    Yes.

22   Q.    What does that mean?

23   A.    That there was insufficient material to prepare an

24   18th ampule.

25   Q.    Was that also the case for the last row in the table

Gemoules - direct

1    for Formulation 6?

2    A.    Yes.

3    Q.    And was that also the case with the last two rows in

4    the table for Formulation 7?

5    A.    Yes.

6    Q.    And was that also the case for the last row in

7    Formulation 9?

8    A.    Yes.

9    Q.    And is the same true for the last row for Formulation

10   10?

11   A.    Yes.

12   Q.    Why wasn't there enough material to fill 18 ampules

13   for some of the formulations?

14   A.    Excuse me.  When the glass ampules were sealed, the

15   way to test they were sealed completely was to invert the

16   ampule.  And in some cases, there were a few ampules that

17   were not sealed completely and the material was lost out of

18   the ampule.

19         So originally there was sufficient volume of the

20   formulation to prepare 18, but in some cases, they were lost

21   before the process started, so to speak.

22   Q.    How was that material lost?  Could you explain that

23   in a little more detail?

24   A.    As you inverted the ampule, the glass seals, of

25   course, at the top of the ampule, when you inverted it to

Gemoules - direct

1    check to see if anything would leak out, some did not seal

2    completely and it did leak out.

3    Q.    Would there have been any reason to expect that the

4    ampules which were not filled would have been either more or

5    less likely to form a precipitate than the other ampules

6    within a given formulation?

7    A.    No.  As I stated, there were -- the ampules were, or

8    there was sufficient volume of the formulation to prepare 18

9    ampules.  It was unrelated to the nature of the formulations

10   with or without EDTA.  As some ampules broke, there was no

11   need to -- or there was no reason to believe that it had any

12   effect on any of the, if any of the formulations might more

13   or less be likely to have a precipitate or not.

14              MR. BAXTER:  Could I have the table for

15   Formulation 5 put back up?

16   BY MR. BAXTER:

17   Q.    Do you see that there is a note about ampule 9 in

18   this table?

19   A.    Yes.

20   Q.    What does that note mean?

21   A.    The note says vial 9 burst.  No data reported.

22   Q.    And can you describe how the ampule broke?

23   A.    Specifically, I don't recall how this one broke, but

24   upon handling, they are glass ampules, and there were

25   instances where one would break around the seal.  The glass

1    is fragile there.

2              MR. BAXTER:  Could I have table for Formulation

3    6 brought up?

4    BY MR. BAXTER:

5    Q.    Was that also the case for ampule 17 in the table for

6    Formulation 6?

7    A.    Yes.

8              MR. BAXTER:  And could I have the Formulation 9

9    brought back up?

10   Q.    And was that, the same true for ampule 3 for

11   Formulation 9?

12   A.    Yes.

13   Q.    Was there any reason to expect that the ampules which

14   broke would have been either more or less likely to form a

15   precipitate than the other ampules in that formulation?

16             MR. ABRAMOWITZ:  Objection, speculation.

17             THE COURT:  The objection is overruled.

18             THE WITNESS:  No.  As I stated before, the

19   formulations -- the type of formulation is not relative to

20   the breaking of the glass ampules.  There were cases where

21   glass ampules broke but there is no reason to believe that

22   that is related to if a formulation were more or less likely

23   to have a precipitate, to form a precipitate.

24   BY MR. BAXTER:

25   Q.    Could you please take a look at the table for

Gemoules - direct

1    Formulation 1?

2    A.      (Witness complies.)

3    Q.      Do you see that there is a note for the second

4    observation for the ninth cycle for ampule 10?

5    A.      Yes, I see that.

6    Q.      What does that note mean?

7    A.      The note means that there was a data entry error.

8    That a minus sign was recorded there in lieu of an NA.

9    Q.      Pardon me?  I couldn't hear you.

10   A.      I said it indicates a minus sign was recorded there

11   in place of an NA, not applicable.

12             MR. BAXTER:  Could we take a look at the table

13   for Formulation 3?

14   BY MR. BAXTER:

15   Q.      Do you see that there is a note for the second

16   observation for the ninth cycle for vial 15?

17   A.      Yes.

18   Q.      What does that note mean?

19   A.      That NA was originally recorded.  It was corrected to

20   read a minus or a dash.

21   Q.      Well, in that same table, do you see there are minus

22   signs entered for the second observations for the tenth

23   cycle for each of vials 15, 16 and 17?

24   A.      Yes.

25   Q.      Can you comment on those entries?

Gemoules - direct

1   A.      Those entries should have read NA for all those

2   entries.

3   Q.      And why was that?

4   A.      There was no precipitate observed on the first

5   reading, the first observation.  There would not have been a

6   second observation.  Agitation of the sample and a second

7   observation.

8            MR. BAXTER:  Could we turn to the table for

9   Formulation 5 again?

10  BY MR. BAXTER:

11  Q.      Do you see there is a No. 1 and a circle for vial 9

12  for the first observation for cycle 1?  Do you see that?

13  A.      Yes.

14  Q.      What does that mean?

15  A.      That the vial had broken and no observations were

16  made.

17  Q.      Is there a footnote at the bottom of the page?

18  A.      Yes.

19  Q.      Is that related to the note for Vial 9 for the first

20  observation, Cycle 1?

21  A.      Correct.  It said had vial had burst.  It had broken.

22  Q.      Could we turn to the table for Formulation 6?

23            Do you see that there is an upper case letter I

24  and a circle entered for the first observation for cycle

25  five for Ampule 17?

Gemoules - direct

1   A.      Yes.

2   Q.      And can you tell us what that relates to?

3   A.      Essentially, the same thing.  The vial had broken.

4   The footnote says the top broke off.

5   Q.      Could we please turn to the table for Formulation 9?

6           And do you see that for Ampule 6, for the first

7   observation for Cycle 4, the plus sign is entered while NA

8   is entered for the second observation?

9           Do you see that?

10  A.      Yes.

11  Q.      Can you explain that?

12  A.      That indicates the -- there's no data for that point.

13  Q.      Which point are you referring to?

14  A.      I'm sorry.  The NA, the second observation of cycle

15  four for that ampule.

16  Q.      And do you see that for Ampule 3 for Cycle 6,

17  there's a number 1 in a circle entered for the first

18  observation?

19  A.      Yes.

20  Q.      And can you explain that?

21  A.      That was broken vial.

22  Q.      Is there a footnote at the bottom of the table?

23  A.      Correct.  That's for that -- for that observation was

24  the -- I think it was a hole in the top of the ampule.

25  Q.      Was any precipitate observed in any of the ampules

Gemoules - direct

1    prior to the first cycle?

2    A.     No.

3    Q.     Did you do anything to control the amount of

4    agitation when a precipitate had been observed at the first

5    observation?

6    A.     Yes.  As I stated, there's a small group of

7    observers, and we strove to make sure that we did not -- or

8    that we were consistent in our agitation procedure.

9    Q.     During the entire test, were all the ampules treated

10   the same way regardless of whether they contained EDTA or

11   not?

12   A.     Yes.

13   Q.     Do you believe that the results presented in PTX-163

14   are reliable?

15   A.     Yes.

16   Q.     Are you aware of any other testing conducted at

17   Cyanta in regard to the precipitate form of formulation

18   which contains gatifloxacin?

19   A.     Yes.

20   Q.     Can you briefly describe that additional testing?

21   A.     We requested to -- to determine the mass spectra of a

22   solution from a freezing of -- a switching that contained

23   EDTA.

24   Q.     I'd like you to turn to exhibit PTX-169.  Have you

25   seen Exhibit PTX-169 before?

Gemoules - direct

1    A.    Yes.

2    Q.    Is PTX-169 a report of results of additional testing

3    go you were just talking about?

4    A.    Yes.

5              MR. BAXTER:  Your Honor, I would like to move

6    PTX-169 into evidence.

7              MR. ABRAMOWITZ:  No objection.

8              THE COURT:  Thank you.

9              (PTX-169 was received into evidence.)

10   BY MR. BAXTER:

11   Q.    What does PTX-169 report?

12   A.    It is a report of the results of the mass spectra

13   data that was be obtained from that precipitate.

14   Q.    And what results are reported in PTX-169?

15             MR. BAXTER:  Can we turn to the second

16   page?  Excuse me.  Go back to the front page.  I'm sorry.

17   BY MR. BAXTER:

18   Q.    Let me repeat my question.  What results were

19   reported in PTX-169?

20   A.    The results reported were the mass -- the mass

21   spectra data of the sample, which was -- which matched the

22   matched spectra of gatifloxacin.

23   Q.    Thank you.

24             MR. BAXTER:  Pass the witness, your Honor.

25             THE COURT:  All right.  Cross-examination.

Gemoules - cross

1              MR. ABRAMOWITZ:  Your Honor, if I may approach

2      the witness, I have binders of initial documents for him.

3              THE COURT:  All right.

4              (Mr. Abramowitz witnesses handed binders to the

5      witness.)

6                         CROSS-EXAMINATION

7      BY MR. ABRAMOWITZ:

8      Q.    Now, if you open up the additional binder to DTX-139,

9      Mr. Gemoules, is this the report of Cyanta to plaintiffs'

10     trial counsel?

11     A.    Yes.

12             MR. ABRAMOWITZ:  Your Honor, we submit DTX-139

13     into evidence.

14             THE COURT:  Any objection?

15             MR. BAXTER:  No objection.

16             THE COURT:  Thank you.

17             (DTX-139 was received into evidence.)

18     BY MR. ABRAMOWITZ:

19     Q.    And turning the page on DTX-139 to the formulation

20     page, AZP0350, do all of the preparations contain slightly

21     different amounts of components?

22     A.    They contain slightly different amounts of

23     gatifloxacin and sodium chloride.

24     Q.    And do all of the formulations contain about

25     .86-percent sodium chloride?

Gemoules - cross

1    A.    Yes.

2    Q.    And not .82-percent sodium chloride?

3    A.    No.

4    Q.    Could you look back at DTX-131?

5              And, Mr. Gemoules, is this the protocol

6    under which Cyanta carried out the Cyanta testing?

7    A.    Yes.

8              MR. ABRAMOWITZ:  Your Honor, we submit DTX-131

9    into evidence.

10             THE COURT:  Any objection?

11             MR. BAXTER:  No objection, your Honor.

12             THE COURT:  Thank you.

13             (DTX-131 was received into evidence.)

14   BY MR. ABRAMOWITZ:

15   Q.    And looking at Pages AZP0324 and 0325, were the

16   formulations made pursuant to that protocol?

17   A.    Yes.

18   Q.    And were the preparations made with gatifloxacin

19   provided by plaintiffs?

20   A.    Yes.

21   Q.    And the pH, according to this protocol, was tested

22   after the addition of sodium hydroxide; correct?

23   A.    Correct.

24   Q.    And afterwards, about 20 to 25 milliliters of sterile

25   water was added to each preparation after the pH was

Gemoules - cross

1   checked; is that correct?

2   A.    I'm not sure, but close to that, I'm sure.

3   Q.    Okay.  And that would have been about 20 to

4   25 percent of the solution?

5   A.    Yes.

6   Q.    Okay.  And you testified earlier that that diluted

7   the preparation; is that correct?

8   A.    Yes.

9   Q.    But you also earlier testified that that would not

10  have affected the pH; is that correct?

11  A.    I don't believe so.

12  Q.    So would that have affected the pH?

13  A.    I'm not sure.

14  Q.    And after you made up all the preparations, you

15  filled them into ampules and they were given a number, 1

16  through 18; is that correct?

17  A.    Yes.

18  Q.    And each ampule was labeled with the formulation

19  number and the ampule number; is that correct?

20  A.    Yes.  That was included.

21  Q.    So the technicians observing the ampules knew which

22  ampule came from which formulation, which number ampule it

23  was for each observation; is that correct?

24  A.    Yes.

25  Q.    So the study wasn't blinded; is that correct?

Gemoules - cross

1    A.      Correct.

2    Q.      And is it correct that the ampules containing the

3    preparations were not put all put into the freezer at the

4    same time every day?

5    A.      No.  I'm sorry?  Did I misunderstand that?

6    Q.      I'm sorry.  Were there some days that ampules were

7    put into the freezer at different times?

8    A.      I'm sorry.  You mean from day to day?

9    Q.      From day to day, yes.

10   A.      Oh, that's correct, yes.

11   Q.      And so the amount of time over the course of the

12   study that the ampules were in the freezer day to day wasn't

13   --

14   A.      No, not exactly.

15   Q.      Okay.  Now, when the ampules are taken out to thaw,

16   was that done at a different time day to day?

17   A.      Yes.

18   Q.      And so the amount of time that the ampules were left

19   to thaw was not uniform; is that correct?

20   A.      Yes.

21   Q.      Now, am I correct that after you removed the

22   ampules -- I will withdraw the question.

23          Now, were all of the ampules for each

24   preparation placed in the same tray?

25   A.      No.

Gemoules - cross

1  Q.    So how were the ampules placed in the freezer?

2  A.    The trays were placed in the freezer.

3  Q.    Okay.  But were the ampules placed in a specific tray

4  for each formulation?

5  A.    Yes.

6  Q.    Yes.  So, like, 1 through 18 was on the same tray?

7  A.    Yes.

8  Q.    Yes.  Okay.  And the trays weren't taken out of the

9  freezer in any specific order; is that right?

10  A.    Yes.

11  Q.    And they weren't taken out in any truly random order

12  created by, like, a random number generator.  Is that also

13  correct?

14  A.    Yes.

15  Q.    So -- and they were left to thaw just out on a lab

16  bench; is that correct?

17  A.    Yes.

18  Q.    Okay.  And they were placed on the lab bench in

19  whatever order kind of they were pulled out of the freezer;

20  is that correct?

21  A.    Yes.

22  Q.    So there wasn't any specific order they were sitting

23  on that lab bench; is that correct?

24  A.    There was no specific order.

25  Q.    Okay.  And there was no random order based on a

Gemoules - cross

1   random number generator?

2   A.      Correct.

3   Q.      And when you went to observe the formulations, there

4   wasn't any specific preparation tray you started with every

5   time; is that correct?

6   A.      That's correct.

7   Q.      Okay.  Now, according to the protocol, the

8   formulations had to be at room temperature before you

9   observed them; is that correct?

10  A.      Yes.

11  Q.      And how did you check that they were at room

12  temperature?

13  A.      They were left on the bench, you know, approximately

14  four hours or so and then I would have observed them.  In

15  other words, touch one.

16  Q.      All right.  So you were doing it by touch; is that

17  right?

18  A.      Yes.

19  Q.      And -- but you didn't use, like, a thermometer

20  internally or externally; is that correct?

21  A.      That's correct.

22  Q.      Okay.  Now, Mr. Gemoules, are your hands sensitive

23  enough to tell exactly what temperature that those vials

24  were every day?

25  A.      I would say they're sensitive enough to know they

Gemoules - cross

1   were at room temperature.

2   Q.      But not the exact temperature?  You couldn't tell me

3   they were at 22C?

4   A.      No, I wouldn't tell you that.

5   Q.      So it's correct, you don't know the exact temperature

6   of any of the ampules at any one point when you observed

7   them?

8   A.      No.  They were room temperature.

9   Q.      And is it also correct that when you began

10  observation, many of the ampules had condensation on the

11  outside?

12  A.      Yes.

13  Q.      So how are you able to look at the precipitate inside

14  since there was condensation covering it?

15  A.      We used a clean paper towel to remove the

16  condensation.

17  Q.      Now, in your experience as a laboratory manager, have

18  you often found that items at room temperature have

19  condensation on the outside?

20  A.      I'm sorry?

21  Q.      So you're an experienced laboratory manager.  Have

22  you often found that items that are at room temperature have

23  condensation on the outside?

24  A.      I would say in this case, they did.  They were room

25  temperature and they had condensation on the outside.

Gemoules - cross

1   Q.    I'm just talking about generally, outside of the

2   ampules.

3             And so it's not true that you really didn't have

4   condensation on the outside, like I would say a water glass,

5   unless the outside of that glass is at a lower temperature

6   than the -- is at a higher -- excuse me.  Strike -- withdraw

7   that.

8             And so you're telling me that when I pour water

9   in a glass with ice, that when I have condensation, it's not

10  because the ice water is at a lower temperature than the

11  ambient air outside the glass?

12  A.    I would tell you that the condensation is caused by

13  the ice in the water.  Once it comes to room temperature

14  does not necessarily mean that the condensation is going to

15  go away.

16  Q.    But if you leave it out -- if you left it out long

17  enough, it would go away; is that right?

18  A.    A couple days, probably so.

19  Q.    Now, when you went to look at the precipitates, did

20  you look at the ampules in any order?

21  A.    Within a formulation, yes.

22  Q.    And within that formulation, did you start at 1 and

23  go to 18?

24  A.    Yes.

25  Q.    Okay.  And if one showed a precipitate, did you

Gemoules - cross

1    agitate it before moving on and re-observe it before moving

2    on to the next one?

3    A.     Yes.

4    Q.     So if you started at one and that particular

5    formulation had a lot of -- preparation had a lot of

6    precipitation on its trays, by the time you reached 18, it

7    could have been quite awhile by the time 1 was observed and

8    18 was observed; is that correct?

9    A.     I couldn't really quantify how long it took.

10   Q.     Maybe 30 minutes or more.  Would that be about right?

11   A.     I don't recall, you know, exactly, or even as such.

12   We did a lot of ampules.

13   Q.     Okay.  But 18 would have been well after 1 was looked

14   at if there was a lot of precipitation on it?

15   A.     Yes.

16   Q.     Yes.  Okay.

17            Now, and because the trays weren't observed

18   in any order, the first tray looked at of the day might

19   have been even a few hours -- would have been looked at

20   even a few hours before the last tray of the day; is that

21   right?

22   A.     I don't know if I would say a few hours, but there

23   was some time between the two, looking at the first tray and

24   the last tray.

25   Q.     There was some time.  You might have started at 1:00

Gemoules - cross

1    and finished at 4:00, for example?

2    A.    I don't know if I recall going quite that long, but

3    it's possible, I guess.

4    Q.    All right.  Now, in recording the precipitates in the

5    sheets, you saw two types of precipitates; is that correct?

6    A.    Yes.

7    Q.    Okay.  And one was a white precipitant and one was a

8    translucent particle; is that correct?

9    A.    Yes.

10   Q.    All right.  And the design of the experiment was to

11   look for whatever precipitate came up.  It wasn't looking

12   for specifically gatifloxacin; is that correct?

13   A.    The protocol required us to look for precipitate.

14   Q.    It doesn't specify gatifloxacin, just whatever

15   precipitate you could find?

16   A.    Yes.

17   Q.    Okay.  And did Cyanta ever undertake any testing of

18   the translucent particle in the test ampules to determine

19   what that was?

20   A.    No.

21   Q.    Okay.  And with respect to actually the white

22   particles in the test, did Cyanta ever open up one of the

23   ampules from that test to determine what the white particles

24   were?

25   A.    From -- from the test in --

Gemoules - cross

1    Q.      Reported in DTX-131?

2    A.      No.

3    Q.      Okay.

4            MR. ABRAMOWITZ:  Your Honor, I'd like to

5    introduce DTX-135.

6            THE COURT:  Any objection?

7            MR. BAXTER:  No, your Honor.

8            (DTX-135 was are received into evidence.)

9    BY MR. ABRAMOWITZ:

10   Q.      Mr. Gemoules, is this an e-mail from yourself to

11   plaintiffs' trial counsel?

12   A.      Yes.

13   Q.      Okay.  And in this e-mail, did you alert plaintiffs'

14   trial counsel that you located two type of precipitates when

15   doing the Cyanta study?

16   A.      Yes.

17   Q.      And in this e-mail, did you request that plaintiffs'

18   trial counsel provide instructions as to which type of

19   ampules that should be counted on the sheets?

20   A.      Yes.

21   Q.      Did you receive any instructions back from

22   plaintiffs' trial counsel as to which precipitates should be

23   counted?

24   A.      I don't recall.

25   Q.      And did you keep any record for each plus sign,

Gemoules - cross

1    whether it was a white particle or translucent?

2    A.    No.

3    Q.    So we can't tell whenever we see a plus whether it

4    actually was white particulate matter or translucent,

5    whatever it would be, with this data; is that correct?

6    A.    Correct.

7    Q.    So we don't know what the precipitate was any time we

8    see a plus sign; is that true?

9    A.    It was a precipitate.  That's all.  Yes.

10                MR. ABRAMOWITZ:  Thank you.

11                THE COURT:  Redirect?

12                MR. BAXTER:  No questions, your Honor.  No

13   redirect.

14                THE COURT:  All right.

15                MR. BAXTER:  We ask that Mr. Gemoules be

16   released.

17                THE COURT:  Any objection to that?

18                MR. ABRAMOWITZ:  No objection.

19                THE COURT:  All right.  You may step down, Mr.

20   Gemoules.  Thank you.

21                THE WITNESS:  Thank you.

22                (Witness excused.)

23                MR. BAXTER:  Your Honor, we'd like to call as

24   our next witness Professor Jonathan Mahnken.

25                THE COURT:  All right.

Mahnken - direct

1          MR. BAXTER:  Could we also ask if Dr. Aijima

2     could be released?

3          MR. ABRAMOWITZ:  No objection.

4          THE COURT:  No objection.  Thank you.

5               ... JONATHAN MAHNKEN, having been duly

6          sworn as a witness, was examined and testified as

7          follows ...

8          MR. BAXTER:  Your Honor, could we have --

9          THE COURT:  Thank you.

10         (Mr. Baxter handed an exhibit notebook to the

11    witness.)

12                    DIRECT EXAMINATION

13    BY MR. BAXTER:

14    Q.    Could you briefly describe your educational

15    background after high school?

16    A.    Sure.  I received a Bachelor's in Arts of Mathematics

17    at the -- at Concordia University in Seward, Nebraska.  I

18    then went on to pursue a Master's degree of Science and I

19    received a Master's of Science in preventive medicine, with

20    a curriculum in biostatistics from the University of Texas

21    Medical Branch at Galveston.  And from there I proceeded to

22    earn my doctorate at the University of Texas Health Science

23    Center in Houston.  I majored in biometry.

24    Q.    Can you tell us what biometry is?

25    A.    Sure.  Biometry is biostatistics or applied

Mahnken - direct

1    statistics.

2    Q.     Did any of your studies relate to -- related to your

3    master's or Ph.D. involve statistical analysis?

4    A.     Yes, the vast majority of them did.

5    Q.     After receiving your Ph.D., did you begin employment?

6    A.     I did.

7    Q.     Can you tell us what your first job was?

8    A.     Sure.  My first job after completing my Ph.D. was

9    Assistant Professor in the Department of Preventive Medicine

10   and Public Health at the University of Kansas Medical

11   Center.

12   Q.     What is your current position?

13   A.     I am currently an assistant professor in the

14   Department of Biostatistics at the University of Kansas

15   Medical Center.

16   Q.     Can you briefly describe your duties as an Assistant

17   Professor?

18   A.     Sure.  My duties mainly fall under teaching service

19   and research.

20   Q.     Can you briefly describe your service activities?

21   A.     Yes.  My service activities include, in addition to

22   numerous internal committees, reviewing grants for

23   institutions like the National Institute of Health,

24   reviewing scientific manuscripts for the medical or for the

25   statistical literature.

Mahnken - direct

1           I also served on some internal committees to --

2    faculty search committees for biostatistics, faculty

3    candidates for the University of Kansas Medical Center.

4    Q.    Have you worked on the development of the master's

5    and Ph.D. degree programs at the University of Kansas

6    Medical Center in biostatistics?

7    A.    Yes.  I recently served on that committee to develop

8    the graduate programs on our campus.

9    Q.    Can you tell us about your research activities?

10   A.    Sure.  The majority of my time is spent doing

11   collaborative research as the lead statistician for

12   biomedical research projects.  I also serve as principal

13   investigator of a grant from the National Institute of

14   Dental and Cranial Research, which is one of the institutes

15   at the National Institutes of Health.

16           I had previously -- yes.  Sorry.

17   Q.    No, that's okay.  Do you do any work in the

18   development of new or novel statistical methodology?

19   A.    Yes.  I spend some of my time as a faculty member of

20   the Department of Biostatistics developing new and novel

21   statistical methodology and getting that work published in

22   the statistical literature in the peer-reviewed statistical

23   literature.

24   Q.    Do you hold any other positions?

25   A.    I'm also a member of the Center For Biostatistics and

Mahnken - direct

1    Advanced Informatics at the University of Kansas Medical

2    Center.

3              I am an associate of the Landon Center on aging

4    at the University of Kansas Medical Center.

5              And I always also the Scientific Director of the

6    Biostatistics and Advanced Informatics Shared Resource at

7    the University of Kansas Cancer Center.

8    Q.   Can you describe your responsibilities as the

9    Scientific Director of Biostatistics and Advanced

10   Informatics Shared Resource at the University of Kansas

11   Cancer Center?

12   A.   Yes.  I meet with investigators doing cancer research

13   that have statistical or data management needs to support

14   their projects.  I assign appropriate faculty,

15   biostatisticians and support statisticians and data

16   management staff to work on those projects.  And I also

17   serve as kind of a sounding board for statistical issues

18   that arise that the other faculty or staff are unclear how

19   they should handle.

20   Q.   Have you ever authored or co-authored any scientific

21   articles which contained your statistical analyses in a

22   peer-reviewed journal?

23   A.   Yes, I have.

24   Q.   About how many?

25   A.   I have about 30-or-so peer-reviewed publications,

Mahnken - direct

1    published or in press at this time.

2    Q.    Have you ever won any award pertaining to your work

3    as a statistician?

4    A.    Yeah.  Yes, I've received -- in 2007, I believe I

5    received the Excellence in Public Health teaching award or

6    maybe I switched that to awards.  For the biostatistics

7    courses that I taught for that, for the master's of public

8    health program at our institution.

9              I also received a pilot award for the Kansas

10   Masonic Cancer Research Institute.

11   Q.    Have you ever been awarded any grants for your

12   research to conduct statistical analysis?

13   A.    Yes, I am coinvestigator on a number of grants and

14   projects, the lead statistician funded by groups like the

15   American Heart Association, the National Institutes of

16   Health, the American Cancer Society, et cetera.

17   Q.    Have you ever been the principal investigator on such

18   a grant?

19   A.    Yes.  That was the one to which I referenced earlier.

20   It was, I am the principal investigator of a grant funded by

21   the National Institute Dental and Cranial Facial Research

22   and NIDCR.

23   Q.    Could you turn to Exhibit PTX-40 in the book in front

24   of you?

25              Can you tell us what PTX-40 is?

Mahnken - direct

1    A.      Yes.  This is a copy of my curriculum vitae.

2    Q.      Is it an accurate copy?

3    A.      It was at the time.  This one is dated in December of

4    2008.  I update my CV probably every, every few weeks or so,

5    if not more often.  For example, some of the publications

6    that were listed as in press or not yet accepted have now

7    been published or in press.

8              MR. BAXTER:  Your Honor, plaintiffs would like

9    to move PTX-40 into evidence.

10             MR. CLEMENT:  Your Honor, we object on the

11   grounds of hearsay.  We have no problem with his being

12   admitted as expert but the CV is clearly hearsay.

13             THE COURT:  In these cases, I either let all the

14   CVs in -- most of the time people want their own expert CVs

15   in, so we'll talk about this later, but it's certainly going

16   to be one or the other.  All right?

17             MR. CLEMENT:  Thank you, your Honor.

18             MR. BAXTER:  He authored it.  I don't understand

19   how it could be hearsay.  Thank you.

20             Your Honor, plaintiffs would also like to offer

21   Professor Mahnken as an expert in the field of statistical

22   analysis.

23             MR. CLEMENT:  No objection, your Honor.

24             THE COURT:  All right.  Thank you.

25   BY MR. BAXTER:

Mahnken - direct

1    Q.    Professor Mahnken, I would like to you turn to

2    Exhibit PTX-163, which should be in the book in front of

3    you.

4    A.    Okay.  I have it.

5    Q.    Can you tell us what PTX-163 is?

6    A.    Yes.  This is a report of some freeze-thaw testing.

7    Q.    Do you conduct any statistical analysis of the data

8    reported in this report?

9    A.    Yes, I did.

10   Q.    Did you reach any conclusions from your analysis?

11   A.    I did.  Based on my analysis, the -- based on my

12   analysis, the groups or the observations based on

13   formulations containing EDTA had a reduced rate of

14   precipitation and a delayed onset of precipitation.

15   Q.    Prior to conducting analysis, did anybody from the

16   Oblon firm tell you what result from the analysis they were

17   looking for?

18   A.    No.  I was completely blinded to the direction that

19   they hoped these results would go.  I appreciated that

20   freedom.

21   Q.    Prior to finishing your analysis, had you ever seen

22   the patent involved in this litigation?

23   A.    No, I had not.

24   Q.    Could you now briefly describe how you conducted your

25   analysis?

Mahnken - direct

1    A.      Sure.  Give me just a moment.

2                MR. BAXTER:  Can we put up Page 1 of PTX-188?

3                And, your Honor, before we begin, I'm going to

4    be using about a 20-or-so page demonstrative exhibit which

5    explains the analysis Professor Mahnken conducted.  And we

6    are -- at some point, we are going to ask that it be moved

7    into evidence; and would you like us to do it now or when

8    we're finished with it?

9                THE COURT:  Probably after.  But so that we

10   don't interrupt him, maybe we should take our 15-minute

11   afternoon break now.

12               MR. BAXTER:  That's a great idea.

13               THE COURT:  Fifteen minutes.

14               (Short recess taken.)

15               THE COURT:  You may proceed.

16               MR. BAXTER:  Thank you, your Honor.

17   BY MR. BAXTER:

18   Q.     Professor Mahnken, when we left off, I think you were

19   just about to tell us how you started to conduct your

20   analysis of the data contained in the Cyanta report for 163.

21   A.      Right.  So the first thing I did was I looked at the

22   data, and I just did a descriptive analysis.  So I wanted to

23   count up all the times that a plus was observed in

24   Observation 1.  I did my initial analysis on the basis of

25   Observation 1, whether or not a precipitate was observed

Mahnken - direct

1    after, after, immediately after the freeze-thaw cycle.

2              So I counted up all of the pluses for each

3    observations.  So in this case, we've got Formulation 1.

4    And so we've got a number of pluses representing the

5    precipitates were observed for that specific formulation

6    vial number and cycle.

7              And, similarly, I counted up all of the

8    negatives or minus signs as well.

9    Q.    But in the first analysis, you focused on the data

10   for Observation 1; is that correct?

11   A.    That's correct.

12   Q.    What did you do next?

13   A.    Then I tabulated the relative frequency of pluses

14   relative to minuses in each of the two groups, the EDTA

15   group or the group identified as containing EDTA and the

16   group identified as not containing EDTA.

17   Q.    And what did you find?

18   A.    Just, at first glance at it, I found that a little

19   over 30 percent of the observations for the no EDTA group

20   had formed precipitates, whereas only a little less than

21   half as many had formed precipitates in the group identified

22   as containing EDTA.

23   Q.    Is that what is shown on the slide there?

24   A.    Yes, that is what is shown on that slide.

25   Q.    Did you conduct any other type of analysis?

Mahnken - direct

1    A.    I did.  The next thing I did was I plotted the data,

2    so I essentially tabulated similar types of relative

3    frequencies, but I broke it out by cycle.  So, for example,

4    for the no EDTA group, I counted up the number of times that

5    there was a precipitate formed in cycle 1 and the number of

6    times that there wasn't and plotted those relative

7    frequencies.

8    Q.    And what did you find?

9    A.    So, yes, as you can see here, these are the plots for

10   the no EDTA group.  And I did a similar thing for the group

11   containing EDTA.

12   Q.    So is the no EDTA shown in red and the EDTA group

13   shown in blue?

14   A.    That is correct.  And one of the things I observed

15   from this, to your question about what did I find, was that

16   in each and every one of these cycles, the proportion of

17   vials forming precipitates was higher in the no EDTA group

18   compared to the group with the EDTA.  So at all ten of those

19   cycles, that was the phenomenon.

20   Q.    Can you explain what the vertical lines are in the

21   graph?

22   A.    Sure.  In addition to the raw relative frequencies, I

23   generated 95 percent point-wise confidence intervals; and

24   that's what the lower and upper bounds are represented by

25   the lower and upper bars on each one of those points, at

Mahnken - direct

1    each cycle for each group.

2    Q.    And did you do anything else?

3    A.    Yes, I did.  I generated a generalized linear mixed

4    model, or GLMM, in order to facilitate the comparison of the

5    vials containing EDTA against the vials that did not contain

6    EDTA.

7    Q.    So what is shown in this plot?

8    A.    So I used that model to generate the estimated means

9    at each cycle; in this case, for the no EDTA group.  I also

10   calculated the 95 percent point-wise confidence intervals

11   for each of those means based on my GLMM. I similarly did

12   that for the EDTA group.

13            So, you know, one of the initial observations

14   just based on this plot or looking at these data is the

15   result of the GLMM was that, again, this shows that at each

16   cycle, the proportion of vials forming precipitates was

17   lower in the group containing EDTA compared to the group not

18   containing EDTA; and that was true at each of those ten

19   cycles.

20   Q.    And vertical lines in this plot mean the same thing

21   as they did in the previous plots?

22   A.    Yes, they have a similar interpretation.

23   Q.    Why did you choose a generalized linear mixed model?

24   A.    So I chose the GLMM because, No. 1, it allowed me

25   to -- this type of model allowed me to analyze these data

Mahnken - direct

1    for the primary comparison, EDTA versus no EDTA, while

2    adjusting for the study design, the experimental factors

3    that were inherent in the study.  For example, cycle, or the

4    number of times that the vial was frozen and then thawed was

5    one of these factors I was able to adjust for in this model.

6            The GLMM was also nice in that it allowed me to

7    account for the fact that repeated measures were made on

8    each vial over time.  So, in other words, on the previous

9    slide, it talked about each vial was observed up to ten

10   times, after up to ten freeze-thaw cycles.  So this allowed

11   me to account for the fact that those observations were made

12   on a common vial ten different times.

13           And it also allowed me to incorporate, or to

14   account for the fact that there could have been the

15   potential for vials within a common formulation to be more

16   similar or homogenous in statistical terms than vials from a

17   different formulation.

18           MR. BAXTER:  Could we put up Page 8?

19   BY MR. BAXTER:

20   Q.    Could you tell us what is shown on Page 8 of PTX-188?

21   A.    Sure.  What I've plotted here is just the Figure 1

22   that we showed before, which was kind of more plot of the

23   raw data, and then Figure 2 below represents the model that

24   I derived.  And I generated these two to kind of compare,

25   just to basically look to see how well the model fit the

Mahnken - direct

1    data.

2    Q.    And did you make any conclusions about whether or not

3    your model was a good fit for the data?

4    A.    Yes.  I believe my model quite accurately picked up

5    the phenomenon in the data.

6    Q.    And how can you tell that?

7    A.    They look very similar.

8    Q.    You say "they."  You mean Figure 1 and Figure 2?

9    A.    Yes.  I mean Figure 1 and Figure 2.

10   Q.    Okay.  Did this analysis allow you to draw any

11   conclusions?

12   A.    It did.

13   Q.    Could you --

14   A.    My GLMM allowed me to assess whether or not the

15   likelihood of forming precipitates was the same in the two

16   groups.  In this case, I found that the odds of forming

17   precipitates were three times higher in the no EDTA group

18   relative to the group of EDTA, or 3 to 1.

19   Q.    Does it seem likely, based on your analysis, that the

20   differences between the two groups were due merely to

21   chance?

22   A.    That seems highly unlikely.  These graphs show, you

23   know -- you know, at each time point, the relative

24   frequencies being higher on the previous slide still.  These

25   graphs show the relative frequencies being higher at each

Mahnken - direct

1    cycle.

2              The 3-to-1 odds ratio, or the odds being three

3    times higher, is quite a sizable effect size in most

4    applications of science.

5              In addition, the P value, 0.0040 is extremely,

6    extremely small, reaching statistical significance at many

7    different conservative criteria.

8    Q.    Is that P value shown at the bottom of Figure 2 on

9    Page 8 of PTX-188?

10   A.    Yes.  That's the P value that indicates the effect of

11   EDTA.

12   Q.    Now I'd like you to go to Page 9.  What did you do

13   next?

14   A.    So I also conducted a survival analysis.  So figure

15   three represents what we call the Kaplan-Meier survival

16   curve.  In this case, the red line is for the group without

17   EDTA.  And what you see along the horizontal axis, it

18   represents cycles.

19             What this basically is, is a time to formation

20   of a precipitate for any given vial.  And so, again, this

21   one just represents no EDT group.

22             So along the horizontal axis, I have cycles

23   labeled, and then along the vertical axis, where it says

24   survival distribution function, that's the -- survival

25   distribution function is the probability -- let me make sure

Mahnken - direct

1      I say this correctly.  This is the probability of not having

2      formed -- of any given vial not having formed a precipitate

3      by that particular cycle.

4              So, for example, if you look where Cycle 5 would

5      be in between Cycles 4 and 6, on that horizontal axis, and

6      if you would kind of draw a line straight up from where 5

7      would be, and you see where it crosses that red line at that

8      kind of point in the step function.  And at that point, at

9      that corner, if you were to draw a line over to the survival

10     distribution function axis, or the Y axis, you would see

11     that's hovering right above 25 percent.

12             So what that indicates is, by the fifth cycle,

13     there are only 25 percent of the vials in the no EDTA group

14     that have not yet formed a precipitate at that time, or, put

15     differently, after five cycles, about three-fourths of the

16     non-EDTA vials had formed a precipitate.

17             MR. BAXTER:  I promise I won't ask him to repeat

18     that answer, but could I happened him a laser pointer for

19     future answers?

20             THE COURT:  All right.  That's fine.

21             MR. BAXTER:  Thank you, your Honor (handing a

22     laser pointer to the witness).

23             THE WITNESS:  Thank you.

24             Yes.  So that would be going up five to this

25     point and then scooting that over to 25 percent.

Mahnken - direct

1    BY MR. BAXTER:

2    Q.      Did you also create a similar plot for the EDTA-

3    containing formulations?

4    A.      Yes, I did.  The blue line in this case represents

5    the survival function for the EDTA group.

6              So a couple of things kind of pop out at me.

7    Well, so first off, so after five cycles in this case, if

8    you extrapolate up, or -- I'm sorry.  If you look up, you

9    see it's about this corner right here (indicating), so

10   that's about 50 percent, so whereas the other one had formed

11   precipitates for about 85 percent in the no EDTA group.  For

12   the EDTA group, only 50 percent have formed precipitates by

13   Cycle 5.  Another interesting observation is the separation

14   in these two survival curves.

15   Q.      And can you describe that, or the significance of

16   that?

17   A.      Sure.  So as you can see, after -- after the first

18   freeze-thaw cycle, there's already separation.  So after

19   they were frozen and thawed once, very few of the EDTA vials

20   had -- had formed precipitates, because that survival

21   distribution is so high, whereas about a quarter of them had

22   already formed precipitates in the no EDTA group, or the red

23   group.

24   Q.      Were you able to draw any conclusions from these

25   curves or plots?

Mahnken - direct

1    A.    Yes.  I believe this demonstrates that the -- that

2    the formation of precipitates was delayed in the groups

3    identified as having EDTA compared to the groups without.

4    Q.    Do you believe that this difference in the onset of

5    precipitates for the EDTA group was just due to chance?

6    A.    That seems highly implausible.  First of all, the

7    separation of the survival curves is really -- it happened,

8    you know, right away.  As I said, after the first

9    freeze-thaw cycle, and it never -- it never crossed over or

10   anything like that.  So there's a very clear separation of

11   curves.

12           In addition, the formal test, the log rank test

13   that corresponds to these two Kaplan-Meier curves was less

14   than 0.0001, indicating an extremely statistically

15   significant event.  You know, very small P value, so highly

16   statistically significant.

17   Q.    Can you succinctly summarize the conclusions you drew

18   from your analysis of the observation one data?

19   A.    Sure.  From the observation one data, I concluded

20   that the -- there was a lower likelihood of formation of

21   precipitates in the compounds -- in the vials with EDTA, and

22   the onset of that formation of precipitates was delayed in

23   the group, in the vials that contained EDTA.

24   Q.    Did you do any analysis of the observation two data?

25   A.    I did.  I did a similar analysis of that.

Mahnken - direct

1          So if you were to look back at that data --

2          MR. BAXTER:  Can we go back to Page 1 of

3    PTX-188?

4          Thank you.

5          THE WITNESS:  Yes.  So in this case, I looked at

6    the Observation 2 data.

7          So what I needed to do, because we've got three

8    potential values, we've got -- there's a possible that there

9    could be a plus or a minus or an NA, as Mr. Gemoules

10   described earlier.

11         So what I was looking for here was the outcome

12   precipitates that would resolve with agitation.  So either

13   there were precipitates that resolved with agitation for a

14   given vial at a given cycle or not.

15         So if there was a plus in observation one, that

16   meant that there were precipitates formed and they would

17   either resolve or not resolve with agitation.

18         So if no precipitates were observed, for

19   example, like, number two, there's a negative, then I would

20   say there's no precipitates that -- there -- in terms of

21   were there precipitates at that cycle that resolved with

22   agitation, the answer would be -- I'm sorry.  I think I'm

23   getting ahead of myself.

24         So either there were precipitates that resolved

25   with agitation or not.  So if there was a plus-plus, that

Mahnken - direct

1   would mean there were precipitates observed in Observation 1

2   and then, again, after agitation.  So those were unresolved

3   precipitates.

4            If there was a precipitate in Observation 1,

5   like in the first example, like here, but that resolved

6   with agitation, I would say no, there were no precipitates

7   that didn't resolve with agitation.  And, similarly, if

8   there was a negative, then there were no precipitates, so

9   there wasn't a precipitate that wouldn't resolve without

10  agitation.  So there were no unresolved precipitates.  So I

11  created that composite yes/no measure for the Observation 2

12  in that manner.

13  Q.     And if we could go to Page 11, PTX-188, can you tell

14  us what you did after counting all of those things up?

15  A.     Right.  Right.  So I did another descriptive analysis

16  and compared the relative frequency of unresolved

17  precipitates in the no EDTA group compared to the EDTA

18  group.

19  Q.     Is there a typo on this slide?

20  A.     There is.  The 96.4, that is actually 96.14 percent,

21  so I mistakenly typed a four there instead of a one.  So

22  that is why, if you were to add those two numbers, they

23  wouldn't add up to 100 percent.  It still gives you the same

24  picture.  The 3.9 is correct.

25            So what this shows is there were unresolved

Mahnken - direct

1    precipitates in 3.9, or not quite four percent of the vial

2    by cycle observations in the no EDTA group compared to less

3    than one percent, you know, in the EDTA group.

4              So there were, just looking at that -- that

5    quick descriptive analysis, we see four times as many

6    unresolved precipitates, relatively speaking, comparing

7    those two groups.

8    Q.    Did you conduct any other type of analysis using the

9    Observation 2 data?

10   A.    I did.

11             So the next thing I did was, as before, I

12   created the -- for the no EDTA group, the relative frequency

13   of unresolved precipitates for the non-EDTA group, and I did

14   that for each and every cycle as well as the corresponding

15   error bars.  And then I did the same thing for the group

16   with EDTA, as shown in blue here.

17   Q.    And what did these plots tell you?

18   A.    So these plots told me a few things.

19             Number one, there were no unresolved

20   precipitates after the first three cycles of freezing and

21   thawing in either group.  And then from that point on, the

22   group started to separate.  And you see that from that point

23   on, the EDTA group always had a lower proportion of vials

24   showing unresolved precipitates than the no EDTA group.

25   And, in fact, the EDTA group didn't have any unresolved

Mahnken - direct

1    precipitates until after -- until after the seventh cycle.

2    So actually it would have been after the eighth freeze.

3    Q.    Did you try to fit this data into any models?

4    A.    I did.

5    Q.    And can you tell us about that?

6    A.    Sure.  So I, again, created a generalized linear

7    mixed model.

8              This plot shows the raw data from before,

9    so that's what's represented by the -- by the -- kind of the

10   non-smooth functions.  That's just the raw data from the

11   previous slide.  And overlaid on top of that, I've got these

12   smoother curves, where the solid line represents the results

13   from a GLMM that included a -- excuse me -- an EDTA by cycle

14   interaction effect.

15             And then those dashed smooth lines

16   represent the results where I took out that interaction, so

17   I only included the main effects of EDTA in the primary --

18   excuse me -- the primary experimental factor and cycle.

19             And from this, it really appeared that the --

20   you know, those two curves were really quite similar in

21   terms of the, you know, just kind of ignore the raw data if

22   you could for a moment -- those curves look really quite

23   similar, so I decided to go with the more parsimonious model

24   or the main effects model.

25   Q.    Okay.  We're looking at Page 14 of PTX-188.

Mahnken - direct

1                     On this slide as well, do the vertical

2    lines mean the same thing they did in the previous slides?

3    A.      Yes, they do.  Those represent the 95 percent

4    point-wise confidence intervals based on the raw data, i.e.,

5    not from the GLMM.

6    Q.      And you decided to proceed with the main effects

7    model?

8    A.      That is correct.

9    Q.      And that's the one shown with the dashed red and blue

10   dashed lines; is that correct?

11   A.      That is correct.

12   Q.      What did the generalized linear mixed model allow you

13   to do in this case?

14   A.      It, again, allowed me to assess for a difference

15   between EDTA and non-EDTA, only this time in terms of the

16   likelihood of -- of the formation of unresolved

17   precipitates.  And here, too, it enabled me to also account

18   for the cycle effect, which was one of the experimental

19   factors incorporated into the study design.  And as well as

20   the repeated -- excuse me -- the repeated measures taken on

21   each vial.

22   Q.      If we look at the next two slides, can you tell us

23   what those are?

24   A.      Sure.

25                     So this one and then the subsequent one are

1   -- so this one represents the GLMM main effects model.

2   That's why it says main effects there.  And in this case,

3   it's basically that same line from before, only this time

4   I've removed that raw data and I've added the error bars so

5   it's in dashes, just so that the main effects can be

6   consistent from slide to slide.

7   Q.      And, again, this is red data so that is no EDTA;

8   correct?

9   A.      I'm sorry.  Could you repeat that?

10  Q.      This is red, so it's no EDTA?

11  A.      That is correct.  This is red.  This is the no EDTA

12  group.

13          MR. BAXTER:  Could we have the next slide, Page

14  16 of page 1288.

15  A.      So this represents the addition of the EDTA group, so

16  these are the model-based results.  Observing this as with

17  before, I see that the proportion of unresolved precipitates

18  was never higher.  The EDTA unresolved precipitates was

19  never exceeded that of the no EDTA group.

20  BY MR. BAXTER:

21  Q.      And as in the case of the Observation 1 data, did you

22  find anything out about the quality of the fit for your

23  model for the Observation 2 data?

24  A.      Yes.  If you plot, overlay the raw data, you know,

25  just kind of looking at it, it looks like the model did a

Mahnken - direct

1    good job of describing the variations that were observed in

2    the data.

3    Q.    Did this allow you to draw any conclusions?

4    A.    It did.

5    Q.    Can you tell us those conclusions?

6    A.    Yes.  From this, we see that -- excuse me -- the

7    likelihood of the formation of a precipitate that you

8    wouldn't resolve with agitation seemed to be a lot lower in

9    the EDTA group than in the non-EDTA group.  So in terms of

10   effect sizes from this, the odds ratio was .25, meaning that

11   the odds of forming an unresolved precipitate were about

12   four times higher in the group with no EDTA relative to the

13   group with EDTA, or about four to one.  Yes.

14   Q.    Does it seem likely that the differences between the

15   EDTA group and the non-EDTA group with regard to the

16   Observation 2 was due merely to chance?

17   A.    No.  Again, that seems highly unlikely.  The plots of

18   the raw data are quite indicative.  They're consistent with

19   the initial table that showed only a quarter as many

20   unresolved precipitates in the EDTA group.

21             The four-fold relative increase in odds.  Again,

22   this is a large effect size that was observed in this in

23   terms of the odds ratio -- a common measure that is used in

24   the biomedical literature.  Very large.

25             And the P value again is very small:  0.0073.

Mahnken - direct

1    That's the P value comparing for the comparison of the EDTA,

2    no EDTA groups.

3    Q.    Are you aware of any other statistical analyzes which

4    have been performed on the Cyanta freeze-thaw study?

5    A.    Yes.

6    Q.    Do you understand that Dr. Elder has conducted an

7    analysis of the data in that report?

8    A.    Yes.  I received a copy of her rebuttal to my expert

9    report.

10   Q.    Did you review that analysis?

11   A.    I did review that analysis.

12   Q.    Did you formulate any opinion of whether Dr. Elder

13   conducted an appropriate analysis?

14   A.    In my opinion, her analysis obscured a significant

15   amount of variation in the data that was attributable to the

16   experimental factors, the primary experimental factors.  So

17   I disagreed with the approach.

18            MR. BAXTER:  Can we go back to slide -- Page 1

19   of-PTX 188?

20   BY MR. BAXTER:

21   Q.    Using these slides, can you explain the basis of your

22   conclusion?

23   A.    Sure.  So the first thing that was presented in that

24   report was a collapsing of these.  For example, in this

25   case, 180 observations into a single yes/no.  Was there ever

Mahnken - direct

1    a plus in any one of those 180 Observation 1 values?

2    Q.    So when you counted the data, you looked at all 180

3    first observation data points?

4    A.    Correct.  Yes, I took advantage of the design of the

5    experiment, which had patent factor 4 for cycle as well as

6    replications within each formulation, the 1 through 18

7    different vials.

8    Q.    And looking at Page 2 of PTX-188.  If we look at the

9    highlighted red squares, does that indicate how you counted

10   the occurrence of precipitates for Observation 1?

11   A.    Yes, it does.  Each one of those would represent a

12   unique data point, a unique vial, observation at a given

13   cycle.

14              MR. BAXTER:  Can we go to Page 18?

15   BY MR. BAXTER:

16   Q.    And what does this show?

17   A.    So this is more representative of Dr. Elder's

18   analysis in her rebuttal report.  She basically said, well,

19   there was at least one plus in one of these Observation 1s,

20   so we'll count this whole table, this whole set of

21   information as a "yes" in a sense or as a "plus" in a sense.

22   Q.    As a single data point?

23   A.    As a single data point, correct.

24   Q.    Could you explain that maybe more clearly using some

25   additional examples?

Mahnken - direct

1               MR. BAXTER:  Can we go to Page 19?

2               THE WITNESS:  Sure.  So in terms of this, you

3   know, whereas I treated each vial by cycle observation as a

4   single point, because, you know, as you can see, there are

5   variation in there, it's not just, you know, no variation,

6   and so I -- and I incorporated all of those experimental

7   factors that were incorporated into the study that was

8   designed.  Because as I showed, that described a significant

9   amount of the information or variation in the data whereas

10   as the approach in the rebuttal just simply collapsed that

11   and said, well, at least one of 180 had a precipitate.

12   So -- yes.

13              MR. BAXTER:  Can we go to Page 20?

14   BY MR. BAXTER:

15   Q.    And on Page 20 of PTX-188, what formulation is

16   depicted?  The results of what formulation table are on the

17   left.

18   A.    Sure.  So this shows that previous set of data that

19   was up there.  This is from Formulation 1, which is one of

20   the five formulations that did not contain EDTA.  And then

21   on the right, we have I believe -- yes, excuse me --

22   Formulation 8, with the observations highlighted in red for

23   the formation of precipitates.

24   Q.    And how many occurrences of precipitation for the

25   first observation did you count for Formulation 1?

Mahnken - direct

1    A.       61, as shown here.

2    Q.       What about for Formulation No. 8?

3    A.       Yeah.  It says 26 but, in reality, that should have

4    been 23.  There were actually three Observation 2 pluses

5    right there, I believe right there and right there, that

6    were highlighted in red because, you know, there weren't

7    hardly any in this EDTA formulation.  There weren't hardly

8    any of those pluses in the observations so that is how that

9    mistake was made, so that should be plus equals 23.  So, in

10   other words, 23 or -- 23 of those 180 observations for

11   Observation 1 formed a precipitate.

12   Q.       So in your analysis, the more than twofold difference

13   in the occurrence of precipitations in observation for

14   Formulation 1 to Formulation 8 was taken into account?

15   A.       Absolutely.  Absolutely.  It was not obscured.

16   Q.       Was that taken into account in Dr. Elder's analysis?

17   A.       No.  No.  In that analysis, as I mentioned, if there

18   was one than the whole formulation was considered to have

19   formed a precipitate.  So it would treat like, for example,

20   the case that had 61, or about 30 percent of the time, as

21   being the same as the one that only had 23, or less than

22   50 percent of the time.  So it treated those formulations as

23   though they had produced the same result.

24   Q.       And just so the record is clear, the 26 on Page 1 of

25   PTX-188 should also read 23?

Mahnken - direct

1   A.      That is correct.  That is the 26 from the prior

2   slide.

3   Q.      Did you draw any conclusion or opinion about the

4   effect of the way Dr. Elder also analyzed the data?

5   A.      Well, that certainly seemed to obscure the amount

6   of variation in the data, so whereas the results from

7   before showed I believe about 30 percent of the no EDTA

8   observations, if you look at the approximately 1,700

9   observations that were actually examined as part of this

10   experiment, about 30 percent in the EDTA group and only

11   about 15 percent in the no EDTA group showed precipitates,

12   whereas with this, by doing it this way, you would show

13   five out of five formed precipitates in both groups or

14   precipitates being observed 100 percent of the time based

15   on this composite measure.

16   Q.      Did Dr. Elder do any other type of analysis?

17   A.      Yes.  She also did a similar type of collapsing of

18   the information, only not quite to the extreme.  So whereas

19   this one took the 1,700 observations and kind of crunched

20   them down into ten observations, she also collapsed by the

21   rows.  So, in other words, she ignored the cycle effect,

22   which is another factor that I found to be a factor that

23   described a significant amount of variation in my models.

24          So, for example, in this case, if you start

25   looking -- and we're back at Formulation 1.  There is a plus

Mahnken - direct

1    there for vial 1 at Observation 1, so basically that said,

2    okay, there is at least one out of these ten cycles so we're

3    going to count that as a plus.

4              No. 2.  There wasn't one there but there was one

5    there.  So given there was one there, we're going to treat

6    that one as a plus, so on and so forth.

7              If you look at vial 12, those were all

8    negatives, and hence this one is a negative.

9              So this one took these, again, 180 data points

10   and collapsed it down to 18.  So it completely ignored the

11   cycle effect, or, in other words, it completely ignored the

12   fact that, you know, some of these pluses were following

13   after they had been frozen eight times compared to some of

14   the others.

15             It also would treat an observation that only

16   formed precipitates in one cycle as being equivalent to one

17   that formed precipitates in nine out of ten cycles.

18   Q.   Did you form any opinion of what effect Dr. Elder --

19   this type of data contraction Dr. Elder had on the analysis?

20   A.   I'm sorry.  Can you repeat the question?

21   Q.   Did you form any opinion of what effect this type of

22   data reduction had on the analysis?

23   A.   Yes.  This one, as with the other, obscured a

24   significant amount of variation that was attributable to

25   experimental factors in this designed study.

Mahnken - direct

1          MR. BAXTER:  Your Honor, that's the end of

2    PTX-188.  We would move it into evidence.

3          THE COURT:  Any objection?

4          MR. CLEMENT:  No, I guess just with the

5    corrections that were noted.

6          THE COURT:  All right.

7          (Plaintiffs' Exhibit No. 188 was received into

8    evidence.)

9          MR. BAXTER:  Could I bring up PTX-189, please?

10         This is another demonstrative.  This one will be

11   faster.

12   BY MR. BAXTER:

13   Q.    Can you describe how the data contraction used by

14   Dr. Elder, how that would have effected the cycle by cycle

15   analysis which you employed?

16   A.    Sure.  So those goes back to the first analysis she

17   presented in her rebuttal report.  Basically, if you were --

18   you know, again, this represents the raw data; and, again,

19   you know, you can see the differences between the two

20   groups.  But with Dr. Elder's, it essentially collapses into

21   five yeses for each group such that it basically kind of

22   converged to very little variation.

23   Q.    Is that what is being shown?

24   A.    Yeah.  This here, yeah.  Essentially it's collapsing

25   all that information.  And then here, too, the same thing,

Mahnken - direct

1    only this time the previous one was the more raw data,

2    this one is my model.  So by collapsing it to those ten

3    observations down from the over 1,700, you lose the ability

4    to even assess for some of those, the effects of some of

5    those designed experimental factors.

6                    MR. BAXTER:  I'd like to move PTX-190.

7                    (Plaintiffs' Exhibit No. 190 was received into

8    evidence.)

9    BY MR. BAXTER:

10   Q.    Can you show what is shown in this animation?

11   A.    The same thing, just with the unresolved precipitates

12   outcome or the observation to.

13   Q.    So this is a similar plot and similar result but this

14   is using the Observation 2 data?

15   A.    Correct.  And, you know, it's a similar phenomenon to

16   her first analysis that collapsed all of the data points

17   into a single data point per page.

18   Q.    And when you do that kind of data collapse, are you

19   able to discern any effect related to the cycle time?

20   A.    No, because you have completely ignored cycle time.

21   And, in fact, in both of the analyses that were presented in

22   the group by that report, you have completely ignored the

23   cycle effect.

24                    MR. BAXTER:  Your Honor, we would also like to

25   move Plaintiffs Exhibits 189 and 190 into evidence.

Mahnken - cross

1              MR. CLEMENT:  No objection, your Honor.

2              THE COURT:  Thank you.

3              (Plaintiffs' Exhibit Nos. 189 and 190 were

4      received into evidence.)

5      BY MR. BAXTER:

6      Q.     Last question.  Can you briefly succinctly sum up

7      your opinion of Dr. Elder's analysis?

8      A.     It obscured the -- I believe that the analysis she

9      performed obscured the significant variation or information

10     that was attributable to the design experimental factors and

11     thus obscured the ability to detect the impact of EDTA on

12     the formation of precipitates.

13             MR. BAXTER:  I'll pass the witness, your Honor.

14             THE COURT:  All right.  Cross-examination.

15             MR. CLEMENT:  Your Honor, I have a witness book

16     for the witness.

17             THE COURT:  All right.

18             MR. CLEMENT:  Thank you.

19             (Witness book passed forward.)

20                     CROSS-EXAMINATION

21     BY MR. CLEMENT:

22     Q.     Good afternoon, Dr. Mahnken.

23     A.     Good afternoon.

24     Q.     Am I correct you testified you never looked at the

25     '045 patent?

Mahnken - cross

1   A.     I'm sorry?

2   Q.     Am I correct that you never looked at the '045

3   patent?

4   A.     If I recall, that patent was part of Dr. Elder's

5   rebuttal report, if that is the correct patent.

6   Q.     Right.  But at the time you did your statistical odds

7   analysis and put in your expert report, you had never

8   reviewed the '045 patent?

9   A.     Yes.  At the time I had done and completed my

10  analysis, that is correct.  I had not seen the '045 patent,

11  no.

12  Q.     Have you ever looked at any of the Senju

13  precipitation data?

14  A.     I'm not sure.  I listed in my expert report each of

15  the documents that I had been given to look at by the Oblon

16  group.

17  Q.     Do you remember looking at any of those documents,

18  seeing the statistical odds ratio analysis that you did when

19  they looked at their precipitation data?

20  A.     I don't recall seeing an analysis presented in terms

21  of odds ratio, but I could just be misremembering.

22  Q.     What about a Kaplan-Meier survival curve?  Do you

23  recall ever seeing one of those in any Senju or Kyorin

24  documents?

25  A.     I don't recall that, no.

Mahnken - cross

1    Q.      Okay.  I'm correct that the analysis that you

2    performed on the Senju data, at least one of the analyses

3    was an odds ratio analysis; correct?

4    A.      I performed an analysis that produced odds ratios as

5    the measure of effect.  Is that what you are asking?

6    Q.      Yes.  Thank you.

7    A.      Then, yes, I did.  That was the generalized linear

8    mixed model that I produced, produced effects called odds,

9    and then I was able to compare the groups using the odds

10   ratio.

11   Q.      Prior to performing your odds analysis, am I correct

12   you never worked with Cyanta before?

13   A.      You are correct.

14   Q.      And would you agree with me that you did not review

15   Cyanta's laboratory notebooks before performing your

16   analysis?

17   A.      Are those notebooks different than the Cyanta reports

18   that I reviewed and presented as part of my expert report?

19   Q.      Yes.

20   A.      Yes.  Then that is correct.  No, I had not seen those

21   documents to which you just referred.

22   Q.      And what about the protocol for their experiment?  Do

23   you recall if you reviewed that before looking at, or

24   conducting your analysis?

25   A.      Was the protocol different than the Cyanta document

Mahnken - cross

1   that was submitted as part of my expert report?

2   Q.      Well, why don't you take a look in your book right

3   there, Exhibit 2, DTX-2, or DTX-131.

4   A.      Okay.  DTX-131.  Okay.  I have it.

5   Q.      All right.  Do you recall looking at that document

6   before reviewing, or conducting your analysis?

7   A.      This document does not appear to be the Cyanta report

8   that I reviewed, so, no.

9   Q.      And would you agree with me, there's nothing in that

10  document saying what type of statistical analysis should be

11  run on the data?

12  A.      I would have to look through it.

13  Q.      Do you recall doing that at your deposition?

14  A.      I believe I recall looking through this at my

15  deposition.

16  Q.      And you didn't find one; is that correct?

17  A.      I don't recall for sure.

18  Q.      Well, why don't you take a minute to look through it

19  and let me see if you see an outlined statistical analysis.

20  A.      Is there a section that I should be directed to?

21  Q.      It's only a couple-page document.  I don't think it's

22  there.  I don't think you testified earlier that it was

23  there.

24  A.      Yes.  I don't recall testifying that it was there

25  either, so I don't know if that answers your question,

Mahnken - cross

1   or --

2   Q.      I think that's fair.

3   A.      Okay.

4   Q.      Would it be fair, you did not follow a Cyanta-defined

5   statistical protocol when you conducted your analysis?

6   A.      That would be correct.

7   Q.      And would it be fair to say you had the Cyanta data

8   in front of you when you designed your statistical analysis?

9   A.      It would be fair to say I had the data in front of me

10  when I conducted my statistical analysis, yes.

11  Q.      And is it true that at the time you ran your

12  statistical odds analysis, you did not know if the two

13  formulations were identical in all respects other than the

14  absence or presence of EDTA?

15  A.      Can you repeat the question?

16  Q.      At the time you ran your statistical analysis, am I

17  correct that you did not know if the two formulations were

18  identical in all -- I will withdraw that question.

19          Do you agree with me that your no hypothesis for

20  your statistical odds ratio analysis had to do with rates of

21  precipitation?

22  A.      Yes, I believe you could term it that way.  Yes.  Or

23  the likelihood of the formation of precipitation might be

24  potentially a better way, or another way of saying it.

25  Q.      Okay.  And do you agree with me that your analysis

Mahnken - cross

1    was just on precipitates, not necessarily looking for

2    gatifloxacin precipitates?

3    A.    I was looking for -- yeah, pluses or minus as they

4    were represented on the Cyanta report, so I was not given

5    any instruction to, you know, go beyond, you know, were

6    there precipitates or not, or, you know, the formation of

7    precipitates.

8    Q.    Right.  You don't know what a gatifloxacin

9    precipitate looks like; is that correct?

10   A.    I have no idea, no.

11   Q.    Whether it's a white particle or a translucent

12   particle?

13   A.    No, I do not know that.

14   Q.    If you will look at -- in your notebook there, I

15   have DTX-149, which should be your expert report.  I know

16   we've marked this as an exhibit, but I'm not going to mark

17   this.  But will you turn there to the Cyanta charts?

18   A.    Okay.

19   Q.    Attachment with the formulations and all the plus-

20   minuses on it?

21   A.    Right.  Right.  Which page?  Formulation 1?

22   Q.    Sure, Formulation 1.

23   A.    Okay.  I'm on Formulation 1.

24   Q.    Okay.  When you did your statistical analysis, you

25   were just looking for pluses and minuses on the chart; is

Mahnken - cross

1    that correct?

2    A.      Correct, as I testified to earlier.

3    Q.      And would you agree with me that the events on the

4    chart are dichotomous?  It's either a plus or a minus?

5    A.      For Observation 1, yes.  And then, of course, for

6    Observation 2, the way I -- the way I analyzed the data, you

7    know, I -- the NA was treated differently.  I mean, it could

8    have been a plus, a minus, or an NA, but as I described

9    earlier how I ultimately resolved that into yes or no, was

10   there the presence of an unresolved precipitate.

11   Q.      And you agree -- you would agree with me, wouldn't

12   you, if there were two types of precipitates appearing and

13   they gave a plus, just whether or not they saw a precipitate

14   at all, that the data were not discriminating between the

15   types of precipitates?

16   A.      Can you repeat that question?

17   Q.      Sure.

18           The plus here, you don't know if that was

19   one type of -- let's assume that there were two types of

20   precipitates.  If there's a plus sign there, you don't know

21   whether or not that was one type of precipitate or another;

22   is that correct?

23   A.      That's correct, I do not know.

24   Q.      All right.  Now, Dr. Mahnken, would you agree with me

25   that for each formulation, there are ten formulation charts,

Mahnken - cross

1    that each one has at least one plus sign during the

2    experiment?

3    A.      Each of them -- each of these formulations has at

4    least one plus sign?  Is that what you said?

5    Q.      Yes.

6    A.      Yes, I would agree with you.

7    Q.      Would you agree with me that each formulation chart

8    has multiple plus signs?

9    A.      Probably.

10   Q.      So then would you agree with me that all ten

11   preparations experienced precipitation during the

12   experiment?

13   A.      You said preparation.

14   Q.      I'm sorry.  Formulation.

15   A.      Okay.  So can you repeat the question?

16   Q.      Sure.  You would agree with me that each of the

17   formulations, 1 through 10, experienced precipitation during

18   the experiment?

19   A.      Experienced at least one precipitate during the

20   experiment?  Yes, I would agree with that.

21   Q.      Now, am I correct that your statistical analysis was

22   based on certain assumptions?

23   A.      Yes, that's correct.

24   Q.      Okay.  You have your report in front of you; is that

25   correct?

Mahnken - cross

1    A.    Yes.  You marked that as -- which one?

2    Q.    I think it's DTX-149.

3    A.    149.  Okay.  Just give me a moment.

4    Q.    Certainly.

5    A.    Okay.

6    Q.    And I think you have an Exhibit D in there.  I would

7    like you to turn to Page 2 of Exhibit D.

8    A.    Okay.  I believe I'm there.  It's not tabbed as

9    Exhibit D.  Let me just make sure the front page -- yes.

10   You are talking about the one dated October 8th.  That one?

11   Is that the correct one?

12   Q.    Yes.

13   A.    Okay.  Okay.  Yes, I'm on Page 2 of that now.

14   Q.    Okay.  That's up on the screen.

15   A.    Okay.

16   Q.    All right.  Would you agree with me that these

17   assumptions that are up there on the screen, 1, 2 and 3,

18   those pertain to your statistical odds analysis?

19   A.    Those pertain to my data analysis.

20   Q.    And am I correct that you listed these assumptions

21   because you were not involved in the underlying Cyanta

22   study?

23   A.    Because, yes.  Correct.

24   Q.    And would you agree with me that violating just one

25   of these assumptions would give the potential for rendering

Mahnken - cross

1    your conclusions incorrect?

2    A.    That would depend on the magnitude of the violation

3    of just one of those assumptions.

4    Q.    So, potentially, it could render your conclusions

5    incorrect?

6    A.    Potentially?

7    Q.    Yes.

8    A.    It -- if it was grossly violated, it potentially

9    could, but it still may not.

10   Q.    Let's look at assumption number one.

11   A.    Okay.

12   Q.    Okay?  That 1 first says that the study was blinded;

13   is that correct?

14   A.    It says that they were blinded, or the observations

15   were sufficiently objective.

16   Q.    All right.  So part of it is blinding; is that

17   correct?

18   A.    It's an either/or.

19   Q.    Okay.  Let's talk about blinding first.

20   A.    Sure.

21   Q.    All right.  Would you agree with me that your purpose

22   in having blinding as one of your assumptions was to

23   alleviate any potential concerns regarding objectivity?

24   A.    That would be a benefit of blinding.

25   Q.    And do you -- am I correct, Dr. Mahnken, that at the

Mahnken - cross

1    time you performed your statistical analysis, you did not

2    know if the underlying study was blinded?

3    A.    That is correct.  At the time I conducted my

4    statistical analysis, I was not aware as to whether or not a

5    valuation of the formation of precipitates was done in a

6    blinded fashion.

7    Q.    All right.  Now, am I correct that you did nothing to

8    check to see if the study was blinded before conducting your

9    analysis?

10   A.    I don't recall either way that I did or that I

11   didn't, and that's probably why I listed it there.

12   Q.    And am I correct that if the study was not blinded,

13   that could have affected your results?

14   A.    Depending on the objectivity of the observations.

15   Q.    Okay.  Let's take a look at the objectivity of the

16   observations.

17           If the Cyanta study was just to look for

18   gatifloxacin precipitates and not any precipitate, if

19   someone put a plus sign down when they observed something

20   they believed not to be a gatifloxacin precipitate, am I

21   correct that this would violate the assumption?

22   A.    So are you talking about a hypothetical that was not

23   actually what was supposed to be done by the Cyanta

24   analysis?

25   Q.    Well, yes.  It's a hypothetical, sure.

Mahnken - cross

1    A.    Okay.  I'm sorry.  So could you repeat it?

2    Q.    If the Cyanta study was just to look for gatifloxacin

3    precipitates and not just any precipitate, if someone put a

4    plus sign down and they observed something they believed not

5    to be a gatifloxacin precipitate, am I correct this would

6    violate the assumption?

7    A.    I'm not sure.  Can you repeat that one more time?

8    I'm sorry.  I'm just --

9    Q.    Okay.  If the Cyanta study -- just stay with me.  If

10   the Cyanta study was just to look for gatifloxacin

11   precipitates --

12   A.    Okay.

13   Q.    Okay?  And not just any precipitate --

14   A.    Okay.

15   Q.    Okay?  If someone put a plus sign down, okay, when

16   they observed something that they believed not to be a

17   gatifloxacin precipitate, am I correct that would violate

18   this assumption?

19   A.    If -- well, I don't know that I would call it that.

20   I would maybe call that misclassification, not necessarily a

21   bias.

22   Q.    Okay.  But it would violate the assumption; is that

23   correct?

24   A.    Well, it sounds like it would violate the protocol.

25   Q.    And that would violate your assumption?

Mahnken - cross

1   A.      Again, I would call that misclassification, not

2   objectivity.

3   Q.      Okay.  Let's turn to the second assumption that's up

4   there.

5   A.      Sure.

6   Q.      Am I correct that this assumption has to do with

7   whether the vial observations were properly randomized?

8   A.      Either that, or -- or that whether or not they

9   were in random order would have had no bearing on the

10  formation of precipitates.  So, again, there's an or clause

11  in there.

12  Q.      Okay.  Well, let's talk about the first part of it.

13  A.      Sure.

14  Q.      Would you agree that part of that assumption, one of

15  the options in that assumption was whether the vial

16  observations were properly random?

17  A.      It's in there insomuch as it only matters if the

18  systematic observation would have any bearing on the

19  results.

20  Q.      Okay.  Do you agree that proper randomization

21  techniques would have included die rolling or the use of a

22  pseudorandom number generator?

23  A.      That is certainly one way to conduct a randomization.

24  Q.      All right.  What about if a person just walked into

25  the freezer, took the samples out, put them on the table in

Mahnken - cross

1    just any old order.  Do you know if that would satisfy your

2    random order assumption?

3    A.    I think that could satisfy it.  It doesn't, you know,

4    necessarily.  But I think -- I think that could be

5    considered random.

6    Q.    But --

7    A.    If there was no systematic approach to it, then, you

8    know, it's really hard to say that it's not random.  I mean,

9    I understand the mechanism of the randomization.

10   Q.    So you don't know one way or the other if it was

11   truly random?

12   A.    It's certainly not systematic, and so if it's not

13   systematic, then I don't know -- I'm not sure that might --

14   yes.

15   Q.    It would have been better laboratory practice

16   for Cyanta to use a random number generator; is that

17   correct?

18   A.    Well, sometimes you have to balance some of the

19   things with logistics of conducting experiments.  I mean,

20   you know, that's something that certainly can be done, but

21   there are times when, you know, rolling a die or things like

22   that are just not feasible in the experiment.

23            In this case, I really don't know.  I don't know

24   enough about this type of laboratory experiment given my

25   area of expertise.

Mahnken - cross

1    Q.      All right.  Dr. Mahnken, am I correct that your

2    Assumption No. 2 includes that second portion, or there was

3    a systematic observation sequence of vials?

4    A.      I'm sorry.  Are you asking, does it include those

5    words?

6    Q.      Yes.

7    A.      If you read it correctly, then, yes, it includes

8    those words.

9    Q.      And do you know if Cyanta followed such a systematic

10   observation sequence at the time you filed your report?

11   A.      It's my understanding from Mr. Gemoules' testimony

12   that there was not a systematic sequence of the --

13   that there was not a systematic sequence of the sets of

14   vials.

15            Are you talking about the sets of vials?

16   Q.      Sure.

17   A.      Or about the -- or about the vials within a set?

18   Q.      Sets of vials.

19   A.      Okay.  The sets of vials?

20   Q.      Yes.

21   A.      I don't recall -- if I recall what he said correctly,

22   they went through 1 through 18 within a given formulation,

23   I guess you would say, if I recall his testimony correctly.

24   Q.      All right.  What about the vials themselves, not the

25   sets?

Mahnken - cross

1    A.     That's what -- that's to what I was referring, is

2    that was my understanding of his testimony.  I could have

3    misunderstood that he said -- that -- within the formulation

4    they went 1 through 18, but I don't recall.

5    Q.     As they pulled them out of the freezer, just hit them

6    in any order; right?  They did not go in any systematic

7    order; correct?

8    A.     Correct.  That was my understanding of his testimony,

9    was that they did not pull them out in any type of

10   systematic order.

11   Q.     And if, in fact, sitting out on the table, they also

12   made observations when they were on the table; is that

13   correct?

14   A.     I'm sorry?

15   Q.     They made their observations after they pulled them

16   out of the freezer, they left them out on the table;

17   correct?

18   A.     That's better a question for him.  I don't recall

19   what it said in the Cyanta report about that specific

20   detail.  I'm sorry.

21   Q.     Okay.  Do you have -- can you turn to Exhibit C in

22   your report?

23   A.     Exhibit C?  Is that the --

24   Q.     I think it's the Cyanta report.

25   A.     Okay.  I'm on the Cyanta report.

Mahnken - cross

1   Q.      If you will turn to Page 3 of 5.

2   A.      Okay.  I have it.

3   Q.      And there's a formulation section there?

4   A.      Yes.  Roman Numeral III.

5   Q.      Do you agree with me that these are the formulations

6   that were tested in the Cyanta study; is that correct?

7   A.      That is what was represented to me.  You know, this

8   was my understanding, but, you know, again, this information

9   was just given to me, and I certainly took it at face

10  value.

11  Q.      And would you agree that Formulation I.D. 74-3-1

12  through 2, 3, and I guess it's 74-4-4 and 74-5.  That first

13  box, those were the formulations without disodium edetate;

14  correct?

15  A.      That is what is represented on this report here, on

16  this table.

17  Q.      You would agree with me that all of those

18  formulations had about .86 grams of sodium chloride;

19  correct?

20  A.      According to this table, yes.  If you use

21  conventional rounding to the one-hundredth decimal place,

22  they would all round to 0.86.

23  Q.      And you would agree with me that your statistical

24  analysis dealt with formulations having .86 grams of sodium

25  chloride; correct?

Mahnken - cross

1    A.    Only insomuch as that is what produced the data that

2    I analyzed, but I didn't incorporate the NaCl into my

3    analysis, only a -- an indicator for whether it was a

4    formulation with disodium edetate or without.

5    Q.    And you didn't run an analysis on a formulation with

6    .82 grams of sodium chloride; correct?

7    A.    It's my understanding that this represents the data

8    that I analyzed and so, you know, whatever it says on here,

9    that's -- this is all I know, and, again, that's outside of

10   my area.

11   Q.    Okay.  So you don't know if your conclusions would

12   apply to a formulation with .82 grams of sodium chloride

13   instead of .86; is that correct?

14   A.    That would probably be a question for someone that --

15   yes, with that type of expertise.  I wouldn't know.

16   Q.    Okay.  Can you turn to Page 2 of Exhibit E of your

17   report?

18   A.    Okay.  Exhibit E.  I'm on Page 2.

19   Q.    Okay.  And you have a primary analysis there?

20   A.    Yes.  There's a section labeled primary analysis at

21   the bottom.

22   Q.    Okay.  And do you see that in the bottom portion of

23   that, there's a sentence that begins, however, there were

24   only 41 observations with unresolved precipitates?

25   A.    Yes, I do.

Mahnken - cross

1    Q.      Okay.  How did you calculate that number?

2    A.      I'm sorry.  How did I calculate that number?

3    Q.      Yes.

4    A.      I believe I counted them up kind of as I demonstrated

5    earlier.

6    Q.      All right.  And then am I correct that you go on to

7    say that only two of the no EDTA formulations had any

8    unresolved precipitates?

9    A.      That is what it says in there, yes.

10   Q.      And in the parenthetical, you agree that you stated

11   that those vials were Formulation 2, which had nine vials of

12   unresolved precipitate, and Formulation 4, which had one

13   vial?

14   A.      That is correct.

15   Q.      So would you agree with me, Dr. Mahnken, that

16   Preparations 1, 3 and 5 had no unresolved precipitate?

17   A.      Yes.

18   Q.      Okay.  Now let's look at the EDTA data that you talk

19   about in that paragraph.

20   A.      Okay.

21   Q.      Do you agree that for the EDTA data, again, only two

22   vials had unresolved precipitate?

23   A.      I'm sorry.  Say that again.

24   Q.      Would you agree with me that for the EDTA data, only

25   two of the vials had unresolved precipitates?

Mahnken - cross

1   A.      No, I don't think I would agree with you.

2   Q.      EDTA says two vials in formulation -- okay.  Two

3   formulations had it.

4   A.      Can you restate the question?

5   Q.      Two vials had unresolved --

6   A.      Yes.  According to this, there were two formulations

7   had unresolved precipitates.

8   Q.      There were two vials in Formulation 7 and two in

9   Formulation 8; correct?

10  A.      Yes, that is correct.

11  Q.      So does that mean, Dr. Mahnken, am I correct that

12  there would be zero vials for Preparation 6, 9 and 10?

13  A.      That is correct.

14  Q.      If you will turn to the last, there's a chart at the

15  end of your book.  I'm also going to put it up on the

16  screen.

17          Dr. Mahnken, I've prepared this chart up on the

18  screen, which I believe accurately reflects what we've just

19  discussed.

20          Do you agree?

21  A.      Let's see.  Yes.  Was it one vial for No. 4 on

22  the --

23  Q.      You can check.

24  A.      Thank you.  Yes.  This looks like a representation of

25  what we just discussed.

Mahnken - cross

1   Q.      Now, would you agree with me that all of the

2   preparations had zero, one, or two vials with unresolved

3   precipitate, except for Preparation 2?

4   A.      I would agree with you, yes.

5   Q.      Okay.  Now, in that number set, 0, 9, 0, 1, 0, 0, 2,

6   2, 0, 0, is there one number that kind of stands out?

7   A.      Potentially.

8   Q.      The number 9?

9   A.      Yes, depending on what you are looking for.

10  Q.      And am I correct that you could have undertaken a

11  statistical test to determine whether preparations within

12  a -- I'm sorry.

13          Am I correct, Dr. Mahnken, that this would

14  suggest there might have been potentially something wrong

15  with Formulation -- Preparation 2?

16  A.      You mean just because it's -- it's the highest?

17  Q.      Well, it's kind of a different number than just zero,

18  one or two.

19  A.      Correct.  But just because something is the highest

20  doesn't mean it's wrong, necessarily.

21  Q.      Right.  I agree.  But you would have undertake an

22  analysis to determine whether there was a formulation

23  difference there; is that correct?

24  A.      That's possible.

25  Q.      But you did not take such -- undertake such an

Mayo - direct

1    analysis; is that correct?

2    A.    I don't believe so, no.

3    Q.    Okay.

4         MR. CLEMENT:  I have nothing further, your

5    Honor.

6         THE COURT:  All right.  Redirect.

7         MR. BAXTER:  We have no redirect, your Honor.

8         THE COURT:  All right.  You may step down.

9    Thank you very much.

10        (Witness excused.)

11        MR. BAXTER:  Plaintiffs would like to call

12   Professor Matthew Mayo as our next witness.

13        THE COURT:  All right.

14             ... MATTHEW STUART MAYO, having been

15        duly sworn as a witness, was examined and testified

16        as follows ...

17                  DIRECT EXAMINATION

18   BY MR. BAXTER:

19   Q.    Good afternoon.

20   A.    Good afternoon.

21   Q.    Could you briefly describe your educational

22   background after high school?

23   A.    I have a bachelor's and master's of arts in

24   Statistics from the University of Missouri, a Ph.D. in

25   Applied Statistics from the University of Alabama, and an

Mayo - direct

1    MBA from Baker University.

2    Q.    Did any of your studies related to your master's or

3    Ph.D. involve statistical analysis?

4    A.    Yes, almost all of them.

5    Q.    After receiving your Ph.D., did you get a job?

6    A.    Yes.  My first job was a postdoctoral fellow at the

7    University of Alabama-Birmingham's Comprehensive Cancer

8    Center.  I was then awarded and earned Research Assistant

9    Professorship at the University of Alabama-Birmingham.

10             Subsequently, I moved to the University of

11   Kansas Medical Center, where I was an Assistant Professor in

12   the Department of Preventive Medicine and Public Health.  I

13   was then subsequently promoted to Associate Professor, and

14   then Full Professor in 2006.

15   Q.    And did anything good happen in 2007?

16   A.    Yes.  I created, through my vision at the Department

17   of Biostatistics, which did not exist in the institution or

18   the State of Kansas, and became Chair of the newly formed

19   Department of Biostatistics in 2007.

20   Q.    And that is at the University of Kansas?

21   A.    Yes.

22   Q.    Can you briefly describe your duties as Full

23   Professor and Chair of the Department of Biostatistics?

24   A.    There are four broad categories:  administration,

25   research, service, and teaching.

Mayo - direct

1    Q.      Can you tell us about your administrative duties?

2    A.      It's my job to maintain the Department of

3    Biostatistics, and that includes currently reviewing and

4    hiring my eight faculty members that were before me and

5    approximately 17 staff members for our growing department.

6    As we grow more, I will continue to annually review those.

7    Q.      So are you, as part of your job, running the hiring,

8    retention and promotion of other faculty members in

9    biostatistics?

10   A.      All biostatisticians hired at the University of

11   Kansas Medical Center have to have my approval to be hired

12   within the department.  I provide the annual review, and

13   then I provide a letter of recommendation of whether or not

14   they can be promoted to Associate or to Full Professor, yes.

15   Q.      Can you describe your teaching duties?

16   A.      I teach, currently teach off and on service courses

17   and service graduate courses in biostatistics throughout the

18   medical center, and that will increase with the MS and Ph.D.

19   programs in biostatistics that we created and received

20   regents approval to start in the fall.

21   Q.      Can you tell us about your service activities?

22   A.      I am a permanent member of the National Cancer

23   Institute's Cancer Biomarker Study Section.  Permanent

24   membership is generally four years.  I don't know why they

25   call it permanent, but they do.  So I review grants for NIH

Mayo - direct

1    and other groups.

2              I also serve as statistical reviewer for both

3    the medical literature and statistical methodological

4    literature.  I sit on numerous committees.

5    Q.    Have you ever been a DSMB member?

6    A.    Yes.  I actually sit, currently sit on three data and

7    safety monitoring boards.  One that is sponsored by the

8    National Institutes of Health and two that are sponsored by

9    pharmaceutical companies for which those drugs are seeking

10   FDA approval.

11   Q.    Can you briefly describe your research activities?

12   A.    Currently, I do a lot of collaborative work.  I'm

13   the lead biostatistician.  We generally have teams of

14   Ph.D., MS biostatisticians and informatics people,

15   informatics personnel on numerous grants, and I'm the lead

16   biostatistician for numerous of those, mostly in a wide

17   variety of areas.  And then currently my methodological

18   research, I do some still, but as a Chair, my focus is to

19   promote my junior faculty and to mentor them to do

20   methodological research.

21   Q.    Do you hold any other positions?

22   A.    Yes.  I'm Associate Director of Shared Resources for

23   the University of Kansas Cancer Center.

24             I'm also Director of the Center For

25   Biostatistics and Advanced Informatics.

Mayo - direct

1          Nationally, I'm a member of the American Joint

2    Commission, Joint Committee on Cancers, Statistical Task

3    Force.

4          And I was recently asked to sit on -- I'll

5    shorten it, AJCC -- the AJCC's Molecular Modelers Work

6    Group.

7    Q.    Can you describe your work responsibilities as

8    Associate Director of Shared Resources for the University of

9    Kansas Cancer Center?

10   A.    I am responsible to oversee and make sure that all

11   shared resources providing support to researchers doing

12   cancer, cancer related researchers are operational,

13   providing high quality service and are maintaining the

14   highest integrity in their research support.

15   Q.    Can you describe your responsibilities as the

16   Director for the Center for Biostatistics and Advanced

17   Informatics at the University of Kansas?

18   A.    I supervise all faculty and staff that are members

19   within that center and am ultimately responsible for all the

20   projects which we support, which is currently between

21   approximately 275 ongoing projects, which we work with 150

22   or more investigators.

23   Q.    Have you ever authored any scientific articles which

24   contain your statistical analysis in any peer-reviewed

25   journals?

Mayo - direct

1   A.      Yes.

2   Q.      About how many?

3   A.      Somewhere between 140 and 150 now.

4   Q.      Have you won any awards pertaining to your work as a

5   statistician?

6   A.      Yes.  In graduate school, at the University of

7   Missouri, I was the graduate -- won the graduate teaching

8   award.  I also won that award at the University of Alabama.

9          I was named Outstanding Graduate Student at the

10  University of Alabama when I was getting my Ph.D.

11         And in 2007, I was awarded the Excellence in

12  Mentoring award by the University of Kansas School of

13  Medicine, of which I was the first recipient and currently

14  the only recipient that has ever been awarded that by the

15  School of Medicine.

16  Q.      Have you ever been awarded any grants related to

17  statistics?

18  A.      Yes.  In 2002, I was awarded a grant from the

19  National Cancer Institute to build the Biostatistics and

20  Advanced Informatics infrastructure at the University of

21  Kansas.  It was a $1.4 million grant over five years.

22  Q.      Could you please turn to Exhibit PTX-42 in the

23  notebook in front of you?

24  A.      (Witness complies.)

25  Q.      And could you tell us what Exhibit PTX-42 is?

Mayo - direct

1    A.      It looks like my CV.

2    Q.      Is it an accurate copy of your CV?

3    A.      It accurate as of the date it was submitted.  I'm

4    sure there are studies I'm a part of and have been a part of

5    the publications that have come about that weren't on it

6    when this was submitted.

7            MR. BAXTER:  Your Honor, I understand you may

8    deal with this issue later but I would like to formally

9    request that PTX-42 be entered into evidence.

10           THE COURT:  Actually what I usually do with a

11   bench trial, because half the time you don't even refer to

12   the documents posttrial that you have admitted, is that I

13   admit all documents with the objections noted; and if you

14   don't mention the documents in your post-trial briefing,

15   they are deemed off the list for purposes of appeal.  So it

16   will be admitted.  If there is an objection, you may state

17   it now but it will be admitted.

18           MR. ABRAMOWITZ:  The objection is hearsay but

19   thank you, your Honor.

20           THE COURT:  All right.

21           MR. BAXTER:  Thank you, your Honor.

22           (Plaintiffs' Exhibit No. 42 was received into

23   evidence.)

24           MR. BAXTER:  Your Honor, plaintiffs would also

25   like to offer Professor Mayo as an expert in the field of

Mayo - direct

1    statistical analysis?

2              THE COURT:  Any objection to that?

3              MR. ABRAMOWITZ:  No objection.

4              THE COURT:  All right.  Thank you.

5    BY MR. BAXTER:

6    Q.    Professor Mayo, I'd like you to turn to Exhibit

7    PTX-88, which should also be in the notebook in front of

8    you.  Tell me when you have it.

9    A.    I have it.

10   Q.    Could you tell us what Exhibit PTX-88 is?

11   A.    It's the face page of an Allergan study in

12   pharmacokinetics and drug metabolism.

13   Q.    Did you conduct any analysis or analyses of any of

14   the testing recorded in this report?

15   A.    Yes.

16   Q.    Can you describe the analyses or the analysis you

17   conducted?

18   A.    Yes.  I compared the amount of drug penetration that

19   was summarized in Table 12.4 on Page 24 of the report.

20   Q.    And did you look at any specific -- or strike that.

21   Did you look at the results of any specific compositions in

22   that table?

23   A.    Yes.  I actually compared.  First, I looked globally.

24   I did a global comparison across all five groups to

25   determine if there was at least one group that differs in

Mayo - direct

1    the amount of drug penetration across the groups.

2              I looked at that actually two ways.  The sample

3    size is somewhat small.  So I looked at it both with the

4    analysis of variance procedure, and then it's non-barometric

5    counterpart, the Kruskal-Wallis test, just in case the data

6    was not normally distributed.

7    Q.    Is that first way you looked at it also referred to

8    as ANOBA?

9    A.    ANOBA.

10   Q.    And that's all caps?

11   A.    Yes.  A-N-O-B-A.  ANOBA.

12   Q.    And could you spell the second way you looked at it?

13   A.    Oh, gosh.  I hope I remember which way it is spelled.

14   It's K --

15   Q.    I withdraw the question.

16   A.    Okay.

17   Q.    What did you find?

18   A.    There was a global difference.  That the P value for

19   both methods was less than .0001, so that indicated that

20   there was at least one group that was significantly

21   different than the others.  There could be more but we know

22   from that test there is at least one group.

23   Q.    Does that low P value mean the fact that there was at

24   least one group in the table different from the others and

25   that it was unlikely that that difference was due to a

Mayo - direct

1    chance?

2    A.      Yes.  It's highly unlikely it was due to chance.

3    Q.      What did you do next?

4    A.      I then conducted pair-wise comparisons.  I

5    constructed a method looking at all pair-wise comparisons to

6    be somewhat conservative, although when I was specifically

7    focusing on the comparison among three groups:  the .03

8    percent Zymar, the .03 percent gatifloxacin in EBSS buffer,

9    and the .5 gatifloxacin in EBSS buffer.

10   Q.      So that would be the two formulations on the

11   left-hand side of the table and then the second formulation

12   from the right?

13   A.      Yes.  If you were looking at it across from left to

14   right in the graph, it would be the first, second, and

15   fourth formulations.

16   Q.      Can you tell us a little more about what a pair-wise

17   comparison was?

18   A.      Pair-wise comparison allows me to, once I get global

19   significance, to determine whether the pair, the two groups

20   differ significantly or not.  So I may want to know does

21   Zymar different from .3 gatifloxacin?  Does Zymar different

22   from .5 percent gatifloxacin individually.  So I'm looking

23   at the pairs, two groups at a time.

24   Q.      What did you find?

25   A.      I found that the amount of drug penetration for the

Mayo - direct

1    Zymar group was statistically higher than that of either the

2    .03 gatifloxacin or the .05 gatifloxacin and that there was

3    no difference between the amount of drug penetrated between

4    the .03 and the .05 percent gatifloxacin.

5    Q.    Do you believe that that was some random effect?

6    A.    No.  If you look at the data, you are basically

7    seeing at least three times the amount.  If you look at the

8    number of standard deviations of effect size, you are

9    looking at about six to nine, depending on which standard

10   deviation effect size, which is a huge effect size, and the

11   P values were less than .007, which are highly significant.

12   Q.    Was that the P values for the two pair-wise

13   comparisons of Zymar?

14   A.    Versus the .03 gatifloxacin and the Zymar versus the

15   .05 gatifloxacin.

16   Q.    Did you reach any conclusion from your analysis?

17   A.    Yes.

18   Q.    Can you tell us what that was?

19   A.    That the amount of drug penetrated after 30 minutes

20   of treatment for the .03 percent Zymar is statistically

21   higher than for the .03 percent gatifloxacin in EBSS buffer

22   and .5 percent gatifloxacin in EBSS buffer.

23   Q.    Did someone from the Oblon firm ask you to conduct

24   this analysis?

25   A.    Yes.

Mayo - direct

1   Q.     Prior to finishing your analysis, did anyone tell you

2   what they expected or hoped your analysis would show?

3   A.     No.

4                THE COURT:  That's a wonderful way to stop the

5   day.  It's 4:30.

6                MR. BAXTER:  I only have two questions before

7   passing the witness.

8                THE COURT:  Oh, two more.

9                MR. BAXTER:  Yes.  I'm almost done.

10               THE COURT:  Okay.

11   BY MR. BAXTER:

12   Q.     Prior to finishing --

13               MR. BAXTER:  Oh, actually one more question.

14   BY MR. BAXTER:

15   Q.     Prior to finishing your analysis, did anybody tell

16   you how your analysis should be conducted?

17   A.     No.

18               MR. BAXTER:  I'll pass the witness, your Honor.

19               THE COURT:  All right.  We will start tomorrow

20   at 9:30.  Thank you very much.

21               Oh, is it 9:00 tomorrow?

22               THE DEPUTY CLERK:  Yes.

23               THE COURT:  Okay.  All right.  It says 9:00.

24   Sorry.  9:00.

25               (Trial adjourned at 4:32 p.m.)